# Exhibit 1

FOSHEE & TURNER COURT REPORTERS

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4
5  CASE NUMBER: 2:05 CV698-B
6  WEELAPAN KERN,
7      Plaintiff,
8  vs.
9  STANDARD FIRE INSURANCE COMPANY, et al.,
10     Defendants.
11
12     S T I P U L A T I O N
13     IT IS STIPULATED AND AGREED by
14  and between the parties through their
15  respective counsel, that the deposition of
16  Weelapan Kern may be taken before Anita
17  Thebo, Commissioner, at the offices of
18  Beasley, Allen, Crow, Methvin, Portis &
19  Miles, at 272 Commerce Street, Montgomery,
20  Alabama 36104, on the 1st day of March,
21  2006.
22     DEPOSITION OF WEELAPAN KERN
23        (46463)

**Page 2**

1      IT IS FURTHER STIPULATED AND
2  AGREED that the signature to and the
3  reading of the deposition by the witness
4  is waived, the deposition to have the same
5  force and effect as if full compliance had
6  been had with all laws and rules of Court
7  relating to the taking of depositions.
8      IT IS FURTHER STIPULATED AND
9  AGREED that it shall not be necessary for
10  any objections to be made by counsel to
11  any questions except as to form or leading
12  questions, and that counsel for the
13  parties may make objections and assign
14  grounds at the time of the trial, or at
15  the time said deposition is offered in
16  evidence, or prior thereto.
17      IT IS FURTHER STIPULATED AND
18  AGREED that in accordance with Rule 5(d)
19  of The Alabama Rules of Civil Procedure,
20  as Amended, effective May 15, 1988, I,
21  Anita Thebo, am hereby delivering to Joel
22  Isenberg the original transcript of the
23  oral testimony taken on the 1st day of

**Page 3**

1  March, 2006, along with the exhibits.
2      Please be advised that this is
3  the same and not retained by the Court
4  Reporter, nor filed with the Court.
5      * * * * * * * * * *

**Page 4**

1          I N D E X
2          EXAMINATION
3                  Page
4  By Mr. Isenberg ........................ 6
5  By Mr. Sanspree ...................... 105
6      EXAMINATION CONTINUED
7                  Page
8  By Mr. Isenberg ...................... 107
9      DEFENDANT'S EXHIBITS
10                 Page
11  Exhibit 1 .............................. 33
12  Exhibit 2 .............................. 44
13  Exhibit 3 .............................. 51
14  Exhibit 4 .............................. 58
15  Exhibit 5 .............................. 68
16  Exhibit 6 .............................. 86
17  Exhibit 7 .............................. 88
18  Exhibit 8 .............................. 88
19  Exhibit 9 .............................. 89
20  Exhibit 10 ............................ 90
21  Exhibit 11 ............................ 95
22  Exhibit 12 ............................ 97

1 (Pages 1 to 4)

FOSHEE & TURNER COURT REPORTERS

---

Page 5

```
1         IN THE UNITED STATES DISTRICT COURT
2          FOR THE MIDDLE DISTRICT OF ALABAMA
3                    NORTHERN DIVISION
4
5   CASE NUMBER:  2:05 CV698-B
6   WEELAPAN KERN,
7          Plaintiff,
8       vs.
9   STANDARD FIRE INSURANCE COMPANY, et al.,
10         Defendants.
11
12  BEFORE:
13       Anita Thebo, Commissioner.
14
15  APPEARANCES:
16       CHRISTOPHER SANSPREE, ESQUIRE,
17  of Beasley, Allen, Crow, Methvin, Portis &
18  Miles, 272 Commerce Street, Montgomery,
19  Alabama 36104, appearing on behalf of the
20  Plaintiff.
21       JOEL S. ISENBERG, ESQUIRE, of
22  Smith & Ely, 2000-A SouthBridge Parkway,
23  Suite 405, Birmingham, Alabama 35209,
```

---

Page 6

```
1   appearing on behalf of the Defendant
2   Standard Fire Insurance Company.
3                  * * * * * *
4
5         I, Anita Thebo, a Court Reporter
6   of Prattville, Alabama, acting as
7   Commissioner, certify that on this date,
8   as provided by the Alabama Rules of Civil
9   Procedure and the foregoing stipulation of
10  counsel, there came before me at the
11  offices of Beasley, Allen, Crow, Methvin,
12  Portis & Miles, 272 Commerce Street,
13  Montgomery, Alabama 36104, beginning at
14  10:05 a.m., Weelapan Kern, witness in the
15  above cause, for oral examination,
16  whereupon the following proceedings were
17  had:
18            WEELAPAN KERN,
19  being first duly sworn, was examined and
20  testified as follows:
21            EXAMINATION
22  BY MR. ISENBERG:
23            COURT REPORTER:  Usual
```

---

Page 7

```
1   stipulations?
2            MR. SANSPREE:  Please.
3            MR. ISENBERG:  That's fine.
4       Q.  Mr. Kern, I'm Joel Isenberg, I
5   represent Standard Fire Insurance Company
6   which is the defendant in this case.  And
7   I'm going to ask you some questions today.
8   Have you ever given a deposition before?
9       A.  No.
10      Q.  I'm going to tell you a little
11  bit about how this works.  I will ask you
12  questions, you just give me an answer to
13  the question.  If you don't understand
14  what I've asked you, please stop me and
15  ask me to repeat the question.  Because if
16  you answer one, I will assume that you
17  understood what I asked; is that okay?
18      A.  That's fine.
19      Q.  Also, if you need to take a
20  break at any time, please feel free to do
21  so; this is not any sort of endurance test
22  at all.  And I'm hoping that we're not
23  going to be too terribly long today, but
```

---

Page 8

```
1   if you need a break, please let me know,
2   okay?
3       A.  Okay.
4       Q.  Can you state your full name
5   for the Record, please.
6       A.  Weelapan Kern.
7       Q.  Can you spell that, please.
8       A.  W-E-E-L-A-P-A-N.  Last name is
9   Kern, K-E-R-N.
10      Q.  What is your present address?
11      A.  371 Spenseth Drive.
12      Q.  Spencer?
13      A.  Spenseth.
14      Q.  Can you spell that?
15      A.  S-P-E-N-S-E-T-H.
16      Q.  Drive?
17      A.  Drive, yes.
18      Q.  Is that in Montgomery?
19      A.  Montgomery, Alabama 36109.
20      Q.  And your social security
21  number?
22      A.  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.
23      Q.  And your date of birth?
```

2 (Pages 5 to 8)

FOSHEE & TURNER COURT REPORTERS

Page 9

1    A.    July -- 07-05-65.
2    Q.    July 5?
3    A.    July 5.
4    Q.    1965?
5    A.    Yes.
6    Q.    You said you've never given a
7  deposition before?
8    A.    No.
9    Q.    Have you ever testified in a
10  court hearing?
11    A.    Court hearing --
12    Q.    As a witness or a party?
13    A.    Witness, yes.
14    Q.    Can you tell me when that was?
15    A.    Twenty years ago.
16    Q.    Twenty years?
17    A.    Twenty years ago.
18    Q.    And if you can make sure you
19  can speak up so the court reporter can
20  hear you, it will it make easier for her
21  to transcribe it.
22    A.    Okay.
23    Q.    And were you a witness in the

Page 10

1  case?
2    A.    No.  Just friend of mine, just
3  testifying as a good person.  That's about
4  it.
5    Q.    You testified on his behalf?
6    A.    Yeah.  It was a long time ago.
7  It was a high school case.
8    Q.    I understand.
9  What court was it in?
10    A.    In Indiana, Peru County; Peru,
11  Indiana.
12    Q.    What kind of case was it?
13    A.    Vandalism.
14    Q.    A vandalism case?
15    A.    Vandalism, yeah.
16    Q.    Was the friend of yours being
17  accused of vandalism?
18    A.    Yeah.
19    Q.    How did that turn out?  What
20  was the verdict, do you remember?
21    A.    I don't remember.
22    Q.    Any other times that you've
23  acted as a witness in a case?

Page 11

1    A.    No.  No.
2    Q.    Now, I know you live in
3  Montgomery now.  Where were you born?
4    A.    In Thailand.
5    Q.    Where in Thailand?
6    A.    Korat.
7    Q.    Can you spell that, please.
8    A.    K-O-R-A-T.
9    Q.    When did you move to the
10  United States?
11    A.    1979.
12    Q.    And what brought you to the
13  United States?
14    A.    What brought me here?
15    Q.    Yes.
16    A.    My stepdad.  I was adopted.
17    Q.    And where did you first live
18  in the United States?
19    A.    First lived in United
20  States -- He travel, he's in the service.
21  We've been to Okinawa, Guam, and Indiana.
22    Q.    Indiana?
23    A.    Indiana.

Page 12

1    Q.    And he was in the military
2  service?
3    A.    Right.
4    Q.    When did you first move to
5  Alabama?
6    A.    1998.
7    Q.    What brought you here?
8    A.    What brought me here?  Me and
9  my ex-wife, we move here to open a
10  business.
11    Q.    What was the business?
12    A.    A restaurant, Thai restaurant.
13    Q.    Here in Montgomery?
14    A.    Here in Montgomery.
15    Q.    What's the name of the
16  restaurant?
17    A.    Ala Thai.
18    Q.    Ala Thai?
19    A.    Yes.
20    Q.    A-L-A --
21    A.    A-L-A T-H-A-I.
22    Q.    Where is that restaurant
23  located?

3 (Pages 9 to 12)

FOSHEE & TURNER COURT REPORTERS

Page 13

1     A.    1361 Federal Drive.  And
2  another location, I've got a second one,
3  6663 Atlanta Highway.
4     Q.    Is that also called Ala Thai?
5     A.    It's called Ala Thai East.
6     Q.    And both of those restaurants
7  are still operating?
8     A.    Yes.
9     Q.    Do you own those restaurants?
10    A.    Yes.
11    Q.    Did you say you and your
12 ex-wife opened the first one?
13    A.    The first one.
14    Q.    What is your ex-wife's name?
15    A.    Sompong, S-O-M-P-O-N-G.
16    Q.    Is that --
17    A.    Her first name.
18    Q.    That's her first name?
19         Does she -- Her last name is still
20 Kern?
21    A.    No.  Her last is Chutakanonta.
22 It's spelled C-H-U-T-A-K-A-N-O-N-T-A.
23    Q.    Does she still live in

Page 14

1  Montgomery?
2     A.    No.
3     Q.    Where does she live?
4     A.    Janesville, Wisconsin.
5     Q.    When were the two of you
6  married?
7     A.    Almost sixteen years ago.
8  We're not married, we just common-law.
9     Q.    Okay.  All right.
10    A.    We have three kids together.
11    Q.    Okay.  And did you say -- Did
12 you ever have a formal divorce proceeding
13 then?
14    A.    No.
15    Q.    You no longer live together
16 though?
17    A.    We no longer live together.
18    Q.    And when did you stop living
19 together?
20    A.    Four years ago.
21    Q.    In 2002?
22    A.    2002.
23    Q.    And what are your three

Page 15

1  children's names?
2     A.    With her?
3     Q.    Yes, with her.
4     A.    Kids with her.
5     Q.    What are their names?
6     A.    Melissa, Vanessa, and Donny.
7     Q.    Donny?
8     A.    Donny, D-O-N-N-Y.  And the
9  last name is Kern, all three of them.
10    Q.    Are they all under the age of
11 eighteen.
12    A.    Right.
13    Q.    Do you have any other
14 children?
15    A.    No.
16    Q.    Do they live with your
17 ex-wife?
18    A.    Yes.
19    Q.    So none of them live in
20 Alabama.
21    A.    No.
22         They only come visit me in the
23 summer and holiday, Christmas.

Page 16

1     Q.    When you opened up the
2  restaurants, you opened them up with you
3  ex-wife; is that correct?
4     A.    Ex-wife.
5     Q.    Does she retain any ownership
6  interest?
7     A.    No.  Because she got her own
8  restaurant now.  I gave her the money to
9  open her own business.
10    Q.    In Wisconsin?
11    A.    In Wisconsin.  She got a
12 restaurant up there.
13    Q.    Is Ala Thai a corporation?
14    A.    Yes.
15    Q.    Who are the shareholders of
16 the corporation?
17    A.    Me.
18    Q.    Anyone else?
19    A.    Just her.  But she won't have
20 anything to do with it.
21    Q.    Who are the officers of the
22 corporation?
23    A.    Me.

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

FOSHEE & TURNER COURT REPORTERS

Page 17

1      Q.    Anyone else?
2      A.    Just me.
3      Q.    You may have said this, but
4   when did you first move to Montgomery?
5      A.    1998.
6      Q.    And that was about the same
7   time you opened up the restaurants?
8      A.    No.  We opened up 1999,
9   January 1999.  We just, you know,
10  remodeled and everything by ourself.
11     Q.    Can you tell me a little bit
12  about your educational background?  Did
13  you attend high school?
14     A.    Yes.
15     Q.    Where did you attend high
16  school?
17     A.    In Indiana, called Maconaquah
18  High School.
19     Q.    Can you spell it?
20     A.    No.  Start with M-A-C --
21     Q.    Maconoco?
22     A.    Maconaquah.  It's --
23     Q.    Is it a native American name?

Page 18

1      A.    Yeah, native -- Indian.
2      Q.    And it's in Peru, Indiana?
3      A.    Peru, Indiana.
4      Q.    And when did you graduate?
5      A.    1984.
6      Q.    Did you have any education
7   after high school?
8      A.    Yes.  Yes.  I went to Kokomo
9   College, that's like twenty miles from
10  Peru.
11     Q.    Did you graduate?
12     A.    No.
13     Q.    How many years did you attend
14  Kokomo College?
15     A.    About a year.
16     Q.    Did you take just basic
17  courses, core courses?
18     A.    Yes.
19     Q.    You did not earn a degree from
20  Kokomo College?
21     A.    No.
22     Q.    Did you attend any other
23  educational institutions?

Page 19

1      A.    No.
2      Q.    I understand now that you work
3   at your restaurant, Ala Thai; is that
4   correct?
5      A.    Yes.
6      Q.    Do you have any other present
7   employment?
8      A.    Yes.
9      Q.    Where else do you work?
10     A.    Present?  I'm sorry, back that
11  up.
12     Q.    Do you work anywhere else now?
13     A.    No.  Just two restaurants that
14  I have, that's it.
15     Q.    Prior to owning and operating
16  these restaurants, what did you do prior
17  to that?
18     A.    Everything:  Server,
19  dishwasher, cook.
20     Q.    At other restaurants?
21     A.    Both of them, I go in, you
22  know.
23     Q.    That's now?  Is that — What

Page 20

1   you're saying, that's what you do now?
2      A.    Yes.
3      Q.    Before you opened these
4   restaurants in 1999, what was your job
5   that you held before 1999?
6      A.    I was managing a restaurant up
7   in Chicago.
8      Q.    What was the name of that
9   restaurant?
10     A.    Stop Siam.
11     Q.    Stop Siam?
12     A.    Stop Siam.
13     Q.    And it was in Chicago?
14     A.    Chicago.
15     Q.    How long did you hold that
16  position?
17     A.    Five years.
18     Q.    And why did you leave there?
19     A.    I wanted to start my own --
20  establish my own business.
21     Q.    Prior to that restaurant,
22  where did you work?
23     A.    That restaurant.

5 (Pages 17 to 20)

FOSHEE & TURNER COURT REPORTERS

Page 21

1   Q.   Just not as a manager?
2   A.   Not as a manager.  As a
3   waiter, bartender, driver.
4   Q.   Little bit of everything?
5   A.   Everything.
6   Q.   And how long had you been at
7   the restaurant while you were doing that
8   before you became a manager?
9   A.   About twelve years.
10  Q.   Have you held any employment
11  outside of the food services industry
12  since college?
13  A.   After high school I work in
14  construction, I work as a hotel bellman.
15  And I like the restaurant better.
16  Q.   Okay.  Mr. Kern, do you have
17  any relatives who live in the Montgomery
18  area?
19  A.   Yes.
20  Q.   Who lives here?
21  A.   My mother.
22  Q.   What's her name?
23  A.   Pensri, P-E-N-S-R-I, Kern; my

Page 22

1   sister, Surerat.
2   Q.   Spell that, please.
3   A.   S-U-R-E-R-A-T.
4   Q.   What is her last name?
5   A.   She remarried, I don't know
6   her last name.
7   Q.   Her maiden name was Kern?
8   A.   Maiden name was Kern.
9   Q.   Do you know her husband's
10  first name?
11  A.   No.
12  My nephew, my niece.
13  Q.   Are they over the age of
14  eighteen?
15  A.   Yeah.
16  Q.   What are their names?
17  A.   Jimmy, Roseanna, Abby.  That's
18  it.
19  Q.   And do you know their last
20  names?
21  A.   No.
22  Q.   Any other adult relatives who
23  live in Alabama?

Page 23

1   A.   No.
2   Q.   Prior to living at the
3   Spenseth Drive address, before that, where
4   did you live?
5   A.   1262 Federal Drive.  We rented
6   that house for almost four years.
7   Q.   That's here in Montgomery?
8   A.   Montgomery.
9   Q.   Do you remember the name of
10  your landlord?
11  A.   No, I don't.  I forgot.
12  Q.   And was that the first home
13  you lived in in Montgomery?
14  A.   Yeah.
15  Q.   When did you move into the
16  Spenseth Drive house?
17  A.   Spenseth Drive house, in 2000-
18  -- early 2002 I believe.
19  Q.   And do you own that house?
20  A.   Yes.  Me and my mother.
21  Q.   You and your mother?
22  A.   Uh-huh (positive response).
23  Q.   Are you the only two people

Page 24

1   who are all the time living in that home?
2   A.   Yes.
3   Q.   Mr. Kern, we are here because
4   you have filed a lawsuit against Standard
5   Fire Insurance Company with regard to
6   automobile insurance; is that correct?
7   A.   Correct.
8   Q.   When did you first obtain
9   automobile insurance with Standard Fire?
10  A.   When I bought the Montero.
11  Q.   When was that?
12  A.   In -- A year before -- I'm not
13  sure.  Two years ago.  Two or three years
14  ago, two and a half years ago.
15  Q.   You said it was when you
16  bought the Montero.  Is that the
17  Mitsubishi Montero --
18  A.   Right.
19  Q.   -- which was your car?
20  A.   Uh-huh (positive response).
21  Q.   Who was your insurance agent
22  at the time?
23  A.   At the time, Colonial.

6 (Pages 21 to 24)

FOSHEE & TURNER COURT REPORTERS

Page 25

1    Q.   Colonial Insurance Agency?
2    A.   Yes.
3    Q.   Here in Montgomery?
4    A.   Yes.
5    Q.   Did you have a particular
6  insurance agent that you dealt with at
7  Colonial?
8    A.   No.  Because they've been in
9  and out.  I can't keep track.
10    Q.   Can you think of any
11 particular person at Colonial with whom
12 you dealt?
13    A.   The guy who used to work
14 there, I used to deal with him, but he's
15 no longer there.
16    Q.   Were there any customer
17 service representatives or any assistants
18 that you remember their names?
19    A.   No.
20    Q.   How did you --
21    A.   Most of the time I called.
22    Q.   How did you come to get your
23 insurance through Colonial?

Page 26

1    A.   Through Colonial.  I used to
2  have them for my restaurant, we changed
3  restaurants.
4    Q.   I didn't understand that.
5    A.   I got the insurance policy
6  from them with the restaurant, for the —
7    Q.   I see.  So you had worked with
8  Colonial before?
9    A.   Before, yes.
10    Q.   On insurance for your
11 restaurant?
12    A.   On insurance, right.
13    Q.   Did you have any other
14 policies through Colonial other than your
15 restaurant insurance?
16    A.   Restaurant and my automobile.
17    Q.   Who did you have homeowner's
18 with?
19    A.   Homeowner, I believe Travelers
20 too.
21    Q.   But that was through Colonial?
22    A.   I believe so.
23    Q.   Did you use any other

Page 27

1  insurance agencies other than Colonial to
2  obtain insurance?
3    A.   No.  No.
4    My mother use different insurance.
5    MR. SANSPREE:  Just answer what
6  he asks you.  Don't volunteer your mom's
7  stuff.
8    Q.   Did somebody refer you to
9  Colonial Insurance?
10    A.   Yes.  Friend of mine, he own a
11 business and talked to him, and he refer
12 us to Colonial.
13    Q.   What is your friend's name?
14    A.   Tyler.
15    Q.   Tyler?
16    A.   Tyler.
17    Q.   Do you know his last name?
18    A.   No.
19    Q.   What business does he own?
20    A.   El Rey.
21    Q.   El Rey?
22    A.   El Rey in Old Cloverdale.
23    Q.   Is it a restaurant?

Page 28

1    A.   Restaurant.
2    Q.   Mr. Kern, can you tell me the
3  first contact you remember having with
4  Colonial Insurance about your automobile
5  policies?
6    A.   First contact, we call from
7  the car dealer when I bought the car.
8    Q.   You called Colonial from the
9  car dealership; is that what you said?
10    A.   Yeah.  My salesman called for
11 me.
12    Q.   Okay.  When you purchased the
13 car?
14    A.   Purchased the car.  And then
15 called and talked to her; I don't know
16 what's her name.
17    Q.   Do you remember the name of
18 the salesperson?
19    A.   Donnie, Donnie Hall.
20    Q.   Hall?
21    A.   Hall.
22    Q.   And was it -- What was the
23 dealership's name?

7 (Pages 25 to 28)

FOSHEE & TURNER COURT REPORTERS

Page 29

1   A.   Reinhardt Toyota.
2   Q.   Was the vehicle new or used?
3   A.   Used.
4   Q.   Were you present when that
5   call was made?
6   A.   Yes.
7   Q.   What did he call Colonial for?
8   A.   To have insurance.
9   Q.   On the Montero?
10  A.   On the Montero.  I told them I
11  have insurance with the restaurant with
12  Colonial when I bought the car.
13  Q.   Had you had previous
14  automobile insurance?
15  A.   Yes.
16  Q.   With what company?
17  A.   In Indiana, State Farm,
18  Prudential, that was it.
19  Q.   Had you used an insurance
20  agency in Indiana for those policies?
21  A.   No.
22  Because I moved to Chicago, then
23  everything was in my ex-wife's name.

Page 30

1   Q.   At the time you purchased the
2   Montero, did you own a car?
3   A.   Yes.
4   Q.   Did you have insurance on that
5   car?
6   A.   Owned the Montero, yes.
7   Q.   Before you owned the Montero.
8   A.   No.  I don't own anything.
9   Q.   Let me make sure you
10  understand my question.
11  You purchased the Montero from
12  Reinhardt Toyota; is that correct?
13  A.   Uh-huh (positive response).
14  Q.   Then the salesperson called
15  Colonial Insurance Agency to see about
16  getting insurance on the Montero for you;
17  is that correct?
18  A.   Right.
19  Q.   What car did you own before
20  the Montero?
21  A.   None.
22  Q.   You did not own a car before?
23  A.   I did not own a car.

Page 31

1   Q.   Did you drive a car before the
2   Montero?
3   A.   Yeah.  My ex-wife's car.
4   Q.   Did you have insurance on that
5   car?
6   A.   She had.
7   Q.   She had insurance?
8   A.   She had insurance.
9   Q.   With what company?
10  A.   Geico.
11  Here in Montgomery.
12  Q.   And do you know if she went
13  through the Colonial Insurance Agency for
14  that policy?
15  A.   No.
16  The reason I bought a Montero,
17  because we no longer together, she took
18  all the cars.  I needed a vehicle.
19  Q.   I understand.
20  I understand from you that the
21  salesperson Donnie at Reinhardt called
22  Colonial to obtain automobile insurance
23  for you; is that correct?

Page 32

1   A.   And talk to the lady from
2   Colonial.
3   Q.   Did you speak to her?
4   A.   Yes, I did.
5   Q.   What did you tell her?
6   Did you tell her you needed
7   insurance?
8   A.   I needed insurance on the
9   Montero because I'm purchasing the
10  Montero.
11  Q.   And did they place that
12  insurance with Standard Fire?
13  A.   I believe so.
14  Q.   Did you ever go into the
15  Colonial Insurance office when you
16  first --
17  A.   Maybe one or two times, that's
18  about it.
19  Q.   At this time when you
20  purchased the insurance for the first time
21  when you bought the Montero, did you
22  personally go into the insurance agency or
23  was it all done over the phone?

8 (Pages 29 to 32)

FOSHEE & TURNER COURT REPORTERS

Page 33

1    A.   Done by the phone.
2         (Whereupon, Defendant's
3         Exhibit No. 1 was
4         marked for
5         identification.)
6    Q.   Mr. Kern, I'm going to show
7    you what I've marked as Defendant's
8    Exhibit 1. Can you tell me if you've ever
9    seen that before?
10   A.   Not familiar, no.
11   I've seen that before, I think.
12   Q.   You have seen this before?
13   A.   Yes.
14   Q.   Do you know what this is?
15   A.   Automobile liability insurance
16   identification card.
17   Q.   Is this the card that you
18   received from Standard Fire evidencing the
19   insurance on the Montero that we've just
20   been talking about?
21   A.   Yes.
22   Q.   Do you recall receiving a copy
23   of your policy from Standard Fire?

Page 34

1    A.   Yes.
2    Q.   And if you look at this card
3    for me, it shows that the issuing company
4    is the Standard Fire Insurance Company; is
5    that correct?
6    A.   Correct.
7    Q.   And it shows a policy number,
8    correct?
9    A.   Correct.
10   Q.   It shows an effective date of
11   what?
12   A.   11/11/03.
13   Q.   And an expiration date of
14   what?
15   A.   11/11/04.
16   Q.   And it shows that you were the
17   insured; is that correct?
18   A.   Yes.
19   Q.   And is that your correct
20   address?
21   A.   Correct.
22   Q.   When you first purchased this
23   policy, did you speak to anybody directly

Page 35

1    at Standard Fire or was all your
2    communication through the phone?
3    A.   Through the phone.
4    Communication through the phone.
5    Q.   Through the phone. But was it
6    with Colonial?
7    A.   Right.
8    Q.   You didn't speak to anybody at
9    Standard Fire Insurance Company about this
10   policy at that time; is that correct?
11   A.   Say that again.
12   Q.   Sure. Your communication when
13   you obtained this coverage was with the
14   Colonial Insurance Agency; is that
15   correct?
16   A.   Correct.
17   Q.   And Colonial Insurance Agency
18   was your insurance agent?
19   A.   Right.
20   Q.   It's my understanding that at
21   this time you did not speak directly to
22   anybody at the insurance company?
23   A.   I'm speaking to Colonial, and

Page 36

1    I'm sure --
2    Q.   But you did not speak -- You
3    personally did not speak directly to
4    anybody at the Standard Fire Insurance
5    Company?
6    A.   Aren't you guys the same
7    company? They represent you, they're your
8    agent?
9    I speak to Colonial --
10   Q.   You spoke only to Colonial; is
11   that correct?
12   A.   Yes.
13   Q.   When you -- You said you went
14   to Colonial's offices on one or two
15   occasions; is that correct?
16   A.   One or two, yeah, if I recall.
17   Q.   When do you recall the first
18   time you went into Colonial's offices?
19   A.   When me and my common-law wife
20   went over there to get the restaurant
21   insurance policy. That's a long time ago,
22   five or six years ago.
23   Q.   Do you know what company that

9 (Pages 33 to 36)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

FOSHEE & TURNER COURT REPORTERS

Page 37

1 policy is with?
2    A.  Hartford.  Hartford Insurance.
3    Q.  Okay.  And you obtained that
4 insurance through Colonial Insurance
5 Company as well, correct?
6    A.  Right.  And they change
7 policies over the years.  They no longer
8 Hartford.  I don't know what's going on.
9    Q.  But that was through, you
10 believe, the Hartford?
11    A.  Uh-huh (positive response).
12 Right.
13    Q.  Is that correct?
14    A.  I believe the Hartford?
15    Q.  Do you believe -- Is it your
16 understanding that that insurance policy
17 was issued by a company called Hartford on
18 the restaurant?
19    A.  Right.
20    Q.  At the time you went into
21 Colonial Insurance, however many years ago
22 it was with your ex-wife for the
23 restaurant insurance, do you recall seeing

Page 38

1 any signs for -- on the door for Travelers
2 Insurance or Standard Fire Insurance?
3    A.  We didn't pay attention to it;
4 too many doors, too many offices.
5    Q.  Let me ask you this:  What
6 does the sign say on the outside of the
7 building?  Does it say Colonial Insurance
8 Agency?
9    A.  Yeah.  On the top.  But the
10 whole building represent a lot of
11 different companies.
12    Q.  All right.  Then on the door
13 of the building, was it Colonial Insurance
14 Agency?
15    A.  Right.  Say Colonial Agency,
16 something like that.  That's a long time
17 ago, I don't --
18    Q.  I understand.  I'm only asking
19 you what you can recall.
20    When was the next time that you can
21 recall visiting in person the Colonial
22 Insurance Agency?
23    A.  When me and my ex-wife was

Page 39

1 together, that's the last time we went
2 over there; twice, that's about it.
3    Q.  How long has it been since you
4 were not together?
5    A.  Four years.
6    Q.  So prior to when you purchased
7 this insurance policy that's shown on
8 Defendant's Exhibit 1; is this correct?
9 Before you purchased the insurance on the
10 Montero; is that correct?
11    A.  Say it again.
12    Q.  Sure.  I understand you to say
13 that the last time you went personally to
14 the Colonial Insurance Agency was while
15 you and your ex-wife were still together;
16 is that correct?
17    A.  Right.
18    Q.  And the two of you have been
19 separated for four years?
20    A.  Four years.
21    Q.  Is that correct?
22    A.  Yes.
23    Q.  So that would have been before

Page 40

1 you purchased the Montero?
2    A.  Correct.
3    Q.  And that was before you
4 obtained this insurance from Standard Fire
5 on the Montero; is that correct?
6    You never went to the Colonial
7 Insurance Agency in person to talk about
8 this Standard Fire policy; is that
9 correct?
10    A.  No.
11    Q.  Is that correct?
12    A.  Yes.  I never --
13    Q.  I want to make sure we're
14 communicating.  I think we are, I just
15 want to make sure the Record is clear.
16    A.  Yes.  I communicate with
17 Colonial by the phone.  I never go back
18 in.
19    Q.  That's what -- I thought we
20 were both saying that, I wanted to make
21 sure for the Record though.
22    Have you made any claims on an
23 insurance policy other than the one we're

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

FOSHEE & TURNER COURT REPORTERS

Page 41

1   here about today for an automobile?
2       A.   Automobile.  Well, I got – My
3   house got broke into, and I believe it's
4   Travelers is my homeowners policy too.
5       Q.   Yes, sir.
6       A.   Yes.  And they stole all my
7   stuff in my house.
8       Q.   When was that?
9       A.   That's last year.
10      Q.   Did you make a claim on your
11  homeowner's policy?
12      A.   I never did.
13      Q.   You never made a claim on
14  your --
15      A.   I never did a claim.  I've
16  been working.  But they caught the person
17  who broke into my house and stole my
18  stuff.
19      Q.   Did you notify Colonial
20  Insurance Agency?
21      A.   I did.  But I never get in
22  touch with them, never get back with them.
23      Q.   Did you tell them about the

Page 42

1   claim or you just called and couldn't get
2   them and never called back?
3       A.   I called them and they came
4   over to the house, actually one person and
5   give me the claim form.  And I lost it and
6   I lost the number.  I never get back
7   with --
8       Q.   You just didn't follow-up?
9       A.   I didn't follow-up.  I just
10  worried about this thing.
11      Q.   Other than that, have you made
12  any claims on an automobile insurance
13  policy?
14      A.   No.  No.
15      Q.   Now, did you make any claims
16  on your Standard Fire Insurance policy
17  prior to November 11, 2004?
18      A.   Say that again.
19      Q.   Sure.  This insurance policy
20  that we've talked about, which is
21  evidenced by Defendant's Exhibit 1 here
22  that we're talking about, shows an
23  expiration date of November 11, 2004; is

Page 43

1   that correct?
2       A.   Correct.
3       Q.   Did you ever make a claim for
4   coverage under this policy before November
5   11, 2004?
6       A.   Never.
7       Q.   And you understand then that
8   this policy that we're talking about, the
9   Standard Fire policy, nonrenewed for
10  failure to pay premiums, do you understand
11  that, on November 11, 2004?
12      A.   Nonrenewed?
13      Q.   Yes, sir.  That it did not
14  renew after November 11, 2004.
15      A.   I don't recall that.  I just
16  deal with Colonial.
17      Q.   Yes, sir, I understand you
18  deal with Colonial.  But you acknowledged
19  here that the policy expired.
20      A.   Expired 11/11/2004, yeah, I
21  see that.
22              (Whereupon, Defendant's
23              Exhibit No. 2 was

Page 44

1               marked for
2               identification.)
3       Q.   Mr. Kern, I'm going to show
4   you a document that your lawyers produced
5   to me that I've marked as Defendant's
6   Exhibit 2.
7       Do you recognize that document?
8       A.   Yes, I do.
9       Q.   Did you receive a copy of that
10  document in the mail?
11      A.   In the mail, yes.
12      Q.   And in the top right-hand
13  corner of it it says date of notice, can
14  you read that for me, please?
15      A.   Date of notice, yes.
16  12/22/04.
17      Q.   And it says a due date in the
18  box is what date?
19      A.   January 11, 2005.
20      Q.   And then I'm going to read
21  this and you tell me if I've read this
22  correctly, by the asterisks in all caps it
23  says:  Important notice, offer to

11 (Pages 41 to 44)

FOSHEE & TURNER COURT REPORTERS

Page 45

1   reinstate. It says: Your policy expired
2   on 11/11/04 at the time stated in your
3   policy because we did not receive the
4   minimum payment required to continue your
5   coverage.
6       Did I read that correctly?
7       A.   Yes.
8       Q.   And then it says: However, we
9   will be happy to reinstate this policy
10  without interruption.
11      Did I read that correctly?
12      A.   Yes.
13      Q.   To reinstate your policy, we
14  must receive at least the, quote, minimum
15  amount due, end quote, shown above by
16  1/11/05.
17      Did I read that correctly?
18      A.   Yes.
19      Q.   Did you read this offer to
20  reinstate, this document, at the time you
21  received it?
22      A.   Yes.
23      Q.   And, Mr. Kern, you'll

Page 46

1   acknowledge for me that it informs you
2   here in this first paragraph that your
3   policy expired on November 11, 2004?
4       A.   Yes.
5       Q.   And that it offers to
6   reinstate the policy but that the payment
7   must be received by January 11, 2005; is
8   that what it says?
9       A.   Yes.
10      I called Colonial and they said to
11  send money and I sent them the check.
12      Q.   Okay. Tell me --
13      A.   Without interruption and my
14  policy will be reinstated.
15      Q.   When did you call Colonial?
16      A.   Right after I received this
17  notice. And I called them, I don't know
18  who I spoke to, they just say send the
19  money in and they will be reinstated.
20      Q.   The date of the notice is
21  December 22, 2004; is that correct?
22      A.   December 22, 2004, correct.
23      Q.   And do you recall when you

Page 47

1   received the notice? Was it a couple of
2   days after that?
3       A.   I don't recall. I was busy
4   working. But once a week I go through the
5   mail.
6       Q.   So at least within a week
7   after December 22, 2004, is when you would
8   have received this?
9       A.   I don't recall. I'm not sure.
10  I can't answer that.
11      Q.   Do you recall when you spoke
12  to the people at Colonial Insurance about
13  this?
14      A.   I give them a call, I don't
15  know when. They said just send the
16  premium. I send in eight hundred dollars.
17      Q.   Yes, sir. Did you speak to
18  them before January 11?
19      A.   January 11.
20      Q.   Which is the due date.
21      A.   I believe so.
22      Q.   So before the due date had
23  run, you called them -- somebody at

Page 48

1   Colonial?
2       A.   Somebody. But I was busy at
3   the time, the restaurant busy, and I
4   just -- a lot of things.
5       Q.   Yes, sir. And you just didn't
6   follow-up on this one?
7       A.   Didn't follow-up, no. No.
8       Q.   But -- So you spoke to the
9   people at Colonial, the people at Colonial
10  said pursuant to this offer to reinstate
11  to send in the money; is that correct?
12      A.   Yes.
13      Q.   Did -- But a period of time
14  went by after you spoke to the people at
15  Colonial before you sent the money in; is
16  that correct?
17      A.   Say it again.
18      Q.   Yes, sir. But you did not
19  immediately send the money when you spoke
20  to the people at Colonial, did you?
21      A.   No.
22      Q.   Do you know how long went by
23  before you sent it? Was it a couple of

12 (Pages 45 to 48)

FOSHEE & TURNER COURT REPORTERS

Page 49

1  weeks or so?
2       A.  Probably.
3       Q.  So it's my understanding then
4  that -- let me back up and ask this:  Did
5  you have more than one conversation with
6  anybody at Colonial about the nonrenewal
7  or reinstatement of this policy?
8       A.  Just one conversation, I
9  called them.
10      Q.  After you received this
11  notice?
12      A.  I don't know who I speak to,
13  but they say send the money, the policy
14  will be reinstated; I send in the money.
15      Q.  Was it a man or a woman you
16  spoke to?
17      A.  Woman I believe.
18      Q.  Did you give her a copy of
19  this offer to reinstate?
20      A.  No.  I spoke over the phone, I
21  didn't give no copy.
22      Q.  Did you tell whoever you spoke
23  to the dates on this policy, that it had

Page 50

1  expired on --
2       A.  They just told me --
3       Q.  Let me finish my question if I
4  can.
5       Did you tell them about the November
6  11, 2004, expiration date?
7       A.  Yes.
8       Q.  Did you also explain the
9  January 11, 2005, due date?
10      A.  Yes.
11      Q.  And they said -- Did the woman
12  tell you to send it in by the due date?
13      A.  Just send eight hundred
14  dollars in and my policy will be
15  reinstated.  I send my money in.
16      Q.  And this shows a minimum
17  amount --
18      A.  Minimum is four hundred
19  dollars.  I send eight hundred dollars.
20      Q.  Yes, sir.  The minimum amount
21  due of four hundred and forty-five
22  forty-nine; is that correct?
23      A.  Correct.

Page 51

1       Q.  With a due date of January 11,
2  2005; is that correct?
3       A.  That's correct.
4       Q.  There's a notation on there,
5  handwritten notation, on Defendant's
6  Exhibit 2.  Can you read that for me,
7  please?
8       A.  Paid January 27, 2005.
9       Q.  What else does it say?
10      A.  Check number 2868.
11      Q.  Is that your handwriting?
12      A.  That's my handwriting.
13           (Whereupon, Defendant's
14           Exhibit No. 3 was
15           marked for
16           identification.)
17      Q.  I'm going to show you what
18  I've marked as Defendant's Exhibit 3 --
19      A.  That's my handwriting too.
20      Q.  Yes, sir.  Is this a copy of
21  the check that you sent?
22      A.  Yes.
23      Q.  And it's dated what date?

Page 52

1       A.  January 27, 2005.
2       Q.  And it's written off an
3  account of Ala Thai, Inc., is that the
4  business we were talking about?
5       A.  Yes.  I use the vehicle for
6  the business.
7       Q.  Is the vehicle owned by the
8  business?
9       A.  Uh-huh (positive response).
10      Q.  Is the title held in the
11  business's name?
12      A.  In my name.  But I'm --
13      Q.  In your personal name?
14      A.  In my name, yes.
15      That's the only vehicle I use for
16  the business.
17      Q.  So the business does not own
18  the vehicle then?
19      A.  Yeah.  Business own vehicle
20  because I am -- own my own business.
21      Q.  Yes, sir, I understand.
22      A.  The vehicle for the business,
23  yes.

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

FOSHEE & TURNER COURT REPORTERS

Page 53

1    Q.    The title for the vehicle
2  though, does it show Weelapan Kern or
3  Alabama Thai, Inc.?
4    A.    It's Ala Thai, Inc.; it's not
5  Alabama Thai.
6    Q.    I'm sorry.
7    A.    It's Ala Thai.
8    Q.    Ala Thai, Inc.  I'm from out
9  of town.
10   A.    That's okay.
11   Q.    Does the title for the
12 vehicle, when you purchased the vehicle
13   A.    Yes.
14   Q.    -- does it say Weelapan Kern
15 for owner or does it say Ala Thai, Inc.?
16   A.    It says Weelapan Kern.
17   Q.    Where did you send this check
18 that's marked as Defendant's Exhibit 3?
19   A.    At the road they sent in the
20 mail.
21   Q.    Do you know what address you
22 sent it to?
23   A.    I guess this over here

Page 54

1  (indicating).
2    Q.    You're pointing to --
3    A.    Travelers, Colonial Insurance
4  Agency.  But they got --
5    Q.    Let me ask you this, this may
6  be a better question:  Did an envelope
7  come with Defendant's Exhibit 2 --
8    A.    Right.
9    Q.    -- with this offer to
10 reinstate?
11   A.    The envelope, yeah.
12   Q.    Was it a self-addressed
13 stamped envelope?
14   A.    No.  It's self-addressed, but
15 no stamp.  I put my own stamp in it.
16   Q.    Yes, sir.
17   But it had a preprinted address to
18 send to Travelers?
19   A.    Yes.  Yes.
20   Q.    Did you return this offer to
21 reinstate with your check?
22   A.    Yes.
23   Q.    So a copy of Defendant's

Page 55

1  Exhibit 2 went along with Defendant's
2  Exhibit 3; is that correct?
3    A.    Yes.
4    Q.    So you wrote this eight
5  hundred dollar check, just so we're clear,
6  in response to this offer to reinstate; is
7  that correct?
8    A.    Correct.
9    Q.    And you wrote the check on
10 January 27, 2005?
11   A.    Yes.  And they deposit the
12 check.
13   Q.    I'm sorry?
14   A.    They deposit the check.
15   Q.    Yes, sir.
16   MR. SANSPREE:  Can we take a
17 break, Joel?
18   MR. ISENBERG:  Absolutely.
19   (Recess was taken.)
20   Q.    Mr. Kern, you ready?
21   A.    Yes.
22   Q.    I understand that you sent
23 this check in, this eight hundred dollar

Page 56

1  check in, on January 27, correct?
2    A.    Correct.
3    Q.    And when was the automobile
4  accident that forms the basis of your
5  claim in this case?
6    A.    The accident happened on
7  February 5, 2005.
8    Q.    Which is a Saturday?
9    A.    I believe, yes, a Saturday.
10   Q.    Between the time you mailed
11 this check and the time of the accident,
12 February 5, did you speak to anybody at
13 either Colonial Insurance or Standard
14 Fire?
15   A.    Yes.  I received this letter,
16 I called Colonial.
17   Q.    No, sir.  We've talked about
18 that.
19   My question is after -- You received
20 this December 22, '04.
21   A.    I've been busy, must have been
22 a couple of weeks in there, you know.  I
23 called them up, they said just send eight

14 (Pages 53 to 56)

FOSHEE & TURNER COURT REPORTERS

Page 57

1  hundred dollars, my policy will be
2  reinstated.
3      Q.   Yes, sir.  My question was
4  after January 27 when you sent the check,
5  after January 27.
6      A.   After, okay.
7      Q.   But before the automobile
8  accident on February 5, so between January
9  27 and February 5, did you speak to
10  anybody at Colonial Insurance?
11     A.   I spoke to them before January
12  27.
13     Q.   Yes, sir.
14     A.   When I send them the money.
15  They told me go ahead, send in eight
16  hundred dollars, and I send in eight
17  hundred dollars and my policy will be
18  reinstated.
19     Q.   Yes, sir.  That's the
20  testimony we've already talked about; is
21  that correct?
22     A.   Yes.
23     Q.   Okay.  I understand that.  Did

Page 58

1  you have any other conversation with
2  Colonial?
3      A.   No.  No.
4      Q.   Did you have any conversation
5  with anybody at Standard Fire Insurance
6  Company?
7      A.   No.
8              (Whereupon, Defendant's
9              Exhibit No. 4 was
10             marked for
11             identification.)
12     Q.   Mr. Kern, I'm showing you what
13  I've marked as Defendant's Exhibit 4,
14  which your lawyer has produced to us; it's
15  made up of documents Bates labeled Kern 27
16  to Kern 30.
17  Can you identify that document?
18         MR. SANSPREE:  He's reading
19  these, Bates numbers (indicating).
20     Q.   It's just a multiple-page
21  exhibit.  I just want to make sure we're
22  talking about the same thing.
23     A.   This accident report.

Page 59

1      Q.   Is this the accident report
2  for the accident that we're talking about
3  on February 5?
4      A.   Yes.
5      Q.   And you were involved in the
6  accident as unit one, Weelapan T. Kern; is
7  that correct?
8      A.   Yes.
9      Q.   And then there were two other
10  people involved.  It was Lisa Ann Jackson
11  and Annette Threatt, T-H-R-E-A-T-T; is
12  that correct?
13     A.   Yes.
14     Q.   And as I said, this is
15  something that you and your lawyers have
16  produced to us.  It explains generally
17  under the -- as an accident report, what
18  happened at the accident.
19         Does it accurately reflect what
20  occurred on the date of the accident?
21     A.   Explain that to me again.
22     Q.   Yes, sir.
23         Does this accurately reflect the

Page 60

1  people who were involved in the accident?
2      A.   Reflect, yes.
3      Q.   And then it has information on
4  it, including on page thirty, the back
5  page, a description of what happened at
6  the accident; is this correct?
7      A.   Correct.
8      Q.   Can you explain to me what
9  happened?
10     A.   Well, we were moving and all
11  of a sudden they just stopped.
12     Q.   Were you following -- Were you
13  the last car?
14     A.   Yeah.
15     Q.   Were you driving?
16     A.   Yes, I was driving.
17     Q.   You were driving your Montero?
18     A.   Yes.
19         It was stop and go, stop and go, and
20  stop.
21     Q.   Did you come in contact with
22  another car?
23     A.   Yeah.

15 (Pages 57 to 60)

FOSHEE & TURNER COURT REPORTERS

Page 61

1    Q.    And did that car then hit the
2 car in front of it?
3    A.    Hit the car in front of her.
4    Q.    Did you contact anybody at
5 Colonial Insurance on the day of the
6 accident?
7    A.    I called.  They didn't know
8 the accident, and I thought my policy
9 would be covered.
10    Q.    When did you call Colonial?
11    A.    On February 7.
12    Q.    Did you call Colonial?
13    A.    Monday, yes, call Colonial.
14    Q.    Do you know who you spoke
15 with?
16    A.    No.
17    Q.    What did you tell the person
18 at Colonial?
19    A.    I told them I had an accident
20 on Saturday.  And they said, well, I sent
21 in my money, it should be okay.
22    Q.    That's what you said?
23    A.    No.  That's what I thought to

Page 62

1 myself, I (unintelligible).  They say a
2 lot of things.
3    Q.    So you told them you had an
4 accident?
5    A.    Yes, I had an accident.
6    Q.    What did the person you spoke
7 with say to you?
8    A.    Just let the other person
9 claim theirs.
10    Q.    I'm sorry, I didn't
11 understand.
12    A.    I don't know.  I don't how to
13 explain it.
14    Q.    Can you tell me the words that
15 that person used when you spoke with him
16 or her?
17    A.    Her.
18    Q.    Her.  What did she say to you
19 when you told her you had an accident on
20 Saturday?
21    A.    I told her I was involved in
22 an accident.  She say, oh, the policy will
23 be okay.  Everything take care of it.

Page 63

1    Q.    She said the policy would be
2 okay?
3    A.    Uh-huh (positive response).
4    Q.    Those were her words?
5    A.    Yes.
6    Q.    And she said the policy would
7 take care of it?
8    A.    Policy -- I'm not sure.  It's
9 been a long time.
10    Q.    So you're not exactly sure
11 what she said?
12    A.    Yeah, I'm not exactly what she
13 say.
14    Q.    So you told her you had an
15 accident?
16    A.    I had an accident.
17    Q.    And that was the person at
18 Colonial?
19    A.    Yes.
20    Q.    Did you speak with anybody at
21 that time at the insurance company, at
22 Standard Fire, or did you just speak to
23 Colonial?

Page 64

1    A.    I speak to Colonial.
2    Q.    What was the next
3 communication you had with anybody about
4 your insurance policy?
5    A.    Next communication, I believe
6 I talked to this lady, the one that we got
7 in an accident with.  That's about it.
8    Q.    You spoke with Lisa Jackson?
9    A.    Lisa Jackson, yes.
10    Q.    Did you speak to her about
11 insurance or about the facts of the
12 accident?
13    A.    About the insurance.
14    Q.    What did you tell her about
15 the insurance?
16    A.    She told me that her car is a
17 total loss and trying to contact with my
18 insurance company, there's no response.
19    Q.    I'm sorry.  She said there was
20 no response or you said there was no
21 response?
22    A.    She contact my insurance
23 company, and she said the insurance

16 (Pages 61 to 64)

FOSHEE & TURNER COURT REPORTERS

Page 65

1 company wouldn't pay for it. And I said,
2 wow.
3     Q.   Did she say why the insurance
4 company said that?
5     A.  I talked to her and told her,
6 you know -- she got all her information
7 that we exchanged on that day, and she
8 contacted the insurance company, and her
9 insurance company say her car's totaled,
10 total loss. And then try and contact the
11 insurance company, my own, and it's no
12 response trying to get -- it's no
13 response, nobody call, I try to call this
14 number, Traveler's number.
15     Q.   She did or you did?
16     A.  I did. I did.
17     Q.   And which number did you call?
18     A.  And I received a -- 1-800
19 number I believe. It's not in this one.
20     Q.   Did you speak with anybody at
21 that 800 number?
22     A.  Nobody answered it.
23     Q.   So you didn't speak with

Page 66

1 anybody at the insurance company?
2     A.  I --
3     Q.   You spoke with somebody at
4 Colonial?
5     A.  Colonial, yeah, that's it.
6     Q.   And that's the conversation
7 we've already talked about; is that
8 correct?
9     You've already told me about that
10 conversation with Colonial, or did you
11 have another conversation with Colonial
12 about your insurance?
13     A.  That's the only conversation I
14 believe. That's the only conversation
15 with Colonial.
16     Q.   That was the only conversation
17 with Colonial, is that correct, that we've
18 already talked about?
19     A.  You confused me. I'm sorry.
20     Q.   I certainly don't want you to
21 be confused.
22     My understanding from you, and
23 correct me if I'm wrong, is that on Monday

Page 67

1 after the accident --
2     A.  Yes.
3     Q.   -- you called Colonial
4 Insurance?
5     A.  Yes.
6     Q.   And we've already talked about
7 what you said in that conversation?
8     A.  Yes. The policy, would be
9 coverage.
10     Q.   Well, you -- I think you
11 testified that you told them there was an
12 accident; is that correct?
13     A.  Right.
14     Q.   And then I think you testified
15 to me you couldn't remember exactly what
16 the woman said back to you?
17     A.  Right.
18     Q.   Did you have any other
19 conversations with Colonial Insurance
20 after that conversation?
21     A.  No. I spoke to the lady here
22 (indicating), Lisa Jackson. And she told
23 me what happened.

Page 68

1     Q.   Did you speak with anybody --
2 and I think you've already told me the
3 answer --
4     A.  I didn't speak with anybody
5 else.
6     Q.   Good. That makes it easier
7 then.
8         (Whereupon, Defendant's
9         Exhibit No. 5 was
10         marked for
11         identification.)
12     Q.   Mr. Kern, I'm going to show
13 you what I marked as Defendant's Exhibit
14 5.
15     Can you tell me if you've seen that
16 document before?
17     A.  Yes.
18     Q.   Is this a letter that you
19 received from Colonial Insurance dated
20 February 10?
21     A.  February 10, yes.
22     Q.   And it's from Chris Setzer,
23 personal account manager. Do you know who

17 (Pages 65 to 68)

FOSHEE & TURNER COURT REPORTERS

Page 69

1  Chris Setzer is?
2      A.  Yes.  I heard his name, yes.
3      Q.  Who have you heard his name
4  from?
5      A.  From my attorney.
6      Q.  And I don't want to know
7  anything --
8      A.  Sorry.
9      Q.  That's okay.  And obviously
10  Mr. Sanspree will tell you this, I don't
11  want to know anything that you have spoken
12  with your attorneys about.  I don't want
13  to know the substance of that.
14      Do you have any independent
15  knowledge of who Chris Setzer is?  Did you
16  speak with Mr. Setzer or Ms. Setzer?
17      A.  No, I didn't speak to him.
18      Q.  Is Chris Setzer a man?
19      A.  A man.
20      Q.  And in this letter -- Will you
21  read for me, please, out loud if you can,
22  the second paragraph starting "I have."
23      A.  I have enclosed a quote for

Page 70

1  replacement coverage with another company.
2  Travelers will not reinstate your policy.
3  This quote is for the same coverage amount
4  you have with Travelers, including the
5  same deductible, and it is for six months.
6      Q.  And then the next paragraph,
7  please.
8      A.  Please let me know what you
9  wish to do as soon as possible.  Please
10  understand you are without any automobile
11  coverage at this time.
12      Q.  And you received this letter,
13  didn't you, from Colonial Insurance?
14      A.  I received this letter.
15      Q.  And you --
16      A.  Go back to this one
17  (indicating).
18      Q.  Yes, sir.  I'm going to have
19  to ask you this question though --
20      MR. SANSPREE:  I think he was
21  answering your question though.
22      A.  Let me -- After I talked to
23  them, I've been busy, you know.  January

Page 71

1  11, I've been busy, and maybe a couple of
2  weeks after that I talked to them.  And
3  they told me to send in eight hundred
4  dollars.
5      Q.  Now, I understood your
6  testimony previously that your
7  conversation you had with the people at
8  Colonial was after you received this offer
9  to reinstate, which is Defendant's Exhibit
10  2, and then it took you several weeks
11  after your conversation before you sent
12  the check in; was that not correct?
13      MR. SANSPREE:  That's not his
14  prior testimony.  He was trying to tell
15  you, but you keep cutting him off before
16  he can finish.
17      You're not doing it on purpose,
18  it's just that he's trying to explain, and
19  I don't think he's understanding what
20  you're saying.
21      MR. ISENBERG:  I think he's
22  understood perfectly, Chris, and I think
23  he's answered the question exactly in his

Page 72

1  testimony with regard to when we were
2  talking about Exhibit 2.
3      MR. SANSPREE:  Well, he's just
4  told you it's different than what you just
5  said.
6      MR. ISENBERG:  Well, it's
7  different than what his prior testimony
8  was, so if he wants to go ahead and change
9  his testimony, he can do that.  But if
10  you'll --
11      Q.  You can explain it to me
12  again, and we'll see if it's consistent
13  with your prior testimony.  Go ahead.
14      MR. SANSPREE:  Go ahead and
15  tell him again what happened.
16      A.  Okay.  I called Colonial.
17  This is past due, I call Colonial --
18      MR. SANSPREE:  When you say
19  this is past due, for the Record --
20      A.  For the Record, January 11,
21  2005.  Must have been a couple of weeks
22  after that I talked to Colonial, and they
23  told me to go ahead and send in the money

18 (Pages 69 to 72)

FOSHEE & TURNER COURT REPORTERS

Page 73

1 and it will be reinstated, eight hundred
2 dollars.
3    Q.   So -- Go ahead. I'm sorry. I
4 don't mean to interrupt you.
5    So is it now your testimony --
6    A.   And this letter is February
7 10.
8    Q.   Mr. Kern, if you'll let me
9 finish my question.
10    MR. SANSPREE: That's what I
11 was talking about.
12    Q.   Go ahead. But -- Go ahead and
13 answer the question then. You can say
14 whatever you'd like to say.
15    A.   Go ahead. Ask me, go ahead.
16    MR. ISENBERG: And, Chris, I'm
17 not interrupting the response to the
18 question. He's --
19    MR. SANSPREE: He's just not
20 understanding what you're asking him.
21 He's not -- He's -- Just ask him again.
22 I'm not trying to be difficult, but I
23 don't think he's understanding your

Page 74

1 questions.
2    Q.   Mr. Kern, at the beginning of
3 this deposition I expressed to you that I
4 would ask you a question, and if you did
5 not understand my question, that I would
6 ask you to tell me that. Do you remember
7 me telling you that?
8    MR. SANSPREE: Can I get an
9 objection? I would object to that
10 because, first, that calls for him to
11 first realize that he doesn't understand
12 your question, so he may misunderstand the
13 question and answer it had a certain way.
14 You see what I'm saying? And then realize
15 that he has misunderstood the question.
16    So he can't ask you to re-ask
17 the question unless he first realizes that
18 there's a misunderstanding there.
19    That's the objection.
20    Q.   Mr. Kern, you'll recall that
21 at the beginning of the deposition I
22 expressed to you that I was going to ask
23 you some questions and if you didn't

Page 75

1 understand them, I'd asked you to let me
2 know. But I assumed if you answered the
3 question you understood that, do you
4 recall me telling you that?
5    MR. SANSPREE: Same objection.
6    Q.   You can answer.
7    MR. SANSPREE: You can answer.
8    A.   I recall that, yes.
9    Q.   And you've answered my
10 questions so far. And so I want to go now
11 and give you a full opportunity to say
12 whatever it is you want to say with regard
13 to my questions on these documents.
14    If you want to tell me again, and
15 we'll see if it's consistent with your
16 prior testimony, this offer to reinstate
17 was dated December 22, 2004, correct?
18    A.   Correct.
19    Q.   We're talking about
20 Defendant's Exhibit 2.
21    Do you recall when you spoke to
22 Colonial Insurance about this offer to
23 reinstate?

Page 76

1    A.   About a couple of weeks after
2 that, after January 11.
3    Q.   So your testimony now is that
4 you spoke to somebody at Colonial
5 Insurance?
6    A.   Colonial Insurance, yes. They
7 told me to send in eight hundred dollars,
8 my policy will be reinstated.
9    Q.   And your testimony now is that
10 that conversation was after January 11?
11    A.   Yes. I was busy.
12    Q.   Yes, sir, I understand you're
13 very busy. And you were busy -- Were you
14 too busy to call Colonial or after you
15 spoke to Colonial were you too busy to
16 send the check in or was it both?
17    MR. SANSPREE: Object to the
18 form of the question.
19    Q.   Do you recall with whom you
20 spoke after January 11, if that's your
21 testimony now?
22    Who did you speak to at Colonial
23 Insurance after -- Who told you to send

19 (Pages 73 to 76)

FOSHEE & TURNER COURT REPORTERS

Page 77

1  the premium check in?
2      A.  I don't recall.
3      Q.  Was it a man or a woman?
4      A.  Lady.
5      Q.  When you called, did you call
6  the main number?
7      A.  Called the Colonial number.
8      Q.  Yes, sir.  Did you call
9  just --
10         MR. SANSPREE:  He's asking, did
11  you call Colonial's main number when you
12  called?
13     A.  Yes.
14     Q.  Did you ask to speak to
15  somebody in particular?
16     A.  No.
17     Q.  Did you give them a policy
18  number?
19     A.  I asked them I got this
20  letter, and they say just send in the
21  eight hundred dollars and my policy should
22  be reinstated.
23     Q.  Did they -- Did the person who

Page 78

1  answered the phone answer your question or
2  did that person transfer you to somebody
3  else?
4      A.  They answered my question.
5      Q.  The person who answered the
6  phone?
7      A.  Yes.
8      Q.  To get back to my question, I
9  was asking you about, and I appreciate the
10  fact that now you've -- I'm glad you've
11  been able to answer that to your
12  satisfaction.
13         To get back to my question I was
14  asking you about, which is on Defendant's
15  Exhibit 5, the last two paragraphs there
16  from Chris Setzer of Colonial that you
17  read, it is my understanding -- I think my
18  question was whether you received a copy
19  of this letter.  And since it was produced
20  to me by you and your lawyer, I'm assuming
21  the answer is yes; is that correct?
22     A.  Yes.
23     Q.  Did you respond to Chris

Page 79

1  Setzer's statement in the second paragraph
2  regarding a quote for other insurance?
3      A.  I didn't contact him.  I let
4  my -- I let Gary contact him.
5      Q.  Your attorney?
6      A.  My attorney.
7      Q.  You understand here in
8  paragraph two that it says that Chris
9  Setzer is enclosing a quote for
10  replacement coverage with another company;
11  do you understand that?
12     A.  You know, this is February
13  10 --
14     Q.  Mr. Kern, if you would --
15     A.  Please let me finish.  I'm
16  sorry.
17         Okay.  The accident happened
18  February 5, this is February 10 they send
19  me a letter.
20     Q.  Yes, sir.  I understand that
21  clearly.
22         And you've admitted that you
23  received the letter on February 10,

Page 80

1  there's no dispute when the accident
2  happened.  My question to you is -- is not
3  with regard to the date of the accident at
4  all.  My question to you, if you'll listen
5  to the question closely, is whether you
6  will acknowledge that in this letter, in
7  this second paragraph, this Chris Setzer
8  is enclosing a quote for other insurance
9  coverage to you; is that correct?
10     A.  I thought I still had my old
11  policy because --
12     Q.  No, sir.  My question to you
13  was --
14         MR. SANSPREE:  Without arguing
15  with him, we'll stipulate that the letter
16  says what it says.
17     A.  Yeah.  It say what it say.
18     Q.  Did -- I understand this
19  letter says what it says.
20         But, Mr. Kern, you understood that
21  at this point Colonial Insurance in this
22  letter was saying that there was no
23  coverage under the Travelers policy, do

20 (Pages 77 to 80)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

FOSHEE & TURNER COURT REPORTERS

Page 81

1  you understand that?
2     I'm not saying that was your
3  position, but I'm telling you -- I'm
4  asking you, in this letter that the
5  statement is there is no coverage.
6     A.   Dated February 10, that's well
7  after the accident.
8     Q.   You understand here that
9  Mr. Setzer was offering you other
10 insurance coverage for the same coverage
11 amounts with Travelers; isn't that
12 correct?
13    A.   Offer me after the accident?
14    Q.   Yes, sir. On February 10.
15    A.   I don't --
16    MR. SANSPREE: Answer the
17 question. He's offering additional
18 insurance.
19    A.   Additional insurance, yes.
20    Q.   And as far as you know,
21 neither you nor your attorneys ever
22 responded to Mr. Setzer taking him up on
23 another insurance; is that correct?

Page 82

1     A.   We already have this policy,
2  why we want to get another insurance for?
3     Q.   Is that your answer, Mr. Kern?
4     MR. SANSPREE: He did have an
5  attorney respond. The next logical
6  question would be why. You would get into
7  attorney-client privilege.
8     MR. ISENBERG: And you know I
9  certainly don't want to do that.
10    Q.   Mr. Kern, do you currently
11 have a driver's license?
12    A.   No, I don't.
13    Q.   When did you lose your
14 driver's license?
15    A.   When -- In --
16    MR. SANSPREE: I don't know.
17 He lost it as a result of the accident,
18 for not having coverage for the accident.
19    A.   Yes.
20    MR. SANSPREE: So obviously it
21 will be after the accident.
22    Q.   Mr. Kern, was it after
23 February 10, 2005, that you lost your

Page 83

1  driver's license, after the date of this
2  letter?
3     MR. SANSPREE: It was after --
4  Yes, Joel. I don't know if he knows.
5  I'll let him answer, but, yeah, it was
6  after that. See, that coverage wouldn't
7  apply.
8     MR. ISENBERG: Chris, I
9  appreciate whatever you're saying, but
10 you're not here to testify. I'm just
11 asking him fact questions. Whatever
12 arguments you want to make -- I'm not
13 saying we're necessarily arguing here, but
14 legal arguments you want to make, I'm just
15 asking him questions.
16    MR. SANSPREE: I'm just trying
17 to point out to you, I'm not trying to
18 argue with you or anything. I'm just
19 saying the new coverage here wouldn't
20 cover the old wreck. He still will lose
21 his license.
22    A.   Exactly.
23    Q.   Do you have automobile

Page 84

1  insurance coverage now?
2     A.   No, I don't.
3     Q.   How long has your driver's
4  license -- Is your driver's license
5  suspended?
6     A.   Yes.
7     Q.   For how long?
8     A.   Until this case is done with.
9     Q.   How do you know that?
10    A.   Because they offer me -- To
11 reinstate my driver's license, I have to
12 pay the damage for Lisa Jackson, almost
13 eight thousand dollars, to reinstate my
14 driver's license. And I don't have that
15 money.
16    Q.   Is the reinstatement of your
17 driver's license -- So that's what you
18 would have to do is pay the money, not
19 show that you had insurance at the time;
20 is that correct?
21    A.   No. Pay the damage of her
22 car, get a letter from her that say -- she
23 say, you know --

21 (Pages 81 to 84)

FOSHEE & TURNER COURT REPORTERS

Page 85

1  Q.  And that you could get your
2  driver's license?
3  A.  Driver's license and — you
4  know, and insurance for automobile.  Have
5  to go through all of that again.
6  Q.  I'm going to try this just one
7  more time, and it's a real simple
8  question, it's a yes or no answer I
9  believe.
10  Mr. Setzer, in paragraph two of this
11  letter, enclosed a quote for auto
12  insurance coverage.  Did you accept that
13  quote for automobile insurance coverage?
14  MR. SANSPREE:  Object to the
15  form.
16  A.  Tell you the truth, I didn't
17  even pay attention to this letter, okay.
18  Because after the fact it's February 10 on
19  the date.
20  (Whereupon, Defendant's
21  Exhibit No. 6 was
22  marked for
23  identification.)

Page 86

1  Q.  Mr. Kern, I've marked a
2  document as Exhibit 6.  This is a copy of
3  an eight-hundred-dollar check that you
4  received from Travelers Insurance, or
5  Standard Fire Insurance.
6  MR. SANSPREE:  Are you asking
7  him —
8  Q.  Did he answer it?
9  MR. SANSPREE:  I thought it was
10  just a statement.  You just said this is a
11  copy.
12  MR. ISENBERG:  I'm sorry, I
13  thought I asked a question.
14  Q.  Is this a copy of a check you
15  received?
16  A.  Yes.
17  Q.  Refunding the eight hundred
18  dollars?
19  A.  Uh-huh (positive response).
20  Q.  Did you have any conversations
21  or personal conversations with anybody at
22  Travelers or Standard Fire with regard to
23  their policy on the refund of this money?

Page 87

1  A.  No.
2  Q.  Did you cash that check?
3  A.  No.
4  Q.  What happened with the check?
5  A.  I gave it to my attorney.
6  Q.  Do you know what he did with
7  it?
8  MR. SANSPREE:  The original, I
9  still have it.
10  MR. ISENBERG:  You still have
11  it?
12  MR. SANSPREE:  Yeah.
13  I take that back, or either Gary has
14  it.  I don't know if I've actually got the
15  original or not.
16  A.  Actually, they sent me two of
17  them, two checks.
18  Q.  Did you return the first one
19  or do you have both of them?
20  A.  I believe I've got both of
21  them with my attorney, gave it to my
22  attorney.
23  (Whereupon, Defendant's

Page 88

1  Exhibit No. 7 was
2  marked for
3  identification.)
4  Q.  Mr. Kern, I'm showing you a
5  document I've marked as Defendant's
6  Exhibit 7.  It's a letter from Rick
7  Finchum at Travelers to Gary Atchison, who
8  was your attorney; is that correct?
9  A.  Yes.
10  Q.  Have you seen a copy of this
11  letter?
12  A.  No.
13  (Whereupon, Defendant's
14  Exhibit No. 8 was
15  marked for
16  identification.)
17  Q.  Mr. Kern, I'm going to show
18  what you've marked as Defendant's
19  Exhibit 8.  Have you seen a copy of that
20  letter?
21  A.  No, I haven't seen it before.
22  Q.  You have not seen that?
23  A.  No.

22 (Pages 85 to 88)

FOSHEE & TURNER COURT REPORTERS

Page 89

1    Q.  And that's a letter dated --
2        MR. SANSPREE:  May 19.
3    Q.  -- May 19, 2005, to your
4  attorney Gary Atchison; is that correct?
5    A.  Uh-huh (positive response).
6        (Whereupon, Defendant's
7        Exhibit No. 9 was
8        marked for
9        identification.)
10    Q.  I'll show you what I've marked
11  as Defendant's Exhibit 9, it's a June 10,
12  2005, letter to Mr. Atchison.  Have you
13  ever seen that letter?
14    A.  No.
15    Q.  Mr. Kern, other than the --
16  other than the conversation that we've
17  spoken about, have you had any other --
18  have you had any other communications with
19  anybody at Colonial Insurance regarding
20  your automobile coverage?
21    A.  No.
22    Q.  And you've never had any
23  conversations with anybody at Standard

Page 90

1  Fire or Travelers?
2    A.  I just let Gary talk with
3  them.
4    Q.  Yes, sir.  But you personally
5  have never had any conversations with
6  them?
7    A.  After the accident I never had
8  a conversation.
9    Q.  And I understood from your
10  prior conversation, you spoke to --
11    A.  Yes.  After they send the
12  check back in, talk to Gary, that's it.
13        Because I knew they send the check
14  in, policy.
15        (Whereupon, Defendant's
16        Exhibit No. 10 was
17        marked for
18        identification.)
19    Q.  Mr. Kern, I want to show you
20  what I've marked as Defendant's Exhibit
21  10.  This is a copy of -- I'll ask you, is
22  this a copy of your responses to
23  Defendant's Interrogatories in this case?

Page 91

1    A.  Yes.
2    Q.  In number two you were asked
3  to identify and describe every
4  communication you've had with Standard
5  Fire or its agents.
6        MR. SANSPREE:  I was pointing
7  to where you were reading.
8    Q.  And your response was you
9  cannot recall each and every communication
10  you've had, but you're sure you've spoken
11  with them several times about the accident
12  and policy.
13        Are there any other communications
14  other than the ones we've talked about
15  today that are responsive to this request?
16  Or have you told me about every
17  communication you've had with Colonial?
18    A.  I don't recall.
19    Q.  You don't know of any others;
20  is that correct?
21    A.  It's been a year.
22    Q.  Same thing for number three --
23        MR. SANSPREE:  Joel, can I just

Page 92

1  ask, communication implies written or
2  oral, if you want to break it down.
3        MR. ISENBERG:  Well, here,
4  Chris, number two, your office or Mr. Kern
5  answered that he's only sure he has spoken
6  with them --
7        MR. SANSPREE:  Okay, I see what
8  you're saying.  So he admitted it.
9        MR. ISENBERG:  And it's my
10  understanding that he only spoke to the
11  Colonial people not directly to Standard
12  Fire, which is what he's testified.
13        MR. SANSPREE:  I don't think
14  he's ever called Travelers.
15        MR. ISENBERG:  I just wanted to
16  make sure we're clear on that.
17    Q.  Same thing with number three,
18  this is with regard to Colonial Insurance,
19  Mr. Kern says that he's sure he's spoken
20  with them on several times during the
21  accident -- spoke to them several times
22  regarding the accident and policy.
23        I just need to know if there's any

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

FOSHEE & TURNER COURT REPORTERS

Page 93

1  other communications that we've not
2  already spoken about?
3      A.  Say again, I'm sorry.
4      Q.  Sure.  Other than what we've
5  already talked about, can you think of any
6  other conversations you have had with
7  Colonial?
8      A.  I don't recall.  I don't
9  remember.
10     Q.  Mr. Kern, what's the policy
11 period for the insurance policy you made
12 the claim under in this case?
13     A.  Policy period?
14     Q.  Yes, sir.  When did the policy
15 begin and when did the policy end?
16     A.  I have to go look at --
17 11/11/04, is that what it is?  I don't
18 recall.
19     Q.  Well, that's what I'm asking
20 you.  Because your position, I believe, is
21 that there's a policy in place, and I just
22 need to understand from you what you think
23 the policy periods were that covered this

Page 94

1  accident?
2      A.  I don't understand the
3  question.
4      Q.  Well, if you -- We'll go back
5  to Defendant's Exhibit 1.  The effective
6  date of this policy was 11/11/03 and the
7  expiration date was 11/11/04.  You made --
8  You wrote a check on January 27, 2005 --
9      A.  Okay.
10     Q.  -- for eight hundred dollars.
11 What is the policy period that you were
12 making any sort of payment for?
13     A.  If you go back to look at this
14 policy, I paid them like a year.
15     Q.  Through 11/11/04.
16     A.  Right.  From this period to
17 this period, 11/11/03 to 11/11/04.
18     Q.  Yes, sir.  And the accident
19 was on what date?
20     A.  February 5, 2005.
21     Q.  What you trying to get -- I'm
22 confused on your question.
23     MR. ISENBERG:  Will you read

Page 95

1  the question back, please.
2      (Requested portion was
3      read back.)
4      A.  I made payment for?
5      Q.  Yes, sir.
6      A.  For the automobile.
7      Q.  What was the effective date of
8  that policy that you claim you were making
9  a payment on?
10     A.  Effective date.  Say to
11 reinstate your policy, we must receive at
12 least the minimum amount due.
13     Q.  By which date?
14     A.  By 01/11/05.  Say minimum
15 amount due.
16     (Whereupon, Defendant's
17     Exhibit No. 11 was
18     marked for
19     identification.)
20     Q.  Mr. Kern, I'm going to show
21 you a document that I've marked as
22 Defendant's Exhibit 11.
23     Can you identify that for me?

Page 96

1      A.  Yes.  This is how much I paid
2  to get my car fixed.
3      Q.  Is this the amount for damage
4  to your car that you're claiming in this
5  lawsuit?
6      A.  Yes.  This damage that I
7  already paid for.
8      Q.  Is there any other damage to
9  your car that you're claiming in this
10 lawsuit?
11     A.  Other than the lady that I --
12     MR. SANSPREE:  That's why he
13 said your car.  Listen to the question.
14     A.  I'm sorry.
15     Q.  To your car.
16     A.  My car, that was the damage.
17     Q.  Those are all the damages,
18 okay.
19     I'll show you what I've marked as
20 Defendant's Exhibit 12, and this is a
21 document that you and your lawyers have
22 produced to us.
23     Do you recognize this document?

24 (Pages 93 to 96)

FOSHEE & TURNER COURT REPORTERS

Page 97

1         **(Whereupon, Defendant's**
2         **Exhibit No. 12 was**
3         **marked for**
4         **identification.)**
5         MR. SANSPREE: He may not have
6    ever seen this, Joel. This is going to be
7    -- This is the damage that he's claiming
8    on it.
9         **Q.    I just want to make sure we're**
10   **clear, that the damage that you're**
11   **claiming for Lisa Jackson's --**
12        MR. SANSPREE: It's Lisa
13   Jackson.
14        **Q.    -- car is five thousand four**
15   **hundred eighty-three dollars and fifty**
16   **cents; is that correct?**
17        A.    When I spoke to her, she says
18   it's like seven thousand, her car is
19   total; to pay off her car is seven
20   thousand and something.
21        **Q.    Are you making a claim for**
22   **those damages in this lawsuit or is it**
23   **limited to five thousand four hundred and**

Page 98

1    **eighty-three dollars and fifty cents?**
2         A.    To reinstate my driver's
3    license, cost almost eight thousand
4    dollars.
5         MR. ISENBERG: Let's go off the
6    Record for a second.
7              (Off the Record.)
8         MR. ISENBERG: Back on.
9         **Q.    Mr. Kern, I just want to**
10   **direct you to interrogatory eleven on**
11   **Defendant's Exhibit 10. And in there you**
12   **identify approximately twenty-one hundred**
13   **dollars as damage to your vehicle, and**
14   **approximately fifty-five hundred dollars**
15   **as the damage to Lisa Jackson's vehicle.**
16        **It's my understanding from your**
17   **attorney that this is the amount that will**
18   **satisfy Ms. Jackson.**
19        **So can we operate off the assumption**
20   **that this is the damage you were claiming**
21   **in this case?**
22        A.    Yes. Also another lady
23   that -- Lisa Threatt --

Page 99

1         MR. SANSPREE: That's who he's
2    talking about.
3         A.    No. This is Jackson. Annette
4    Threatt, the third party, also sent me a
5    letter --
6         MR. SANSPREE: I've never seen
7    that one.
8         A.    -- that she claiming her
9    damage is eight hundred and something
10   dollars, almost a thousand dollars, to fix
11   her vehicle.
12        **Q.    Can you provide that to**
13   **Mr. Sanspree and he can provide that to**
14   **me?**
15        A.    Okay.
16        MR. SANSPREE: And we can
17   assume that the interrogatory responses
18   are supplemented since it's federal court?
19        MR. ISENBERG: Yeah. If you
20   can get me that, that will be sufficient.
21   Just send it with a cover letter
22   explaining it.
23        MR. SANSPREE: I can do that.

Page 100

1         **Q.    You think it's about nine**
2    **hundred dollars then?**
3         A.    Eight hundred and something,
4    almost nine hundred dollars for that lady.
5         **Q.    Mr. Kern, other than those**
6    **items of damage we've talked about, are**
7    **you claiming any other damage in this**
8    **lawsuit?**
9         A.    Tell you the truth, I can't go
10   see my kids now because I'm afraid to
11   drive up there. It's been a year.
12        **Q.    You've not seen your children**
13   **in a year?**
14        A.    They were here last summer,
15   that was it. Usually I go up there to see
16   them, I drive up there to see my kids.
17        **Q.    How often would you drive up**
18   **to see your children normally?**
19        A.    Spring break, happy holiday on
20   Christmas and summer, they came stay with
21   me for the whole summer.
22        **Q.    So your children were here**
23   **during the summer?**

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 101

1    A.    Yes.
2    Q.    And we've not had spring break
3  yet, so it just would have just been at
4  the holidays?
5    A.    Yeah.  Holidays, I didn't go
6  see them.
7    Q.    Did you offer to bring them
8  here?
9    A.    Yes.  But their mother got a
10 restaurant too.  And restaurant business
11 is twenty-four to seven, you know.
12   Q.    Very busy?
13   A.    Very busy.
14   Q.    Anything else?
15   A.    Anything else?  I thought I'd
16 be covered.  I paid my money, I thought
17 there would be coverage.
18   Q.    And that's your claim here, is
19 that correct, against Standard Fire is
20 that you claim that there was a policy and
21 they didn't pay under the policy?
22   A.    They didn't -- Yeah.  After
23 the accident, I pay my money, I write my

Page 102

1  check, they cashed my check, I thought my
2  policy is good, reinstate, whatever you
3  want to call it.  And after the accident,
4  they returned my check.
5    Q.    Any other damages you're
6  claiming?
7    A.    I'm losing sleep over it.
8    Q.    Have you seen a doctor about
9  that?
10   A.    No.
11   Q.    Taking any medication for it?
12   A.    No.
13   Q.    Have you seen a counselor or
14 therapist?
15   A.    No.  I should have.
16   Q.    But you haven't?
17   A.    No.  Too busy working.
18   Q.    Have you been involved in any
19 other lawsuits?
20   A.    No.
21   Q.    You've never sued anybody?
22   A.    No.
23   Q.    Have you ever been sued by

Page 103

1  anybody?
2    A.    I don't recall, no.
3    Q.    Have you ever been arrested?
4    A.    Yes, I've been arrested
5  before.
6    Q.    When was that?
7    A.    Couple of years ago I believe.
8  Yeah, couple of years ago.  Between me and
9  my ex-wife.
10   Q.    Was that here in Montgomery?
11   A.    Here in Montgomery.  An
12 altercation.  We end up living separate
13 ways, we go our own life.  She open her
14 business and I operate mine and that's it.
15   Q.    Were any charges filed against
16 you?
17   A.    All dropped.
18   Q.    Were there any charges filed
19 against you?
20   A.    They all dropped.
21     MR. SANSPREE:  Listen to his
22 question.  He just wants to know if they
23 were filed.  We understand they may have

Page 104

1  been dropped.  He wants to know were any
2  filed.
3    A.    Filed, like --
4      MR. SANSPREE:  What were you
5  charged with when you were arrested?
6    A.    Domestic violence.
7    Q.    Was that Montgomery police or
8  sheriff?
9    A.    Montgomery police.
10   Q.    The charges were ultimately
11 dropped?
12   A.    Yes.
13   Q.    Any other arrests?
14   A.    Like when I was eighteen.
15 That's eighteen, nineteen, that's a long
16 time ago.  DUI.
17   Q.    Where was that?
18   A.    Indiana.
19   Q.    Were you convicted?
20   A.    Yeah.  I pay my fine, went to
21 class for it, yes.
22   Q.    Any other arrests?
23   A.    That's about it.

26 (Pages 101 to 104)

FOSHEE & TURNER COURT REPORTERS

Page 105

1    Q.    And have you ever filed for
2    bankruptcy?
3        A.    No.
4        Q.    Either personally or as a
5    business?
6        A.    Never.
7            MR. ISENBERG:  Give me about
8    five minutes, I think I'm done.
9            (Recess was taken.)
10            MR. ISENBERG:  That's all I've
11    got.  Unless, Chris, you've got something.
12            MR. SANSPREE:  Hang on one
13    second.
14            EXAMINATION
15    BY MR. SANSPREE:
16        Q.    Mr. Kern, on Exhibit 1 you've
17    testified that there's an effective date
18    of 11/11/03, 11/11/04 is the expiration
19    date?
20        A.    Yes.
21        Q.    And you see on -- You've
22    already testified previously that
23    Defendant's 2 informed you that if you

Page 106

1    paid the minimum amount of premium by
2    January 11, 2005, your policy would be
3    reinstated?
4        A.    Yes.
5        Q.    The January 11, 2005, date is
6    after the 11/11/04?
7        A.    Right.
8        Q.    What was your understanding if
9    you paid the premium after the 11/11/04?
10    What was your policy period if you paid
11    the premium after that date?
12            MR. ISENBERG:  I'm going to
13    object.
14        Q.    Go ahead.
15        A.    Be renewed.
16        Q.    What does that mean to you?
17        A.    Mean be 11/11/05.
18        Q.    And did you -- And you've
19    testified previously that you contacted
20    Colonial?
21        A.    Yes.
22        Q.    After the January 11, 2005,
23    date?

Page 107

1        A.    Yes.
2        Q.    And Colonial instructed you to
3    send in --
4        A.    -- eight hundred dollars.
5        Q.    And did you do that?
6        A.    Yes, I did.
7        Q.    And once you sent in that
8    eight hundred dollars, what was your
9    understanding of your coverage?
10        A.    It would be reinstated without
11    interruption.
12        Q.    And just for the Record,
13    everybody you've dealt with regarding this
14    insurance would be at Colonial Insurance
15    Company or Colonial Insurance Agency,
16    correct?
17        A.    Right.
18            MR. SANSPREE:  That's all I've
19    got.
20            MR. ISENBERG:  I have just a
21    few more questions.
22            EXAMINATION CONTINUED
23    BY MR. ISENBERG:

Page 108

1        Q.    Mr. Kern, this conversation
2    you said you had with somebody at Colonial
3    after January 11, 2005, do you have any
4    notes of that conversation?
5        A.    Just the phone conversation,
6    no notes.
7        Q.    You didn't make any notes at
8    the time you spoke with somebody there?
9        A.    No.
10        Q.    How do you know that it was
11    after January 11, 2005?
12        A.    How do I know?
13        Q.    Yes, sir.  If you received the
14    notice December 22, 2004, how do you know
15    it was after January 11, 2005?
16        A.    Repeat the question again.
17        Q.    Sure.  Earlier in the day you
18    said you couldn't remember when you talked
19    to them, then your testimony became that
20    you were certain that it was after January
21    11, 2005.
22            My question to you is how can you be
23    so certain that it was after January 11,

27 (Pages 105 to 108)

FOSHEE & TURNER COURT REPORTERS

Page 109

1  **2005, that you spoke to Colonial?**
2       A.   I don't understand what you --
3            MR. ISENBERG:  Would you read
4  my question back, please.
5            (Requested portion was
6            read back.)
7       A.   I got this letter and a couple
8  of weeks after that I called them, and
9  they said to send in money, and it will be
10  reinstated, don't worry about it.
11      **Q.   And the letter you're talking**
12  **about is the one that's dated December 22**
13  **2005, is that correct?**
14      A.   December 22 --
15      **Q.   2004, excuse me.**
16      A.   2004, yes.
17      **Q.   Do you know what day it was**
18  **that you spoke to the people at Colonial**
19  **about this?**
20      A.   No, I don't.
21      I spoke to a lot of people every
22  day.  I'm sorry.
23      **Q.   You can't remember exactly**

Page 110

1  **when it was; is that correct?**
2       A.   (Witness nods head
3  affirmatively.)
4       **Q.   Is that correct?**
5       A.   That's correct.  I can't
6  remember.
7            MR. ISENBERG:  That's all I
8  have.
9  (The deposition of Weelapan Kern was
10  concluded at 12:15 p.m. on March 1,
11  2006.)
12
13
14
15
16
17
18
19
20
21
22
23

Page 111

1       C E R T I F I C A T E
2
3  STATE OF ALABAMA      )
4  AUTAUGA COUNTY        )
5
6       I do hereby certify that the above
7  and foregoing transcript was taken down by
8  me in stenotype, and the questions and
9  answers thereto were transcribed by means
10  of computer-aided transcription, and that
11  the foregoing represents a true and
12  correct transcript of the testimony given
13  by said witness.
14       I further certify that I am neither
15  of counsel, nor of any relation to the
16  parties to the action, nor am I anywise
17  interested in the result of said cause.
18
19
20
21            Anita Thebo, Certified
               Shorthand Reporter and
22            Commissioner for the
               State of Alabama at
23            Large.

28 (Pages 109 to 111)

FOSHEE & TURNER COURT REPORTERS

Page 112

**A**

Abby 22:17
able 78:11
Absolutely 55:18
accept 85:12
accident 56:4,6,11 57:8
  58:23 59:1,2,6,17,18
  59:20 60:1,6 61:6,8
  61:19 62:4,5,19,22
  63:15,16 64:7,12
  67:1,12 79:17 80:1,3
  81:7,13 82:17,18,21
  90:7 91:11 92:21,22
  94:1,18 101:23 102:3
account 52:3 68:23
accurately 59:19,23
accused 10:17
acknowledge 46:1 80:6
acknowledged 43:18
acted 10:23
acting 6:6
action 111:11
additional 81:17,19
address 8:10 23:3
  34:20 53:21 54:17
admitted 79:22 92:8
adopted 11:16
adult 22:22
advised 3:2
affirmatively 110:3
afraid 100:10
age 15:10 22:13
agencies 27:1
agency 25:1 29:20
  30:15 31:13 32:22
  35:14,17 38:8,14,15
  38:22 39:14 40:7
  41:20 54:4 107:15
agent 24:21 25:6 35:18
  36:8
agents 91:5
ago 9:15,17 10:6 14:7
  14:20 24:13,14,14
  36:21,22 37:21 38:17
  103:7,8 104:16
AGREED 1:13 2:2,9
  2:18
ahead 57:15 72:8,13,14
  72:23 73:3,12,12,15
  73:15 106:14
al 1:9 5:9
Ala 12:17,18 13:4,5
  16:13 19:3 52:3 53:4
  53:7,8,15
Alabama 1:2,20 2:19

5:2,19,23 6:6,8,13
  8:19 12:5 15:20
  22:23 53:3,5 111:3
  111:22
Allen 1:18 5:17 6:11
altercation 103:12
Amended 2:20
American 17:23
amount 45:15 50:17,20
  70:3 95:12,15 96:3
  98:17 106:1
amounts 81:11
Anita 1:16 2:21 5:13
  6:5 111:21
Ann 59:10
Annette 59:11 99:3
answer 7:12,16 27:5
  47:10 68:3 73:13
  74:13 75:6,7 78:1,11
  78:21 81:16 82:3
  83:5 85:8 86:8
answered 65:22 71:23
  75:2,9 78:1,4,5 92:5
answering 70:21
answers 111:9
anybody 34:23 35:8,22
  36:4 49:6 56:12
  57:10 58:5 61:4
  63:20 64:3 65:20
  66:1 68:1,4 86:21
  89:19,23 102:21
  103:1
anywise 111:16
APPEARANCES 5:15
appearing 5:19 6:1
apply 83:7
appreciate 78:9 83:9
approximately 98:12
  98:14
area 21:18
argue 83:18
arguing 80:14 83:13
arguments 83:12,14
arrested 103:3,4 104:5
arrests 104:13,22
asked 7:14,17 75:1
  77:19 86:13 91:2
asking 38:18 73:20
  77:10 78:9,14 81:4
  83:11,15 86:6 93:19
asks 27:6
assign 2:13
assistants 25:17
assume 7:16 99:17
assumed 75:2

assuming 78:20
assumption 98:19
asterisks 44:22
Atchison 88:7 89:4,12
Atlanta 13:3
attend 17:13,15 18:13
  18:22
attention 38:3 85:17
attorney 69:5 79:5,6
  82:5 87:5,21,22 88:8
  89:4 98:17
attorneys 69:12 81:21
attorney-client 82:7
AUTAUGA 111:4
auto 85:11
automobile 24:6,9
  26:16 28:4 29:14
  31:22 33:15 41:1,2
  42:12 56:3 57:7
  70:10 83:23 85:4,13
  89:20 95:6
A-L-A 12:20,21
a.m 6:14

**B**

back 19:10 40:17 41:22
  42:2,6 49:4 60:4
  67:16 70:16 78:8,13
  87:13 90:12 94:4,13
  95:1,3 98:8 109:4,6
background 17:12
bankruptcy 105:2
bartender 21:3
basic 18:16
basis 56:4
Bates 58:15,19
Beasley 1:18 5:17 6:11
beginning 6:13 74:2,21
behalf 5:19 6:1 10:5
believe 23:18 26:19,22
  32:13 37:10,14,15
  41:3 47:21 49:17
  56:9 64:5 65:19
  66:14 85:9 87:20
  93:20 103:7
bellman 21:14
better 21:15 54:6
Birmingham 5:23
birth 8:23
bit 7:11 17:11 21:4
born 11:3
bought 24:10,16 28:7
  29:12 31:16 32:21
box 44:18
break 7:20 8:1 55:17

92:2 100:19 101:2
bring 101:7
broke 41:3,17
brought 11:12,14 12:7
  12:8
building 38:7,10,13
business 12:10,11 16:9
  20:20 27:11,19 52:4
  52:6,8,16,17,19,20
  52:22 101:10 103:14
  105:5
business's 52:11
busy 47:3 48:2,3 56:21
  70:23 71:1 76:11,13
  76:13,14,15 101:12
  101:13 102:17

**C**

C 111:1,1
call 28:6 29:5,7 46:15
  47:14 61:10,12,13
  65:13,13,17 72:17
  76:14 77:5,8,11
  102:3
called 13:4,5 17:17
  25:21 28:8,10,15
  30:14 31:21 37:17
  42:1,2,3 46:10,17
  47:23 49:9 56:16,23
  61:7 67:3 72:16 77:5
  77:7,12 92:14 109:8
calls 74:10
caps 44:22
car 24:19 28:7,7,9,13
  28:14 29:12 30:2,5
  30:19,22,23 31:1,3,5
  60:13,22 61:1,2,3
  64:16 84:22 96:2,4,9
  96:13,15,16 97:14,18
  97:19
card 33:16,17 34:2
care 62:23 63:7
cars 31:18
car's 65:9
case 1:5 5:5 7:6 10:1,7
  10:12,14,23 56:5
  84:8 90:23 93:12
  98:21
cash 87:2
cashed 102:1
caught 41:16
cause 6:15 111:17
cents 97:16 98:1
certain 74:13 108:20
  108:23

certainly 66:20 82:9
Certified 111:21
certify 6:7 111:6,14
change 37:6 72:8
changed 26:2
charged 104:5
charges 103:15,18
  104:10
check 46:11 51:10,21
  53:17 54:21 55:5,9
  55:12,14,23 56:1,11
  57:4 71:12 76:16
  77:1 86:3,14 87:2,4
  90:12,13 94:8 102:1
  102:1,4
checks 87:17
Chicago 20:7,13,14
  29:22
children 15:14 100:12
  100:18,22
children's 15:1
Chris 68:22 69:1,15,18
  71:22 73:16 78:16,23
  79:8 80:7 83:8 92:4
  105:11
Christmas 15:23
  100:20
CHRISTOPHER 5:16
Chutakanonta 13:21
Civil 2:19 6:8
claim 41:10,13,15 42:1
  42:5 43:3 56:5 62:9
  93:12 95:8 97:21
  101:18,20
claiming 96:4,9 97:7,11
  98:20 99:8 100:7
  102:6
claims 40:22 42:12,15
class 104:21
clear 40:15 55:5 92:16
  97:10
clearly 79:21
closely 80:5
Cloverdale 27:22
college 18:9,14,20
  21:12
Colonial 24:23 25:1,7
  25:11,23 26:1,8,14
  26:21 27:1,9,12 28:4
  28:8 29:7,12 30:15
  31:13,22 32:2,15
  35:6,14,17,23 36:9
  36:10 37:4,21 38:7
  38:13,15,21 39:14
  40:6,17 41:19 43:16

FOSHEE & TURNER COURT REPORTERS

Page 113

43:18 46:10,15 47:12
48:1,9,9,15,20 49:6
54:3 56:13,16 57:10
58:2 61:5,10,12,13
61:18 63:18,23 64:1
66:4,5,10,11,15,17
67:3,19 68:19 70:13
71:8 72:16,17,22
75:22 76:4,6,14,15
76:22 77:7 78:16
80:21 89:19 91:17
92:11,18 93:7 106:20
107:2,14,15 108:2
109:1,18
**Colonial's** 36:14,18
77:11
**come** 15:22 25:22 54:7
60:21
**Commerce** 1:19 5:18
6:12
**Commissioner** 1:17
5:13 6:7 111:22
**common-law** 14:8
36:19
**communicate** 40:16
**communicating** 40:14
**communication** 35:2,4
35:12 64:3,5 91:4,9
91:17 92:1
**communications** 89:18
91:13 93:1
**companies** 38:11
**company** 1:9 5:9 6:2
7:5 24:5 29:16 31:9
34:3,4 35:9,22 36:5,7
36:23 37:5,17 58:6
63:21 64:18,23 65:1
65:4,8,9,11 66:1 70:1
79:10 107:15
**compliance** 2:5
**computer-aided**
111:10
**concluded** 110:10
**confused** 66:19,21
94:22
**consistent** 72:12 75:15
**construction** 21:14
**contact** 28:3,6 60:21
61:4 64:17,22 65:10
79:3,4
**contacted** 65:8 106:19
**continue** 45:4
**CONTINUED** 4:6
107:22
**conversation** 49:5,8

58:1,4 66:6,10,11,13
66:14,16 67:7,20
71:7,11 76:10 89:16
90:8,10 108:1,4,5
**conversations** 67:19
86:20,21 89:23 90:5
93:6
**convicted** 104:19
**cook** 19:19
**copy** 33:22 44:9 49:18
49:21 51:20 54:23
78:18 86:2,11,14
88:10,19 90:21,22
**core** 18:17
**corner** 44:13
**corporation** 16:13,16
16:22
**correct** 16:3 19:4 24:6
24:7 30:12,17 31:23
34:5,6,8,9,17,19,21
35:10,15,16 36:11,15
37:5,13 39:8,10,16
39:21 40:2,5,9,11
43:1,2 46:21,22
48:11,16 50:22,23
51:2,3 55:2,7,8 56:1
56:2 57:21 59:7,12
60:6,7 66:8,17,23
67:12 71:12 75:17,18
78:21 80:9 81:12,23
84:20 88:8 89:4
91:20 97:16 101:19
107:16 109:13 110:1
110:4,5 111:12
**correctly** 44:22 45:6,11
45:17
**cost** 98:3
**counsel** 1:15 2:10,12
6:10 111:15
**counselor** 102:13
**County** 10:10 111:4
**couple** 47:1 48:23
56:22 71:1 72:21
76:1 103:7,8 109:7
**courses** 18:17,17
**court** 1:1 2:6 3:3,4 5:1
6:5,23 9:10,11,19
10:9 99:18
**cover** 83:20 99:21
**coverage** 35:13 43:4
45:5 67:9 70:1,3,11
79:10 80:9,23 81:5
81:10,10 82:18 83:6
83:19 84:1 85:12,13
89:20 101:17 107:9

**covered** 61:9 93:23
101:16
**Crow** 1:18 5:17 6:11
**currently** 82:10
**customer** 25:16
**cutting** 71:15
**CV698-B** 1:5 5:5
**C-H-U-T-A-K-A-N-...**
13:22

**D**

**D** 4:1
**damage** 84:12,21 96:3
96:6,8,16 97:7,10
98:13,15,20 99:9
100:6,7
**damages** 96:17 97:22
102:5
**date** 6:7 8:23 34:10,13
42:23 44:13,15,17,18
46:20 47:20,22 50:6
50:9,12 51:1,23
59:20 80:3 83:1
85:19 94:6,7,19 95:7
95:10,13 105:17,19
106:5,11,23
**dated** 51:23 68:19
75:17 81:6 89:1
109:12
**dates** 49:23
**day** 1:20 2:23 61:5 65:7
108:17 109:17,22
**days** 47:2
**deal** 25:14 43:16,18
**dealer** 28:7
**dealership** 28:9
**dealership's** 28:23
**dealt** 25:6,12 107:13
**December** 46:21,22
47:7 56:20 75:17
108:14 109:12,14
**deductible** 70:5
**defendant** 6:1 7:6
**Defendants** 1:10 5:10
**Defendant's** 4:9 33:2,7
39:8 42:21 43:22
44:5 51:5,13,18
53:18 54:7,23 55:1
58:8,13 68:8,13 71:9
75:20 78:14 85:20
87:23 88:5,13,18
89:6,11 90:15,20,23
94:5 95:16,22 96:20
97:1 98:11 105:23
**degree** 18:19

**delivering** 2:21
**deposit** 55:11,14
**deposition** 1:15,22 2:3
2:4,15 7:8 9:7 74:3
74:21 110:9
**depositions** 2:7
**describe** 91:3
**description** 60:5
**different** 27:4 38:11
72:4,7
**difficult** 73:22
**direct** 98:10
**directly** 34:23 35:21
36:3 92:11
**dishwasher** 19:19
**dispute** 80:1
**DISTRICT** 1:1,2 5:1,2
**DIVISION** 1:3 5:3
**divorce** 14:12
**doctor** 102:8
**document** 44:4,7,10
45:20 58:17 68:16
86:2 88:5 95:21
96:21,23
**documents** 58:15 75:13
**doing** 21:7 71:17
**dollar** 55:5,23
**dollars** 47:16 50:14,19
50:19 57:1,16,17
71:4 73:2 76:7 77:21
84:13 86:18 94:10
97:15 98:1,4,13,14
99:10,10 100:2,4
107:4,8
**Domestic** 104:6
**Donnie** 28:19,19 31:21
**Donny** 15:6,7,8
**door** 38:1,12
**doors** 38:4
**drive** 8:11,16,17 13:1
23:3,5,16,17 31:1
100:11,16,17
**driver** 21:3
**driver's** 82:11,14 83:1
84:3,4,11,14,17 85:2
85:3 98:2
**driving** 60:15,16,17
**dropped** 103:17,20
104:1,11
**due** 44:17 45:15 47:20
47:22 50:9,12,21
51:1 72:17,19 95:12
95:15
**DUI** 104:16
**duly** 6:19

**D-O-N-N-Y** 15:8

**E**

**E** 4:1 111:1,1
**Earlier** 108:17
**early** 23:18
**earn** 18:19
**easier** 9:20 68:6
**East** 13:5
**education** 18:6
**educational** 17:12
18:23
**effect** 2:5
**effective** 2:20 34:10
94:5 95:7,10 105:17
**eight** 47:16 50:13,19
55:4,23 56:23 57:15
57:16 71:3 73:1 76:7
77:21 84:13 86:17
94:10 98:3 99:9
100:3 107:4,8
**eighteen** 15:11 22:14
104:14,15
**eighty-three** 97:15 98:1
**eight-hundred-dollar**
86:3
**either** 56:13 87:13
105:4
**El** 27:20,21,22
**eleven** 98:10
**Ely** 5:22
**employment** 19:7
21:10
**enclosed** 69:23 85:11
**enclosing** 79:9 80:8
**endurance** 7:21
**envelope** 54:6,11,13
**ESQUIRE** 5:16,21
**establish** 20:20
**et** 1:9 5:9
**everybody** 107:13
**evidence** 2:16
**evidenced** 42:21
**evidencing** 33:18
**exactly** 63:10,12 67:15
71:23 83:22 109:23
**examination** 4:2,6 6:15
6:21 105:14 107:22
**examined** 6:19
**exchanged** 65:7
**excuse** 109:15
**exhibit** 4:11,12,13,14
4:15,16,17,18,19,20
4:21,22 33:3,8 39:8
42:21 43:23 44:6

FOSHEE & TURNER COURT REPORTERS

Page 114

51:6,14,18 53:18
54:7 55:1,2 58:9,13
58:21 68:9,13 71:9
72:2 75:20 78:15
85:21 86:2 88:1,6,14
88:19 89:7,11 90:16
90:20 94:5 95:17,22
96:20 97:2 98:11
105:16
**exhibits** 3:1 4:9
**expiration** 34:13 42:23
50:6 94:7 105:18
**expired** 43:19,20 45:1
46:3 50:1
**explain** 50:8 59:21 60:8
62:13 71:18 72:11
**explaining** 99:22
**explains** 59:16
**expressed** 74:3,22
**ex-wife** 12:9 13:12
15:17 16:3,4 37:22
38:23 39:15 103:9
**ex-wife's** 13:14 29:23
31:3

---

**F**

**F** 111:1
**fact** 78:10 83:11 85:18
**facts** 64:11
**failure** 43:10
**familiar** 33:10
**far** 75:10 81:20
**Farm** 29:17
**February** 56:7,12 57:8
57:9 59:3 61:11
68:20,21 73:6 79:12
79:18,18,23 81:6,14
82:23 85:18 94:20
**federal** 13:1 23:5 99:18
**feel** 7:20
**fifty** 97:15 98:1
**fifty-five** 98:14
**filed** 3:4 24:4 103:15,18
103:23 104:2,3 105:1
**Finchum** 88:7
**fine** 7:3,18 104:20
**finish** 50:3 71:16 73:9
79:15
**Fire** 1:9 5:9 6:2 7:5
24:5,9 32:12 33:18
33:23 34:4 35:1,9
36:4 38:2 40:4,8
42:16 43:9 56:14
58:5 63:22 86:5,22
90:1 91:5 92:12

101:19
**first** 6:19 11:17,19 12:4
13:12,13,17,18 17:4
22:10 23:12 24:8
28:3,6 32:16,20
34:22 36:17 46:2
74:10,11,17 87:18
**five** 20:17 36:22 97:14
97:23 105:8
**fix** 99:10
**fixed** 96:2
**following** 6:16 60:12
**follows** 6:20
**follow-up** 42:8,9 48:6,7
**food** 21:11
**force** 2:5
**foregoing** 6:9 111:7,11
**forgot** 23:11
**form** 2:11 42:5 76:18
85:15
**formal** 14:12
**forms** 56:4
**forty-five** 50:21
**forty-nine** 50:22
**four** 14:20 23:6 39:5,19
39:20 50:18,21 97:14
97:23
**free** 7:20
**friend** 10:2,16 27:10
**friend's** 27:13
**front** 61:2,3
**full** 2:5 8:4 75:11
**further** 2:1,8,17 111:14

---

**G**

**Gary** 79:4 87:13 88:7
89:4 90:2,12
**Geico** 31:10
**generally** 59:16
**getting** 30:16
**give** 7:12 42:5 47:14
49:18,21 75:11 77:17
105:7
**given** 7:8 9:6 111:12
**glad** 78:10
**go** 19:21 32:14,22
40:17 47:4 57:15
60:19,19 70:16 72:8
72:13,14,23 73:3,12
73:12,15,15 75:10
85:5 93:16 94:4,13
98:5 100:9,15 101:5
103:13 106:14
**going** 7:7,10,23 33:6
37:8 44:3,20 51:17

68:12 70:18 74:22
85:6 88:17 95:20
97:6 106:12
**good** 10:3 68:6 102:2
**graduate** 18:4,11
**grounds** 2:14
**Guam** 11:21
**guess** 53:23
**guy** 25:13
**guys** 36:6

---

**H**

**half** 24:14
**Hall** 28:19,20,21
**handwriting** 51:11,12
51:19
**handwritten** 51:5
**Hang** 105:12
**happened** 56:6 59:18
60:5,9 67:23 72:15
79:17 80:2 87:4
**happy** 45:9 100:19
**Hartford** 37:2,2,8,10
37:14,17
**head** 110:2
**hear** 9:20
**heard** 69:2,3
**hearing** 9:10,11
**held** 20:5 21:10 52:10
**high** 10:7 17:13,15,18
18:7 21:13
**Highway** 13:3
**hit** 61:1,3
**hold** 20:15
**holiday** 15:23 100:19
**holidays** 101:4,5
**home** 23:12 24:1
**Homeowner** 26:19
**homeowners** 41:4
**homeowner's** 26:17
41:11
**hoping** 7:22
**hotel** 21:14
**house** 23:6,16,17,19
41:3,7,17 42:4
**hundred** 47:16 50:13
50:18,19,21 55:5,23
57:1,16,17 71:3 73:1
76:7 77:21 86:17
94:10 97:15,23 98:12
98:14 99:9 100:2,3,4
107:4,8
**husband's** 22:9

---

**I**

**identification** 33:5,16
44:2 51:16 58:11
68:11 85:23 88:3,16
89:9 90:18 95:19
97:4
**identify** 58:17 91:3
95:23 98:12
**immediately** 48:19
**implies** 92:1
**Important** 44:23
**including** 60:4 70:4
**independent** 69:14
**Indian** 18:1
**Indiana** 10:10,11 11:21
11:22,23 17:17 18:2
18:3 29:17,20 104:18
**indicating** 54:1 58:19
67:22 70:17
**industry** 21:11
**information** 60:3 65:6
**informed** 105:23
**informs** 46:1
**institutions** 18:23
**instructed** 107:2
**insurance** 1:9 5:9 6:2
7:5 24:5,6,9,21 25:1
25:6,23 26:5,10,12
26:15 27:1,2,4,9 28:4
29:8,11,14,19 30:4
30:15,16 31:4,7,8,13
31:22 32:7,8,12,15
32:20,22 33:15,19
34:4 35:9,14,17,18
35:22 36:4,21 37:2,4
37:4,16,21,23 38:2,2
38:7,13,22 39:7,9,14
40:4,7,23 41:20
42:12,16,19 47:12
54:3 56:13 57:10
58:5 61:5 63:21 64:4
64:11,13,15,18,22,23
65:3,8,9,11 66:1,12
67:4,19 68:19 70:13
75:22 76:5,6,23 79:2
80:8,21 81:10,18,19
81:23 82:2 84:1,19
85:4,12,13 86:4,5
89:19 92:18 93:11
107:14,14,15
**insured** 34:17
**interest** 16:6
**interested** 111:17
**Interrogatories** 90:23
**interrogatory** 98:10
99:17

**interrupt** 73:4
**interrupting** 73:17
**interruption** 45:10
46:13 107:11
**involved** 59:5,10 60:1
62:21 102:18
**Isenberg** 2:22 4:4,8
5:21 6:22 7:3,4 55:18
71:21 72:16 73:16
82:8 83:8 86:12
87:10 92:3,9,15
94:23 98:5,8 99:19
105:7,10 106:12
107:20,23 109:3
110:7
**issued** 37:17
**issuing** 34:3
**items** 100:6

---

**J**

**Jackson** 59:10 64:8,9
67:22 84:12 97:13
98:18 99:3
**Jackson's** 97:11 98:15
**Janesville** 14:4
**January** 17:9 44:19
46:7 47:18,19 50:9
51:1,8 52:1 55:10
56:1 57:4,5,8,11
70:23 72:20 76:2,10
76:20 94:8 106:2,5
106:22 108:3,11,15
108:20,23
**Jimmy** 22:17
**job** 20:4
**Joel** 2:21 5:21 7:4
55:17 83:4 91:23
97:6
**July** 9:1,2,3
**June** 89:11

---

**K**

**keep** 25:9 71:15
**Kern** 1:6,16,22 5:6
6:14,18 7:4 8:6,9
13:20 15:9 21:16,23
22:7,8 24:3 28:2 33:6
44:3 45:23 53:2,14
53:16 55:20 58:12,15
58:16 59:6 68:12
73:8 74:2,20 79:14
80:20 82:3,10,22
86:1 88:4,17 89:15
90:19 92:4,19 93:10
95:20 98:9 100:5

---

105:16 108:1 110:9
**kids** 14:10 15:4 100:10
   100:16
**kind** 10:12
**knew** 90:13
**know** 8:1 11:2 17:9
   19:22 22:5,9,19
   27:17 28:15 31:12
   33:14 36:23 37:8
   46:17 47:15 48:22
   49:12 53:21 56:22
   61:7,14 62:12 65:6
   68:23 69:6,11,13
   70:8,23 75:2 79:12
   81:20 82:8,16 83:4
   84:9,23 85:4 87:6,14
   91:19 92:23 101:11
   103:22 104:1 108:10
   108:12,14 109:17
**knowledge** 69:15
**knows** 83:4
**Kokomo** 18:8,14,20
**Korat** 11:6
**K-E-R-N** 8:9
**K-O-R-A-T** 11:8

---

**L**

**L** 1:12
**labeled** 58:15
**lady** 32:1 64:6 67:21
   77:4 96:11 98:22
   100:4
**landlord** 23:10
**Large** 111:23
**laws** 2:6
**lawsuit** 24:4 96:5,10
   97:22 100:8
**lawsuits** 102:19
**lawyer** 58:14 78:20
**lawyers** 44:4 59:15
   96:21
**leading** 2:11
**leave** 20:18
**legal** 83:14
**letter** 56:15 68:18
   69:20 70:12,14 73:6
   77:20 78:19 79:19,23
   80:6,15,19,22 81:4
   83:2 84:22 85:11,17
   88:6,11,20 89:1,12
   89:13 99:5,21 109:7
   109:11
**Let's** 98:5
**liability** 33:15
**license** 82:11,14 83:1

83:21 84:4,4,11,14
84:17 85:2,3 98:3
**life** 103:13
**limited** 97:23
**Lisa** 59:10 64:8,9 67:22
   84:12 97:11,12 98:15
   98:23
**listen** 80:4 96:13
   103:21
**little** 7:10 17:11 21:4
**live** 11:2,17 13:23 14:3
   14:15,17 15:16,19
   21:17 22:23 23:4
**lived** 11:19 23:13
**lives** 21:20
**living** 14:18 23:2 24:1
   103:12
**located** 12:23
**location** 13:2
**logical** 82:5
**long** 7:23 10:6 20:15
   21:6 36:21 38:16
   39:3 48:22 63:9 84:3
   84:7 104:15
**longer** 14:15,17 25:15
   31:17 37:7
**look** 34:2 93:16 94:13
**lose** 82:13 83:20
**losing** 102:7
**loss** 64:17 65:10
**lost** 42:5,6 82:17,23
**lot** 38:10 48:4 62:2
   109:21
**loud** 69:21

---

**M**

**Maconaquah** 17:17,22
**Maconoco** 17:21
**maiden** 22:7,8
**mail** 44:10,11 47:5
   53:20
**mailed** 56:10
**main** 77:6,11
**making** 94:12 95:8
   97:21
**man** 49:15 69:18,19
   77:3
**manager** 21:1,2,8
   68:23
**managing** 20:6
**March** 1:20 3:1 110:10
**marked** 33:4,7 44:1,5
   51:15,18 53:18 58:10
   58:13 68:10,13 85:22
   86:1 88:2,5,15,18

89:8,10 90:17,20
95:18,21 96:19 97:3
**married** 14:6,8
**mean** 73:4 106:16,17
**means** 111:9
**medication** 102:11
**Melissa** 15:6
**Methvin** 1:18 5:17 6:11
**MIDDLE** 1:2 5:2
**miles** 1:19 5:18 6:12
   18:9
**military** 12:1
**mine** 10:2 27:10 103:14
**minimum** 45:4,14
   50:16,18,20 95:12,14
   106:1
**minutes** 105:8
**misunderstand** 74:12
**misunderstanding**
   74:18
**misunderstood** 74:15
**Mitsubishi** 24:17
**mom's** 27:6
**Monday** 61:13 66:23
**money** 16:8 46:11,19
   48:11,15,19 49:13,14
   50:15 57:14 61:21
   72:23 84:15,18 86:23
   101:16,23 109:9
**Montero** 24:10,16,17
   29:9,10 30:2,6,7,11
   30:16,20 31:2,16
   32:9,10,21 33:19
   39:10 40:1,5 60:17
**Montgomery** 1:19 5:18
   6:13 8:18,19 11:3
   12:13,14 14:1 17:4
   21:17 23:7,8,13 25:3
   31:11 103:10,11
   104:7,9
**months** 70:5
**mother** 21:21 23:20,21
   27:4 101:9
**move** 11:9 12:4,9 17:4
   23:15
**moved** 29:22
**moving** 60:10
**multiple-page** 58:20
**M-A-C** 17:20

---

**N**

**N** 1:12 4:1
**name** 8:4,8 12:15 13:14
   13:17,18,19 15:9
   17:23 20:8 21:22

22:4,6,7,8,10 23:9
27:13,17 28:16,17,23
29:23 52:11,12,13,14
69:2,3
**names** 15:1,5 22:16,20
   25:18
**native** 17:23 18:1
**necessarily** 83:13
**necessary** 2:9
**need** 7:19 8:1 92:23
   93:22
**needed** 31:18 32:6,8
**neither** 81:21 111:14
**nephew** 22:12
**never** 9:6 40:6,12,17
   41:12,13,15,21,22
   42:2,6 43:6 89:22
   90:5,7 99:6 102:21
   105:6
**new** 29:2 83:19
**niece** 22:12
**nine** 100:1,4
**nineteen** 104:15
**nods** 110:2
**nonrenewal** 49:6
**nonrenewed** 43:9,12
**normally** 100:18
**NORTHERN** 1:3 5:3
**notation** 51:4,5
**notes** 108:4,6,7
**notice** 44:13,15,23
   46:17,20 47:1 49:11
   108:14
**notify** 41:19
**November** 42:17,23
   43:4,11,14 46:3 50:5
**number** 1:5 5:5 8:21
   34:7 42:6 51:10
   65:14,14,17,19,21
   77:6,7,11,18 91:2,22
   92:4,17
**numbers** 58:19

---

**O**

**O** 1:12
**object** 74:9 76:17 85:14
   106:13
**objection** 74:9,19 75:5
**objections** 2:10,13
**obtain** 24:8 27:2 31:22
**obtained** 35:13 37:3
   40:4
**obviously** 69:9 82:20
**occasions** 36:15
**occurred** 59:20

22:4,6,7,8,10 23:9
**offer** 44:23 45:19 48:10
   49:19 54:9,20 55:6
   71:8 75:16,22 81:13
   84:10 101:7
**offered** 2:15
**offering** 81:9,17
**offers** 46:5
**office** 32:15 92:4
**officers** 16:21
**offices** 1:17 6:11 36:14
   36:18 38:4
**oh** 62:22
**okay** 7:17 8:2,3 9:22
   14:9,11 21:16 28:12
   37:3 46:12 53:10
   57:6,23 61:21 62:23
   63:2 69:9 72:16
   79:17 85:17 92:7
   94:9 96:18 99:15
**Okinawa** 11:21
**old** 27:22 80:10 83:20
**once** 47:4 107:7
**ones** 91:14
**open** 12:9 16:9 103:13
**opened** 13:12 16:1,2
   17:7,8 20:3
**operate** 98:19 103:14
**operating** 13:7 19:15
**opportunity** 75:11
**oral** 2:23 6:15 92:2
**original** 2:22 87:8,15
**ourself** 17:10
**outside** 21:11 38:6
**owned** 30:6,7 52:7
**owner** 53:15
**ownership** 16:5
**owning** 19:15

---

**P**

**P** 1:12
**page** 4:3,7,10 60:4,5
**paid** 51:8 94:14 96:1,7
   101:16 106:1,9,10
**paragraph** 46:2 69:22
   70:6 79:1,8 80:7
   85:10
**paragraphs** 78:15
**Parkway** 5:22
**particular** 25:5,11
   77:16
**parties** 1:14 2:13
   111:16
**party** 9:12 99:4
**pay** 38:3 43:10 65:1
   84:12,18,21 85:17

---

97:19 101:21,23
104:20
**payment** 45:4 46:6
94:12 95:4,9
**Pensri** 21:23
**people** 23:23 47:12
48:9,9,14,20 59:10
60:1 71:7 92:11
109:18,21
**perfectly** 71:22
**period** 48:13 93:11,13
94:11,16,17 106:10
**periods** 93:23
**person** 10:3 25:11
38:21 40:7 41:16
42:4 61:17 62:6,8,15
63:17 77:23 78:2,5
**personal** 52:13 68:23
86:21
**personally** 32:22 36:3
39:13 90:4 105:4
**Peru** 10:10,10 18:2,3
18:10
**phone** 32:23 33:1 35:2
35:3,4,5 40:17 49:20
78:1,6 108:5
**place** 32:11 93:21
**Plaintiff** 1:7 5:7,20
**please** 3:2 7:2,14,20 8:1
8:5,7 11:7 22:2 44:14
51:7 69:21 70:7,8,9
79:15 95:1 109:4
**point** 80:21 83:17
**pointing** 54:2 91:6
**police** 104:7,9
**policies** 26:14 28:5
29:20 37:7
**policy** 26:5 31:14 33:23
34:7,23 35:10 36:21
37:1,16 39:7 40:8,23
41:4,11 42:13,16,19
43:4,8,9,19 45:1,3,9
45:13 46:3,6,14 49:7
49:13,23 50:14 57:1
57:17 61:8 62:22
63:1,6,8 64:4 67:8
70:2 76:8 77:17,21
80:11,23 82:1 86:23
90:14 91:12 92:22
93:10,11,13,14,15,21
93:23 94:6,11,14
95:8,11 101:20,21
102:2 106:2,10
**portion** 95:2 109:5
**Portis** 1:18 5:17 6:12

**position** 20:16 81:3
93:20
**positive** 23:22 24:20
30:13 37:11 52:9
63:3 86:19 89:5
**possible** 70:9
**Prattville** 6:6
**premium** 47:16 77:1
106:1,9,11
**premiums** 43:10
**preprinted** 54:17
**present** 8:10 19:6,10
29:4
**previous** 29:13
**previously** 71:6 105:22
106:19
**prior** 2:16 19:15,16
20:21 23:2 39:6
42:17 71:14 72:7,13
75:16 90:10
**privilege** 82:7
**Probably** 49:2
**Procedure** 21:9 6:9
**proceeding** 14:12
**proceedings** 6:16
**produced** 44:4 58:14
59:16 78:19 96:22
**provide** 99:12,13
**provided** 6:8
**Prudential** 29:18
**purchased** 28:12,14
30:1,11 32:20 34:22
39:6,9 40:1 53:12
**purchasing** 32:9
**purpose** 71:17
**pursuant** 48:10
**put** 54:15
**P-E-N-S-R-I** 21:23
**p.m** 110:10

---
**Q**
---
**question** 7:13,15 30:10
50:3 54:6 56:19 57:3
70:19,21 71:23 73:9
73:13,18 74:4,5,12
74:13,15,17 75:3
76:18 78:1,4,8,13,18
80:2,4,5,12 81:17
82:6 85:8 86:13 94:3
94:22 95:1 96:13
103:22 108:16,22
109:4
**questions** 2:11,12 7:7
7:12 74:1,23 75:10
75:13 83:11,15

107:21 111:8
**quote** 45:14,15 69:23
70:3 79:2,9 80:8
85:11,13

---
**R**
---
**R** 111:1
**read** 44:14,20,21 45:6
45:11,17,19 51:6
69:21 78:17 94:23
95:3 109:3,6
**reading** 2:3 58:18 91:7
**ready** 55:20
**real** 85:7
**realize** 74:11,14
**realizes** 74:17
**reason** 31:16
**recall** 33:22 36:16,17
37:23 38:19,21 43:15
46:23 47:3,9,11
74:20 75:4,8,21
76:19 77:2 91:9,18
93:8,18 103:2
**receive** 44:9 45:3,14
95:11
**received** 33:18 45:21
46:7,16 47:1,8 49:10
56:15,19 65:18 68:19
70:12,14 71:8 78:18
79:23 86:4,15 108:13
**receiving** 33:22
**Recess** 55:19 105:9
**recognize** 44:7 96:23
**Record** 8:5 40:15,21
72:19,20 98:6,7
107:12
**refer** 27:8,11
**reflect** 59:19,23 60:2
**refund** 86:23
**Refunding** 86:17
**regard** 24:5 72:1 75:12
80:3 86:22 92:18
**regarding** 79:2 89:19
92:22 107:13
**Reinhardt** 29:1 30:12
31:21
**reinstate** 45:1,9,13,20
46:6 48:10 49:19
54:10,21 55:6 70:2
71:9 75:16,23 84:11
84:13 95:11 98:2
102:2
**reinstated** 46:14,19
49:14 50:15 57:2,18
73:1 76:8 77:22

106:3 107:10 109:10
**reinstatement** 49:7
84:16
**relating** 2:7
**relation** 111:15
**relatives** 21:17 22:22
**remarried** 22:5
**remember** 10:20,21
23:9 25:18 28:3,17
67:15 74:6 93:9
108:18 109:23 110:6
**remodeled** 17:10
**renew** 43:14
**renewed** 106:15
**rented** 23:5
**repeat** 7:15 108:16
**replacement** 70:1
79:10
**report** 58:23 59:1,17
**reporter** 3:4 6:5,23
9:19 111:21
**represent** 7:5 36:7
38:10
**representatives** 25:17
**represents** 111:11
**request** 91:15
**Requested** 95:2 109:5
**required** 45:4
**respective** 1:15
**respond** 78:23 82:5
**responded** 81:22
**response** 23:22 24:20
30:13 37:11 52:9
55:6 63:3 64:18,20
64:21 65:12,13 73:17
86:19 89:5 91:8
**responses** 90:22 99:17
**responsive** 91:15
**restaurant** 12:12,12,16
12:22 16:8,12 19:3
20:6,9,21,23 21:7,15
26:2,6,11,15,16
27:23 28:1 29:11
36:20 37:18,23 48:3
101:10,10
**restaurants** 13:6,9 16:2
17:7 19:13,16,20
20:4 26:3
**result** 82:17 111:17
**retain** 16:5
**retained** 3:3
**return** 54:20 87:18
**returned** 102:4
**Rey** 27:20,21,22
**re-ask** 74:16

**Rick** 88:6
**right** 12:3 14:9 15:12
24:18 26:12 30:18
35:7,19 37:6,12,19
38:12,15 39:17 46:16
54:8 67:13,17 94:16
106:7 107:17
**right-hand** 44:12
**road** 53:19
**Roseanna** 22:17
**Rule** 2:18
**rules** 2:6,19 6:8
**run** 47:23

---
**S**
---
**S** 1:12 5:21
**salesman** 28:10
**salesperson** 28:18
30:14 31:21
**Sanspree** 4:5 5:16 7:2
27:5 55:16 58:18
69:10 70:20 71:13
72:3,14,18 73:10,19
74:8 75:5,7 76:17
77:10 80:14 81:16
82:4,16,20 83:3,16
85:14 86:6,9 87:8,12
89:2 91:6,23 92:7,13
96:12 97:5,12 99:1,6
99:13,16,23 103:21
104:4 105:12,15
107:18
**satisfaction** 78:12
**satisfy** 98:18
**Saturday** 56:8,9 61:20
62:20
**saying** 20:1 40:20
71:20 74:14 80:22
81:2 83:9,13,19 92:8
**says** 44:13,17,23 45:1,8
46:8 53:16 79:8
80:16,16,19,19 92:19
97:17
**school** 10:7 17:13,16,18
18:7 21:13
**second** 13:2 69:22 79:1
80:7 98:6 105:13
**security** 8:20
**see** 26:7 30:15 43:21
72:12 74:14 75:15
83:6 92:7 100:10,15
100:16,18 101:6
105:21
**seeing** 37:23
**seen** 33:9,11,12 68:15

88:10,19,21,22 89:13
97:6 99:6 100:12
102:8,13
**self-addressed** 54:12
54:14
**send** 46:11,18 47:15,16
48:11,19 49:13,14
50:12,13,15,19 53:17
54:18 56:23 57:14,15
71:3 72:23 76:7,16
76:23 77:20 79:18
90:11,13 99:21 107:3
109:9
**sent** 46:11 48:15,23
51:21 53:19,22 55:22
57:4,16 61:20 71:11
87:16 99:4 107:7
**separate** 103:12
**separated** 39:19
**Server** 19:18
**service** 11:20 12:2
25:17
**services** 21:11
**Setzer** 68:22 69:1,15,16
69:16,18 78:16 79:9
80:7 81:9,22 85:10
**Setzer's** 79:1
**seven** 97:18,19 101:11
**shareholders** 16:15
**sheriff** 104:8
**Shorthand** 111:21
**show** 33:6 44:3 51:17
53:2 68:12 84:19
88:17 89:10 90:19
95:20 96:19
**showing** 58:12 88:4
**shown** 39:7 45:15
**shows** 34:3,7,10,16
42:22 50:16
**Siam** 20:10,11,12
**sign** 38:6
**signature** 2:2
**signs** 38:1
**simple** 85:7
**sir** 41:5 43:13,17 47:17
48:5,18 50:20 51:20
52:21 54:16 55:15
56:17 57:3,13,19
59:22 70:18 76:12
77:8 79:20 80:12
81:14 90:4 93:14
94:18 95:5 108:13
**sister** 22:1
**six** 36:22 70:5
**sixteen** 14:7

**sleep** 102:7
**Smith** 5:22
**social** 8:20
**somebody** 27:8 47:23
48:2 66:3 76:4 77:15
78:2 108:2,8
**Sompong** 13:15
**soon** 70:9
**sorry** 19:10 53:6 55:13
62:10 64:19 66:19
69:8 73:3 79:16
86:12 93:3 96:14
109:22
**sort** 7:21 94:12
**SouthBridge** 5:22
**speak** 9:19 32:3 34:23
35:8,21 36:2,3,9
47:17 49:12 56:12
57:9 63:20,22 64:1
64:10 65:20,23 68:1
68:4 69:16,17 76:22
77:14
**speaking** 35:23
**spell** 8:7,14 11:7 17:19
22:2
**spelled** 13:22
**Spencer** 8:12
**Spenseth** 8:11,13 23:3
23:16,17
**spoke** 36:10 46:18
47:11 48:8,14,19
49:16,20,22 57:11
61:14 62:6,15 64:8
66:3 67:21 75:21
76:4,15,20 90:10
92:10,21 97:17 108:8
109:1,18,21
**spoken** 69:11 89:17
91:10 92:5,19 93:2
**spring** 100:19 101:2
**stamp** 54:15,15
**stamped** 54:13
**Standard** 1:9 5:9 6:2
7:5 24:4,9 32:12
33:18,23 34:4 35:1,9
36:4 38:2 40:4,8
42:16 43:9 56:13
58:5 63:22 86:5,22
89:23 91:4 92:11
101:19
**start** 17:20 20:19
**starting** 69:22
**state** 8:4 29:17 111:3
111:22
**stated** 45:2

**statement** 79:1 81:5
86:10
**States** 1:1 5:1 11:10,13
11:18,20
**stay** 100:20
**stenotype** 111:8
**stepdad** 11:16
**stipulate** 80:15
**STIPULATED** 1:13
2:1,8,17
**stipulation** 6:9
**stipulations** 7:1
**stole** 41:6,17
**stop** 7:14 14:18 20:10
20:11,12 60:19,19,20
**stopped** 60:11
**Street** 1:19 5:18 6:12
**stuff** 27:7 41:7,18
**substance** 69:13
**sudden** 60:11
**sued** 102:21,23
**sufficient** 99:20
**Suite** 5:23
**summer** 15:23 100:14
100:20,21,23
**supplemented** 99:18
**sure** 9:18 24:13 30:9
35:12 36:1 39:12
40:13,15,21 42:19
47:9 58:21 63:8,10
91:10 92:5,16,19
93:4 97:9 108:17
**Surerat** 22:1
**suspended** 84:5
**sworn** 6:19
**S-O-M-P-O-N-G** 13:15
**S-P-E-N-S-E-T-H** 8:15
**S-U-R-E-R-A-T** 22:3

---

**T**

**T** 1:12,12 59:6 111:1,1
**take** 7:19 18:16 55:16
62:23 63:7 87:13
**taken** 1:16 2:23 55:19
105:9 111:7
**talk** 32:1 40:7 90:2,12
**talked** 27:11 28:15
42:20 56:17 57:20
64:6 65:5 66:7,18
67:6 70:22 71:2
72:22 91:14 93:5
100:6 108:18
**talking** 33:20 42:22
43:8 52:4 58:22 59:2
72:2 73:11 75:19

99:2 109:11
**tell** 7:10 9:14 17:11
28:2 32:5,6 33:8
41:23 44:21 46:12
49:22 50:5,12 61:17
62:14 64:14 68:15
69:10 71:14 72:15
74:6 75:14 85:16
100:9
**telling** 74:7 75:4 81:3
**terribly** 7:23
**test** 7:21
**testified** 6:20 9:9 10:5
67:11,14 92:12
105:17,22 106:19
**testify** 83:10
**testifying** 10:3
**testimony** 2:23 57:20
71:6,14 72:1,7,9,13
73:5 75:16 76:3,9,21
108:19 111:12
**Thai** 12:12,17,18 13:4
13:5 16:13 19:3 52:3
53:3,4,5,7,8,15
**Thailand** 11:4,5
**Thebo** 1:17 2:21 5:13
6:5 111:21
**theirs** 62:9
**therapist** 102:14
**thereto** 2:16 111:9
**thing** 42:10 58:22
91:22 92:17
**things** 48:4 62:2
**think** 25:10 33:11
40:14 67:10,14 68:2
70:20 71:19,21,22
73:23 78:17 92:13
93:5,22 100:1 105:8
**third** 99:4
**thirty** 60:4
**thought** 40:19 61:8,23
80:10 86:9,13 101:15
101:16 102:1
**thousand** 84:13 97:14
97:18,20,23 98:3
99:10
**Threatt** 59:11 98:23
99:4
**three** 14:10,23 15:9
24:13 91:22 92:17
**time** 2:14,15 7:20 10:6
17:7 24:1,22,23
25:21 30:1 32:19,22
35:10,21 36:18,21
37:20 38:16,20 39:1

**39**:13 45:2,20 48:3
48:13 56:10,11 63:9
63:21 70:11 84:19
85:7 104:16 108:8
**times** 10:22 32:17
91:11 92:20,21
**title** 52:10 53:1,11
**today** 7:7,23 41:1
91:15
**told** 29:10 50:2 57:15
61:19 62:3,19,21
63:14 64:16 65:5
66:9 67:11,22 68:2
71:3 72:4,23 76:7,23
91:16
**top** 38:9 44:12
**total** 64:17 65:10 97:19
**totaled** 65:9
**touch** 41:22
**town** 53:9
**Toyota** 29:1 30:12
**track** 25:9
**transcribe** 9:21
**transcribed** 111:9
**transcript** 2:22 111:7
111:12
**transcription** 111:10
**transfer** 78:2
**travel** 11:20
**Travelers** 26:19 38:1
41:4 54:3,18 70:2,4
80:23 81:11 86:4,22
88:7 90:1 92:14
**Traveler's** 65:14
**trial** 2:14
**true** 111:11
**truth** 85:16 100:9
**try** 65:10,13 85:6
**trying** 64:17 65:12
71:14,18 73:22 83:16
83:17 94:21
**turn** 10:19
**twelve** 21:9
**twenty** 9:15,16,17 18:9
**twenty-four** 101:11
**twenty-one** 98:12
**twice** 39:2
**two** 14:5 19:13 23:23
24:13,13,14 32:17
36:14,16 39:18 59:9
78:15 79:8 85:10
87:16,17 91:2 92:4
**Tyler** 14:15,16
**T-H-A-I** 12:21
**T-H-R-E-A-T-T** 59:11

## U

U 1:12
Uh-huh 23:22 24:20
30:13 37:11 52:9
63:3 86:19 89:5
ultimately 104:10
understand 7:13 10:8
19:2 26:4 30:10
31:19,20 38:18 39:12
43:7,10,17 52:21
55:22 57:23 62:11
70:10 74:5,11 75:1
76:12 79:7,11,20
80:18 81:1,8 93:22
94:2 103:23 109:2
understanding 35:20
37:16 49:3 66:22
71:19 73:20,23 78:17
92:10 98:16 106:8
107:9
understood 7:17 71:5
71:22 75:3 80:20
90:9
unintelligible 62:1
unit 59:6
United 1:1 5:1 11:10,13
11:18,19
use 26:23 27:4 52:5,15
Usual 6:23
Usually 100:15

## V

vandalism 10:13,14,15
10:17
Vanessa 15:6
vehicle 29:2 31:18 52:5
52:7,15,18,19,22
53:1,12,12 98:13,15
99:11
verdict 10:20
violence 104:6
visit 15:22
visiting 38:21
volunteer 27:6
vs 1:8 5:8

## W

waiter 21:3
waived 2:4
want 40:13,15 58:21
66:20 69:6,11,12
75:10,12,14 82:2,9
83:12,14 90:19 92:2
97:9 98:9 102:3
wanted 20:19 40:20

92:15
wants 72:8 103:22
104:1
way 74:13
ways 103:13
week 47:4,6
weeks 49:1 56:22 71:2
71:10 72:21 76:1
109:8
Weelapan 1:6,16,22
5:6 6:14,18 8:6 53:2
53:14,16 59:6 110:9
went 18:8 31:12 36:13
36:18,20 37:20 39:1
39:13 40:6 48:14,22
55:1 104:20
we'll 72:12 75:15 80:15
94:4
we're 7:22 14:8 40:13
40:23 42:22 43:8
55:5 58:21 59:2
75:19 83:13 92:16
we've 11:21 33:19
42:20 56:17 57:20
66:7,17 67:6 89:16
91:14 93:1,4 100:6
101:2
wife 36:19
Wisconsin 14:4 16:10
16:11
wish 70:9
witness 2:3 6:14 9:12
9:13,23 10:23 110:2
111:13
woman 49:15,17 50:11
67:16 77:3
words 62:14 63:4
work 19:2,9,12 20:22
21:13,14 25:13
worked 26:7
working 41:16 47:4
102:17
works 7:11
worried 42:10
worry 109:10
wouldn't 65:1 83:6,19
wow 65:2
wreck 83:20
write 101:23
written 52:2 92:1
wrong 66:23
wrote 55:4,9 94:8
W-E-E-L-A-P-A-N 8:8

## X

X 4:1

## Y

yeah 10:6,15,18 18:1
22:15 23:14 28:10
31:3 36:16 38:19
43:20 52:19 54:11
60:14,23 63:12 66:5
80:17 83:5 97:17
99:19 101:5,22 103:8
104:20
year 18:15 24:12 41:9
91:21 94:14 100:11
100:13
years 9:15,16,17 14:7
14:20 18:13 20:17
21:9 23:6 24:13,13
24:14 36:22 37:7,21
39:5,19,20 103:7,8

## 0

01/11/05 95:14
04 56:20
07-05-65 9:1

## 1

1 4:11 33:3,8 39:8
42:21 94:5 105:16
110:10
1st 1:20 2:23
1-800 65:18
1/11/05 45:16
10 4:20 68:20,21 73:7
79:13,18,23 81:6,14
82:23 85:18 89:11
90:16,21 98:11
10:05 6:14
105 4:5
107 4:8
11 4:21 42:17,23 43:5
43:11,14 44:19 46:3
46:7 47:18,19 50:6,9
51:1 71:1 72:20 76:2
76:10,20 95:17,22
106:2,5,22 108:3,11
108:15,21,23
11/11/03 34:12 94:6,17
105:18
11/11/04 34:15 45:2
93:17 94:7,15,17
105:18 106:6,9
11/11/05 106:17
11/11/2004 43:20
12 4:22 96:20 97:2

12/22/04 44:16
12:15 110:10
1262 23:5
1361 13:1
15 2:20
19 89:2,3
1965 9:4
1979 11:11
1984 18:5
1988 2:20
1998 12:6 17:5
1999 17:8,9 20:4,5

## 2

2 4:12 43:23 44:6 51:6
54:7 55:1 71:10 72:2
75:20 105:23
2:05 1:5 5:5
2000 23:17
2000-A 5:2
2002 14:21,22 23:18
2004 42:17,23 43:5,11
43:14 46:3,21,22
47:7 50:6 75:17
108:14 109:15,16
2005 44:19 46:7 50:9
51:2,8 52:1 55:10
56:7 72:21 82:23
89:3,12 94:8,20
106:2,5,22 108:3,11
108:15,21 109:1,13
2006 1:21 3:1 110:11
22 46:21,22 47:7 56:20
75:17 108:14 109:12
109:14
27 51:8 52:1 55:10 56:1
57:4,5,9,12 58:15
94:8
272 1:19 5:18 6:12
2868 51:10

## 3

3 4:13 51:14,18 53:18
55:2
30 58:16
33 4:11
35209 5:23
36104 1:20 5:19 6:13
36109 8:19
371 8:11

## 4

4 4:14 58:9,13
405 5:23
44 4:12

46463 1:23

## 5

5 4:15 9:2,3 56:7,12
57:8,9 59:3 68:9,14
78:15 79:18 94:20
5(d) 2:18
51 4:13
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 8:22
58 4:14

## 6

6 4:4,16 85:21 86:2
6663 13:3
68 4:15

## 7

7 4:17 61:11 88:1,6

## 8

8 4:18 88:14,19
800 65:21
86 4:16
88 4:17,18
89 4:19

## 9

9 4:19 89:7,11
90 4:20
95 4:21
97 4:22

ALABAMA PERSONAL AUTOMOBILE LIABILITY
INSURANCE IDENTIFICATION CARD

The vehicle described below is covered by a personal automobile
policy that meets Alabama's insurance requirements.

Company: THE STANDARD FIRE INSURANCE COMPANY
One Tower Square, Hartford, CT 06183

Agent.       Policy Number        Effective Date    Expiration Date
OTX786    975499318 101 1         11/11/03          11/11/04

Year    Make/Model           Vehicle Identification Number
01      MITSU/ MONTERO LI    JA4MW51R21J008388

Agent·                        NAIC 19070
COLONIAL INS AGENCY
PO BOX 231449
MONTGOMERY AL 36123

Insured:
WEELAPAN KERN
371 SPENSETH DRIVE
MONTGOMERY AL 36109

Travelers

Rev. 8-01.   See Important Notice On Reverse Side

DEFENDANT'S
EXHIBIT

1 Kern

SF 0035

IN CASE OF AN ACCIDENT:

* Call The Travelers immediately
  1-800-CLAIM33 toll free, 24 hours a day.

* Be sure to get name and address of each driver, passenger, and witness;
  and insurance company and policy number for each vehicle involved.

* Only discuss the accident with police officers or Travelers representatives.

FRAUD HOTLINE: 800-6-FRAUD-0

FOR POLICY SERVICE CALL: 334-270-6824

SF 0036

# TRAVELERS

COLONIAL INS AGENCY INC
PO BOX 231443
MONTGOMERY AL  36123

0008

412

## Offer to Reinstate

Account No.        975499318
Date of Notice     12/22/04

| TOTAL ACCOUNT BALANCE |
| $1,650.00 |

| MINIMUM AMOUNT DUE |
| $445.49 |

| DUE DATE |
| JANUARY 11, 2005 |

For Automated Billing and Payment
Information call: 1-800-550-7716
Available 7 days a week
For policy changes or questions
call: (334) 270-6924
For claims call: 1-800-CLAIM-33

WEELAPAN KERN
371 ARENSETH DRIVE
MONTGOMERY AL  36109

*[handwritten: Paid Jan 27, 2005 $500.00 CK# 2868]*

Insurer THE STANDARD FIRE INSURANCE COMPANY

**Billing Activity**

|  | Amount |
| --- | --- |
| Previous balance | $1,640.00 |
| Late charge | +10.00 |

**Policy Information**

| | Policy Period | Minimum Payment | Unpaid Balance |
| --- | --- | --- | --- |
| Automobile 975499318 101 1 | LAPSED-11/11/04 to 11/11/05 | $445.49 | $1,650.00 |

## *IMPORTANT NOTICE - OFFER TO REINSTATE*

Your policy expired on 11/11/04 at the time stated in your policy because we did not receive the minimum payment required to continue your coverage. However, we will be happy to reinstate this policy without interruption.

To reinstate your policy, we must receive at least the "MINIMUM AMOUNT DUE" shown above by 01/11/05. If we receive your payment by that date, we will send a notice of reinstatement to you.

If you pay the "TOTAL ACCOUNT BALANCE" there will be no service charge.

Please contact your agent or insurance representative immediately if you have any questions.

Please detach and mail the lower portion of this bill with your payment in the enclosed envelope to TRAVELERS, ONE TOWER SQUARE, HARTFORD, CT 06183-1001. Thank You.

DEFENDANT'S
EXHIBIT

*[handwritten signature: Kern]*

KERN0001

ALA THAI, INC.
1361 FEDERAL DR.  PH. 334-262-5830
MONTGOMERY, AL  36107

2868

61-411/651

DATE

PAY TO THE ORDER OF *Travelers Indemnity and affiliates*    $ 800.00

*Eight Hundred Dollars only*    DOLLARS

WHITNEY  Whitney National Bank
Montgomery, Alabama 36108

731109600020 4  P  975499318
9111098230    010405

FOR *Acct # 975499318    1o1 1*

C/O WEELAVAN T. KERN    321 SPENSE TH. DR.

MONTGOMERY, AL 36109-4934

⑈002868⑈  ⑆065101651⑆  720490713⑈    ⑈0000080000⑈

020457735  0207  05  0500  00
085069746  50340112  000000002160
LPSI LOU KY

DEFENDANT'S
EXHIBIT

3 kern

KERN0002

AST-27
REV. 1/91

**ALABAMA UNIFORM TRAFFIC ACCIDENT REPORT**

DATA PROCESSED

DPS Accident No.

Local Case No. **00973**

Local Zone **05**

# **23831**   Sheet **1** of **2** Sheets

| | |
|---|---|
| On Street, Road or Highway: **N. E. Blvd** **5152** | At Intersection of or Between (Note 1): **TODD RD** **0550** Place 2: **PLANTATION WAY** |

County: **08**  City: **MONTGOMERY**

UNIT
NO
LEFT
SCENE
COM
VEH
UNIT 1
VEHICLE

**Driver Full Name:** WESTBROOK JEFFERSON   **Street Address:** 3262 FEDERAL DR   **City and State:** Montg. AL   **ZIP:** 36107   **Telephone No.:** 467-1741

DL Class: **D**  Restriction: **C**   **DL No.:** 73.55158

Mo: **3**  Day  Year   **OVA**

Place of Employment: **AIA-THAI**

Maneuver: **01**   Travel Road Name: **N.E. Blvd**   Road Type: **5152**

Veh Year **2001**  Make **MITS**  Model **Mont**   VIN: **JA4MN51R21J008388**   License Tag Number: **3A9522Y**   State **AL**  Year **200?**

Owner's Name: **SAMS**

**Driver/Pedestrian Full Name:** LISA ANN B. JACKSON   **Street Address:** 501 Eugene Dr   **City and State:** Montg. AL   **ZIP:** 36109   **Telephone No.:** 409-6990

Mo: **11**  Day **27**  Year **1958**   DL Class: **D**  Restriction: **C**   **Driver License No.:** 4460269

Place of Employment: **Southern Food** — Safeway

Maneuver: **18**   Travel Road Name: **N.E. Blvd**   Road Type: **5152**

Veh Year **1000**  Make **Chev**  Model **IMP**   VIN: **261KW55K5Y9124565**   License Tag Number: **3A3092N**   State **AL**  Year **2003**

Owner's Name: **SAMS**

UNIT
NO
LEFT
SCENE
COM
VEH
VEHICLE OR PEDESTRIAN
UNIT 2

CODES

DEFENDANT'S
EXHIBIT

KERN0027

4 Kern



SEE SHEET 2 OF 2

SEE SHEET 2 OF 2

KERN0028

# ALABAMA UNIFORM TRAFFIC ACCIDENT REPORT

DATA PROCESSED

A form with handwritten entries. Key legible fields include:

**Date:** 02 05 2005   **Time:** 1250   **Day of Week:** F 03

**On Street, Road or Highway:** N. E. Bypass   5152   0454   0550   25000

**Driver (Unit 1):** LYNETTE S TRUSCOTT   P.O. Box 412   Linden AL   35096

**Driver License No.:** 3444688   **State:** AL

**Place of Employment:** Retired

**Vehicle:** ISUZU   ROD   VIN: 452CX5BWOWV323807   CK2687

**Owner:** Chris Truscott   1357 Dickerson Rd   Monroe AL 36117

KERN0029

**SEATING**

Unit 1 — 42

Other Involved Unit (Circle One)
12 - Pedestrian
13 - Rider of Domestic Animal
14 - Occ. of Non-Motorized Vehicle
15 - Victim of Other Circumstance/ Codes Not Applicable

Other Involved Safety Equipment

Unit 2

Other Involved Unit (Circle One)
12 - Pedestrian
13 - Rider of Domestic Animal
14 - Occ. of Non-Motorized Vehicle
15 - Victim of Other Circumstance/ Codes Not Applicable

Other Involved Safety Equipment

**CODES** — SAFETY EQUIPMENT

**VICTIMS**

N/A

| | Name | Address | Taken To | Taken By | Unit No | Seat Pos | Injury Type | Age | Sex | Ejection | First Aid By |
|---|---|---|---|---|---|---|---|---|---|---|---|

**CODES**

Injury Type
K - Killed
B - Bruise/Abrasion/Swelling
A - Visible as Carried from Scene
C - Not Visible—Has Pain/Faint

Ejected
N - Not
F - Fully
P - Partially
E - Trapped
X - Not Applicable

A - Ambulance Attended
D - Doctor

First Aid By
N - Paramedic
O - Other
P - Police
U - Unknown
N - None

**NARRATIVE AND DIAGRAM**



Not To Scale

Prostitution WBN

N.E. Blvd (S. Bound Lanes Only)

Todd Rd

Officer's Opinion of What Happened: VEN #1 FAILED TO SEE THAT VEN #2 WAS SLOWING IN TRAFFIC CAUSING VEN #1 TO COLLIDE WITH VEH #2 THEN COLLIDED WITH VEH #3

**ROADWAY ENVIRONMENT**

For Each Roadway Environment Field, Circle One Entry for Each Involved Unit.

| | Unit 1 | Unit 2 |
|---|---|---|
| 1 | 3 | |
| 2 | | A |

Contributing Road Defects
0 - None
1 - Shoulders Low
2 - Shoulders High
3 - Holes, Bumps, Etc.
4 - Other

Surface Construction
1 - Asphalt
2 - Concrete
3 - Brick
4 - Unpaved
5 - Other

Condition
1 - Dry
2 - Wet
3 - Icy
4 - Snowy/Slushy
5 - Muddy
6 - Other

Accident In
0) Not Related To Road Construction Zone?
1 - Zone
2 - No

Material In Roadway (Contributing)
0 - None       5 - Gravel
1 - Ice         6 - Oil/Petrol
2 - Sand        7 - Water
3 - Trees/Limbs  8 - Other
4 - Mud

Material Source
1 - Not Applicable
2 - Natural Environment
3 - Dropped From Vehicle
4 - Already in Road, But Fell From Vehicle
8 - Other
9 - Unknown

Character
1 - Straight—Level
2 - Straight—Down Grade
3 - Straight—Up Grade
4 - Straight—Hillcrest
5 - Curve—Level
6 - Curve—Down Grade
7 - Curve—Up Grade
8 - Curve—Hillcrest

Vision Obscured By:
00) 07 - Not Obscured
1 - Buildings
2 - Signboard
3 - Trees, Crops, Bushes
4 - Blowing Snow/Sand
5 - Hillcrest
6 - Cover in Road
7 - Fog
8 - Parked Vehicle
9 - Moving Vehicle(s)
10 - Blinded by Sunlight
11 - Fire/Smoke
12 - Rain
13 - Blinded by Headlights
14 - Embankment
15 - Rain on Windshield
16 - Snow on Windshield
17 - Other
98 - Other
99 - Unknown

Traffic Control
1 - Police Officer
2 - R.R. Crossing Gates
3 - R.R. Flashing Lights
4 - R.R. Cross Backs/Pave Mark
5 - Pedestrian Control
6 - Traffic Signal
7 - Flashing Beacon
8 - Stop Sign
9 - Yield Sign
10 - Lane Control Device
11 - Flagman
97 - None
98 - Other

Traffic Control Functioning: Yes / No — N/A
DOT Railroad Crossing#: N/A

Opposing Lanes Separated By:
97 - None
1 - Unpaved Surface
2 - Paved Surface
3 - Broken Painted Line
4 - Solid Painted Line
5 - Concrete Barrier
6 - Metal Guard Rail
7 - Fence
98 - Other Barrier

Roadway Lanes
1 - One Lane
2 - Two Lanes
3 - Three Lanes
4 - Four Lanes
5 - Five Lanes
6 - Six Lanes or More

One-Way Street: Yes / (No)

**INVESTIGATION**

Light
1 - Daylight
2 - Dawn
3 - Dusk
4 - Darkness—Road Not Lit
5 - Darkness—Road Lit

Weather
1) Clear
2 - Cloudy
3 - Rain
4 - Snow
5 - Sleet/Hail
6 - Crosswind
7 - Fog
8 - Other

Locale
1 - Open Country
2 - Residential
3 - Shop's or Business
4 - Mfg. or Industrial
5 - School
6 - Playground
8 - Other

Non-Vehicles Property Damage
1 - None Visible
2 - Slight
3 - Moderate
4 - Severe

Description: N/A

Owner: N/A

Address:

| Time Police Notified | Time Police Arrived | Time EMS Arrived | Name of Photographer |
|---|---|---|---|
| 1251 | B10 | N/A | N/A |

Witness Full Name: N/A

Address:     Telephone:

Witness Full Name:     Address:     Telephone:

| Name of Investigating Officer | Officer ID | Agency ORI | Supervisor Reviewed |
|---|---|---|---|
| Cpl. S.M. Johnson | 611 | 0030100 | |

Name of Other Investigating Officer(s) at Scene: N/A     Officer ID:     Agency ORI:

KERN0030

2000 Interstate Park Drive, Suite 100, 36109
Post Office Box 231449
Montgomery, Alabama 36123-1449
(334) 270-6624
(334) 270-6797 (fax)
www.colonial-insurance.com



COLONIAL
INSURANCE
A COLONIAL COMPANY

February 10, 2005

Weelapan Kern
371 Spenseth Drive
Montgomery, AL 36109

RE:   Private Passenger Auto Policy # 9754993181011

Dear Weelapan:

We have been notified by Travelers Insurance Company that your auto policy
was cancelled on 1-25-05 back to the effective date of your renewal on 11-11-
04 for nonpayment. Travelers did receive your check for $800.00 on 2-7-05,
however they are returning your premium payment since it was posted on 2-7-
05, well after the cancellation date.

I have enclosed a quote for replacement coverage with another company.
Travelers will not reinstate your policy. This quote is for the same coverage
amounts you had with Travelers, including the same deductibles, and it is for 6
months.

Please let me know what you wish to do as soon as possible. Please understand
you are without any automobile coverage at this time.

Sincerely,

Chris Setzer
Personal Accounts Manager

**DEFENDANT'S
EXHIBIT**

5 Kern

KERN0005

0442

 **TRAVELERS**

P.O. BOX 59059
KNOXVILLE, TN 37950-9059

0442

WEELAPAN KERN
371 SPENSETH DRIVE
MONTGOMERY AL 36109

DATE:            02/17/05
CHECK NUMBER: 883A  44642061
AMOUNT:              $800.00***
OFFICE: 412    AGENT: OTR786
ACCOUNT:      975499318

REFUND DUE TO CANCELLATION            975499318

NAMED INSURED WEELAPAN KERN
AND ADDRESS    371 SPENSETH DRIVE
                MONTGOMERY AL  36109

** IF YOU HAVE ANY QUESTIONS, PLEASE CALL (334) 270-6824 **
                COLONIAL INS AGENCY INC

...Detach Check                                          Detach Check...

P.O. BOX 59059
KNOXVILLE, TN 37950-9059

**TRAVELERS**                                    02-20
                                                  311
CITIBANK DELAWARE
NEW CASTLE DELAWARE 19720                **883A  44642061**

| DATE:    | OFFICE: | AGENT: | ACCOUNT: 975499318 | PAY | $800.00*** |
|----------|---------|--------|---------------------|-----|------------|
| 02/17/05 | 412     | OTR786 |                     |     |            |

EIGHT HUNDRED & 00/100 DOLLARS ***********************************************************

PAY
TO THE        WEELAPAN KERN
ORDER OF      371 SPENSETH DRIVE
              MONTGOMERY AL  36109

                                        *Douglas K. Russell*
                                        AUTHORIZED SIGNATURE
                                        **PLEASE CASH WITHIN 60 DAYS**

DEFENDANT'S
EXHIBIT                        KERN0007

                        *Le Kern*

 **TRAVELERS**

**Rick Finchum**
*Quality Audit Specialist*
*Knoxville Business Center*
PO Box 57059
Knoxville, TN 37950-9059
(877)-878-2458
(865) 595-2115 (fax)

March 28, 2005


Gary E Atchison
PO Box 2002
Montgomery, AL 36102-2002


RE:    Weelapan Kern
       975499318 101 1
       The Standard Fire Insurance Company


Dear Mr. Atchison:

I am writing in response to your letter dated March 17, 2005 regarding the auto policy for Weelapan Kern.

The Standard Fire Insurance Company ("Standard Fire") was the company that underwrote Mr. Kern's auto policy referenced above. Mr. Kern's policy period was November 11, 2003 to November 11, 2004. Prior to the expiration of this policy period, Standard Fire sent a renewal offer to Mr. Kerns for the policy period November 11, 2004-November 11, 2005. In order for Mr. Kern's to accept the offer of renewal, he was to pay the renewal premium. Billing statements that contained a specific notice instructing the insured that payment was due by the due date in order to continue coverage were sent to the customer in October and November, but no payments were received to continue the coverage. As a result, the policy lapsed. An Offer to Re-instate dated December 22, 2004 was mailed to the insured. This Offer clearly informed the insured that his policy expired on November 11, 2004 because he did not pay his premium. Mr. Kerns was given an opportunity to have his policy reinstated by sending in the minimum amount due of $445.49 by January 11, 2005. Mr. Kerns did not accept the Offer to Reinstate. As a result, his policy expired November 11, 2004.

After the expiration of his policy, Mr. Kern mailed a payment in the amount of $800 (check dated January 27, 2005) using the payment stub from the Offer to Reinstate which clearly informed Mr. Kern that payment was due by January 11, 2005 in order to reinstate his policy. The check was electronically scanned and automatically deposited. Once the payment is deposited, the system checks for outstanding premium due. In this case, since the policy was no longer active, a refund check was mailed to Mr. Kern on February 17, 2004.



DEFENDANT'S
EXHIBIT

7 Kern

KERN0010

 **TRAVELERS**

**Rick Finchum**
*Quality Audit Specialist*
*Knoxville Business Center*
*PO Box 57059*
*Knoxville, TN 37950-9059*
*(877)-878-2468*
*(865) 595-2115 (fax)*

Since Mr. Kern's policy expired on November 11, 2004, there was no policy in force for the February 5, 2005 accident. The fact that his check was cashed after the expiration date of his policy does not bind Travelers to coverage after the expiration of his policy on November 11, 2004.

Sincerely,

Rick Finchum
Quality Audit Specialist

KERN0011



**ST PAUL**
**TRAVELERS**

4400 NORTH POINT PARKWAY
SUITE 160
ALPHARETTA, GA 30022-2429
TEL: (770) 521-3515
FAX: (770) 521-3078

CHARLENE E. BLANKE
COVERAGE COUNSEL –
SOUTH REGION
CLAIM LEGAL-COVERAGE AND
EXTRACONTRACTUAL GROUP
TEL: (770) 521-3515
FAX: (770)-521-3078



May 19, 2005

**By Certified Mail, RRR**

Law Office of Attorney Gary E. Atchison
P.O. Box 2002
492 South Court Street
Montgomery, AL 36102-2002

RE:      Insured:          Weelapin Kern
         Claimants:        Lisa Jackson and Annette Threatt
         Date of Loss:     February 5, 2005
         Policy No.:       OTR786-975499318-1
         Claim No.:        L2Z5076

Dear Mr. Atchison:

     The undersigned is coverage counsel to the Standard Fire Insurance Company (herein
"St. Paul Travelers") with respect to the captioned matter. In a letter dated March 28, 2005 St.
Paul Travelers responded to your letter of March 17, 2005, advising you that Mr. Kern's policy
was not renewed and had lapsed at the time of the accident.  Therefore, there is no coverage for
Mr. Kern for this loss.

     I am attaching a copy of St. Paul Travelers' March 28, 2005 letter.

                              ***

                                   Sincerely,

                                   *Charlene E. Blanke*

                                   Charlene E. Blanke

cc:      Colonial Insurance
         2000 Interstate Park Drive
         Suite 100
         Montgomery, AL 36123-1449

**DEFENDANT'S**
**EXHIBIT**
8 Kern

KERN0017

Mr. Gary Atchison
May 19, 2005
Page 2

Enc.

KERN0018



**ST PAUL TRAVELERS**

4400 NORTH POINT PARKWAY
ALPHARETTA, GA 30022-2429

LUKE J. OBRIEN
UNIT MANAGER AD UNIT
TEL: (770) 521-3416
FAX: (866)680-3951

June 10, 2005

Law Office of Attorney Gary E. Atchison
P.O. Box 2002
492 South Court Street
Montgomery, AL  36102-2002

RE:     Insured:         Weelapan Kern
        Claimants:       Lisa Jackson and Annette Threatt
        Date of Loss:    February 5, 2005
        Policy No.:      OTR786-975499318-1
        Claim No.:       L2Z5076

Dear Mr. Atchison:

We recently received a payment from your office in regards to return premium for our insured and your client Weelapan Kern. In a previous letter from our Company, we had advised you that Mr. Kern's policy was not renewed and had lapsed at the time of the accident. Therefore, there is no coverage for Mr. Kern for this loss. Enclosed you will find the return premium payable to your client. Thank you for your cooperation.

***

Sincerely,

Luke J. O'Brien

**DEFENDANT'S EXHIBIT**
9 Kern

KERN0019

3287

 **TRAVELERS**

ONE TOWER SQUARE, PLPBA
HARTFORD, CT 06183

3287

WEELAPAN KERN
371 SPENSETH DRIVE
MONTGOMERY    AL  36109

DATE:        07/21/05
CHECK NUMBER: 883A 48794706
AMOUNT:        $800.00***
OFFICE: 998    AGENT: OTR786
ACCOUNT:      975499318

ACCOUNT REFUND              975499318

REPLACING REFUND CK# 44642061 DTD 02/17/05
TAP    SXD

 ** IF YOU HAVE ANY QUESTIONS, PLEASE CALL (860) 277-2455 **

---

Detach Check                                    Detach Check

ONE TOWER SQUARE, PLPBA
HARTFORD, CT 06183

**TRAVELERS**

CITIBANK DELAWARE
NEW CASTLE DELAWARE 19720

62-20
311

**883A  48794706**

| DATE: 07/21/05 | OFFICE: 998 | AGENT: OTR786 | ACCOUNT: 975499318 | PAY | $800.00*** |
|---|---|---|---|---|---|

EIGHT HUNDRED & 00/100 DOLLARS **********************************************************

PAY
TO THE
ORDER OF

WEELAPAN KERN
371 SPENSETH DRIVE
MONTGOMERY       AL   36109

*Douglas K. Russell*
AUTHORIZED SIGNATURE

**PLEASE CASH WITHIN 60 DAYS**

KERN0020

⑆48794706⑆ ⑈031100209⑈  38615676⑈

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

WEELAPAN KERN;                        *
                                      *
        Plaintiff,                    *
                                      *        Case No.
vs.                                   *        2:05-cv-698-B
                                      *
STANDARD FIRE INSURANCE               *
COMPANY; ET AL.,                      *
                                      *
        Defendants.                   *

## PLAINTIFFS RESPONSE TO DEFENDANTS INTERROGATORIES

Plaintiff responds to Defendant Standard Fire Insurance Company's First Interrogatories to Plaintiffs as follows:

1.      Please state you full name, address, date of birth, and social security number.

**RESPONSE:**

        1.      **Weelapan Kern**
        2.      **371 Spenseth Drive, Montgomery, Alabama 36109**
        3.      **07-05-1965**
        4.      **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**

2.      Please identify and describe in detail each and every communication you have had with Standard Fire or any of Standard Fire's agents or representatives that relates to the incidents made the basis of this lawsuit.

**RESPONSE: Plaintiff cannot recall each and every communication that he has had with the insurance company.  He is only sure that he has spoken to them several times regarding the accident and policy.**

3.      Please identify and describe in detail each and every conversation or communication that you have had with Colonial Insurance or any other insurance agency



DEFENDANT'S
EXHIBIT

10 Kern

regarding automobile coverage for you from 2002 to the present, or any conversation or communication regarding the incidents made the basis of this lawsuit.

**RESPONSE: Plaintiff cannot recall each and every communication that he has had with the insurance company. He is only sure that he has spoken to them several times regarding the accident and policy.**

4.    In paragraph 4 of your complaint, you allege that you maintained your automobile insurance policy with Standard Fire "by paying the necessary premiums to keep said policy in force." Please identify each and every fact that supports this contention, specifically noting the date and time of each premium payment and how these payments kept the policy in force.

**RESPONSE: Plaintiff's checks reflect the requested information. These checks have been produced.**

5.    In paragraph 7 of your compliant, you allege that "Defendant Standard Fire has failed and/or refused to pay for" covered damages and losses. Please identify the damages and losses that you claim were covered and the reason(s) that the damages and losses should be covered by a Standard Fire policy.

**RESPONSE: Plaintiff claims the damage to his vehicle was approximately $2,100.00 and the damage to the other vehicle was approximately $5,500.00. These losses should have been covered because Plaintiff paid his premiums and Defendant accepted the premium.**

6.    Please identify the policy that you claim was in force at the time of the accident made basis of this lawsuit, including, but not limited to, the policy number and the policy period.

**RESPONSE: Travelers Insurance, Policy Number 0TR786-975499318-101-1**

7.    If you allege that a policy was in force at the time of the accident made the basis of this lawsuit, please explain the basis for this allegation, including but not limited to,

the facts that you claim give rise to a binding contract of insurance between you and Standard Fire.

**RESPONSE: Plaintiff paid premiums for coverage that the Defendant accepted. Plaintiff suffered a loss, made a claim for coverage, and said claim was denied and Plaintiffs premiums returned.**

8.   Please identify the specific policy provisions which you base your claim that the damages and losses you allegedly sustained were "covered damages and losses" and the specific policy provisions that provide the Standard Fire should have paid for said damages and losses.

**RESPONSE: Plaintiff does not have nor did he ever receive a copy of his policy. As a result, Plaintiff is unable to answer this interrogatory.**

9.   In paragraph 9 of your complaint, you allege that "Defendant Standard Fire was under a contractual obligation to pay benefits owed to Plaintiff under the aforementioned automobile policy of insurance." Please identify each and every fact that supports you contention that Standard Fire had a contractual obligation to you, including but not limited to, identifying the contract under which such alleged obligation was owed.

**RESPONSE: Plaintiff paid premiums towards policy number 0TR786-975499318- 101-1 for coverage that the Defendant accepted. Plaintiff suffered a loss, made a claim for coverage, and said claim was denied and Plaintiffs premiums returned.**

10.   In paragraph 10 of your complaint, you allege that "Defendant Standard Fire breached its contractual obligation by failing to and refusing to properly pay the benefits due" under a policy of insurance. Please identify each and every fact that supports your contention that the benefits were "due" under any policy of insurance, including, but not limited to, identifying the contract under which such alleged obligation was owed and the specific contractual provisions that you allege that Standard Fire breached.

**RESPONSE: Plaintiff paid premiums towards policy number 0TR786-975499318-101-1 for coverage that the Defendant accepted. Plaintiff suffered a loss, made a claim for coverage, and said claim was denied and Plaintiffs premiums returned.**

11.     In paragraph 11 of your complaint, you allege that "[a]s a proximate consequence of Defendant Standard's breach, Plaintiffs was injured and damaged...," and you then list general items of damage. Please identify with specificity the damages you claims were caused by Standard Fire and how these damages were caused by Standard Fire's alleged breach.

**RESPONSE: Plaintiff claims the damage to his vehicle was approximately $2,100.00 and the damage to the other vehicle was approximately $5,500.00. These losses should have been covered because Plaintiff paid his premiums and Defendant accepted the premium. Emotional and Mental distress damages are properly left for the jury to decide.**

12.     Please explain why your driver's license was revoked.

**RESPONSE: Plaintiffs license was revoked because the Travelers Insurance reported him not covered by automobile at the time of the accident.**

13.     Please identify the date you first notified Standard Fire of the accident made the basis of this lawsuit.

**RESPONSE: Plaintiff states he notified the insurance company via telephone the day of the accident.**

14.     In paragraph 14 of your complaint, you allege that "Defendant Standard Fire has intentionally, and in bad-faith, failed and/or refused to fully investigate and/or pay the benefits due under the aforesaid policy of insurance as set forth above." Please identify each and every fact that supports this contention, including, but not limited to, identifying with specificity how and what Standard Fire failed to investigate and the basis for you contention that Standard Fire should have paid benefits to you.

**RESPONSE: Defendant Returned premiums after the accident, even though they had been previously accepted and deposited, and denied Plaintiffs claim.**

15.   Please identify and describe in detail each and every communication that you, or your attorney or other representative, have had with any person regarding the incidents made the basis of your lawsuit, including but not limited to, the alleged payment of premiums to Standard Fire.

**RESPONSE: None**

16.   Please identify and describe in detail each and every communication that you, or your attorney or other representative, have had with any person regarding the alleged failure of Standard Fire to pay amounts you allege are owed to you.

**RESPONSE: None**

17.   Please identify the insurance companies with whom you have had automobile insurance from 2000 to the present.

**RESPONSE: Geico Insurance**

18.   Please identify any and all efforts you made to obtain automobile insurance from any entity other than Standard Fire from 2002 to the present.

**RESPONSE: Plaintiff has not had any other insurance besides Geico. This insurance was for his spouse's vehicle.**

19.   Please identify the name, address, and qualification of each person whom you expect to call, or may call, as an expert witness at the trial of this matter, and state the subject matter on which each such expert is expected to testify. As to each expert identified by you, please identify: (a) the substance of the facts and opinions to which each expert may testify and give a summary of the grounds for each opinion; and (b) the factual information that has been furnished to the expert for his or her study, examination and review, and when such information was furnished, and by whom.

**RESPONSE: Plaintiff expects to call John H Allen as an expert witness in this case. a) Insurance claims expert; b) John Allen has been provided with all documents produced to defendant.**

20.     Please state the names and address of all insurance companies with whom you have filed any kind of insurance claim within the last five years. For each such claim, please state the date, nature, and the amount of the claim as well as the policy number and the company name that issued the policy upon which said claim was made.

**RESPONSE: None other than the claim at issue.**

21.     Please state the name and addresses of all companies, businesses, entities, or individuals against whom you have sought compensation for damages as a result of the incidents made the basis of this lawsuit, stating in said response any amount you received by way of payment or settlement for any and all claims.

**RESPONSE: None**

22.     Please identify any and all damages that you claim were proximately caused by the actions or inactions of Standard Fire. Please include in your response any and all economic damages, specifying the nature of the damages as well as the amount of the damages, and any and all mental and/or physical damage, specifying the nature of said damage and the amount of compensation sought for said damage. Please state for each said item or damage, any and all compensation that you have received from any source for that damage, specifying for each item of compensation the source of said compensation.

**RESPONSE: Please see attached documents for detailed listing of damage to Plaintiffs vehicle. Plaintiff is also responsible for the damage caused to the other vehicle involved in the accident. Plaintiff has also lost his drivers license as a result of the Defendants actions. Mental and emotional distress damages, along with any punitive damages are properly left to jury.**

23.    Please identify and describe in detail each and every way in which you have attempted to mitigate damages arising from the incidents made the basis of this lawsuit, including, but not limited to, procuring other automobile insurance.

**RESPONSE: Plaintiff hired an attorney and has made attempts to hold off attempts of collection by the other party involved in the accident.**

24.    Please identify any and all mental anguish and emotional distress injuries allegedly incurred by you and for which you seek compensation through this lawsuit. Please identify in your response the date of each visit to any and all health-care provider or facility, the name or names of the heath care provider or providers, the diagnosis or multiple diagnoses, the cost of each visit, the ultimate outcome for each diagnosis, and the cost of treatment for each physical injury, illness or medical reaction sustained.

**RESPONSE: Plaintiff has not seen a physician regarding his mental anguish and emotional distress damages.**

25.    Please identify any and all persons who have knowledge, claim to have knowledge or are reported to have any knowledge of any of the incidents or damages made the basis of this lawsuit.

**RESPONSE:  Plaintiffs attorneys, Montgomery Policy Department, Ms. Lisa Ann Jackson and the Defendant.**

26.    Please identify any and all other lawsuits in which you have been involved as a party, including the nature of the case, the names of all the parties, the attorneys for each party, the court in which the case was filed, the status of the case, and, if the case has been resolved or settled, state how the case was resolved or settled and for what amount.

**RESPONSE: Divorce proceedings only.**

27.    If you have ever been charged or convicted of a crime, please state separately for each such charge or conviction, the title and location of the court, the date of the charge

or the conviction, the crime for which you were charged or convicted, and the sentence imposed, if any.

**RESPONSE: None**

_____
CHRISTOPHER E. SANSPREE (SAN048)
Attorney for Plaintiff

OF COUNSEL:

**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS, & MILES, P.C.**
272 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103-4160
(334) 269-2343
(334) 954-7555 (Fax)

Mr. Gary E. Atchison
Attorney at Law
Post Office Box 2002
Montgomery, Alabama 36102-2002

_____
WEELAPAN KERN

STATE OF ALABAMA                    )
COUNTY OF Montgomery                )

I, the undersigned Notary Public in and for the State of Alabama at Large, hereby certify that Weelapan Kern, whose name is signed to the foregoing, and who is known to me and who being by me first duly sworn, acknowledged before me on this day that being informed of the contents of the said document, she executed the same voluntarily on the day the same bears date.

SWORN to and SUBSCRIBED before me this the 17th day of Feb , 2006.

_____
NOTARY PUBLIC
My Commission Expires: 9/17/07

_____
Witness to Notary

## CERTIFICATE OF SERVICE

I hereby certify that I have filed the original of the foregoing document in this Court with copies to be served upon all Defendants of record as listed below by placing a copy of same in the United States Mail, first class, postage prepaid on this the 27 day of _____ 2006.

OF COUNSEL

Brenen G. Ely
Joel Isenberg
**SMITH & ELY, LLP**
2000 A. Southbridge Parkway, Ste 405
Birmingham, Alabama 35209
205-802-2214
205-879-4445 fax



Hendrick, L. Burt
AUTO PAINTING

**McTIER's**
(Formerly Robert McTier)
PAINTING — REBUILDING
AUTO PAINTING, BODY & FENDER WORK
OWNERS — JAMES McTIER / CALVIN McTIER
PHONE 262-0009          436 JULIA STREET
MONTGOMERY, ALABAMA

MARCH _____ , 19 05

WEELADAN T. KERN
371 SPENSETH DR.
Montgomery, AL. 36109 (334) 467-1741
2002 Mitsubishi Montero Limited

| Description | Parts | | Labor |
|---|---|---|---|
| R&R Fr. Bumper Cover | 460 | 00 | 8.0 |
| R&R Protector pan (under Bumper) | 130 | 00 | .5 |
| R&R Grille | 218 | 00 | 1.2 |
| R&R Rt. Fr. Fog light | 214 | 00 | .3 |
| R&R Rt Fr. Fog light cover | 40 | 00 | .3 |
| R&R L. Fr. Fog light cover | 40 | 00 | .3 |
| Pull Re Bar | | | 1.5 |
| Paint & Clean Coat Bumper Grn. | | | 5.0 |
| Paint Material | 180 | 00 | |
| | | | |
| Total Parts | 1,1 | 02 | 00 |
| " Paint Material | 1 | 80 | 00 |
| " Body Labor 10.6 × 40°° p.h. | 4 | 24 | 00 |
| " Paint Labor 5.0 × 40°° p.h. | 2 | 00 | 00 |
| " Pull (Frame Bar) Labor 45°° × 1.5e | | 67 | 50 |
| " Tax | 1 | 28 | 20 |
| Grand Total | 2,1 | 01 | 70 |

The above is an estimate based on our inspection and does not cover any additional parts or labor which
may be required after the work has been opened up. Occasionally after the work has started, worn or
damaged parts are discovered which are not evident on the first inspection. Because of this the above
prices are not guaranteed, and are for immediate accept only.


DEFENDANT'S
EXHIBIT
11 Kern

KERN0021

 # Bell Corporation of America

### Insurance Subrogation Recovery Services
### Since 1976



F. W. Bell, Chairman
John T. Simon, President

(813) 261-7755
(800) 282-6882
Fax: (813) 289-8864
Bell@bellcorp.com

Executive Office
1411 N Westshore Blvd
P. O. Box 24538
Tampa, FL 33623

A National Firm
Beasley Allen
Attn: Bilinda
218 Commerce Street
Montgomery, AL 36104

July 13, 2005

Your Client:  Weelapin T Kern
Bell File#:    05-09377

D.O.L.: 2/05/05
Our Client: Safeway Insurance

Dear Bilinda,

We have been advised that your firm is representing Weelapin T Kern in regards to an incident that occurred on 2/05/05. Bell Corporation is representing Safeway Insurance a/s/o Mr. Jackson. Our client is seeking 100% of the total damages to their insured's property as a result of the incident mentioned above which amounts to $5,483.50. Please contact our office in order to resolve this claim in a manner that is satisfactory to everyone involved.

Thanking you in advance for your cooperation in this matter.

Sincerely,


Toni Havel, Ext.276
toni.havel@bellcorp.com
Bell Corporation

**This is a communication from a Professional Debt Collection Agency. This letter is an attempt to collect the debt of another. Any information obtained will be used for that purpose.**



KERN0034