FOSHEE & TURNER COURT REPORTERS

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER: 2:05 CV698-B

WEELAPAN KERN,

        Plaintiff,

        vs.

STANDARD FIRE INSURANCE COMPANY, et al.,

        Defendants.


       S T I P U L A T I O N

       IT IS STIPULATED AND AGREED by

and between the parties through their

respective counsel, that the deposition of

Weelapan Kern may be taken before Anita

Thebo, Commissioner, at the offices of

Beasley, Allen, Crow, Methvin, Portis &

Miles, at 272 Commerce Street, Montgomery,

Alabama 36104, on the 1st day of March,

2006.

       DEPOSITION OF WEELAPAN KERN

               (46463)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209

1-800-888-DEPO

EXHIBIT

B

tabbies

92e9c2bd-

FOSHEE & TURNER COURT REPORTERS

Page 2

1          IT IS FURTHER STIPULATED AND

2    AGREED that the signature to and the

3    reading of the deposition by the witness

4    is waived, the deposition to have the same

5    force and effect as if full compliance had

6    been had with all laws and rules of Court

7    relating to the taking of depositions.

8          IT IS FURTHER STIPULATED AND

9    AGREED that it shall not be necessary for

10   any objections to be made by counsel to

11   any questions except as to form or leading

12   questions, and that counsel for the

13   parties may make objections and assign

14   grounds at the time of the trial, or at

15   the time said deposition is offered in

16   evidence, or prior thereto.

17         IT IS FURTHER STIPULATED AND

18   AGREED that in accordance with Rule 5(d)

19   of The Alabama Rules of Civil Procedure,

20   as Amended, effective May 15, 1988, I,

21   Anita Thebo, am hereby delivering to Joel

22   Isenberg the original transcript of the

23   oral testimony taken on the 1st day of

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 3

1    March, 2006, along with the exhibits.

2              Please be advised that this is

3    the same and not retained by the Court

4    Reporter, nor filed with the Court.

5              * * * * * * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

FOSHEE & TURNER COURT REPORTERS

Page 4

1                   I N D E X

2                 EXAMINATION

3                                          Page

4   By Mr. Isenberg ....................... 6

5   By Mr. Sanspree ..................... 105

6           EXAMINATION CONTINUED

7                                          Page

8   By Mr. Isenberg ..................... 107

9           DEFENDANT'S EXHIBITS

10                                         Page

11  Exhibit 1 ............................ 33

12  Exhibit 2 ............................ 44

13  Exhibit 3 ............................ 51

14  Exhibit 4 ............................ 58

15  Exhibit 5 ............................ 68

16  Exhibit 6 ............................ 86

17  Exhibit 7 ............................ 88

18  Exhibit 8 ............................ 88

19  Exhibit 9 ............................ 89

20  Exhibit 10 ........................... 90

21  Exhibit 11 ........................... 95

22  Exhibit 12 ........................... 97

23

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com

1-800-888-DEPO

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 5

1        IN THE UNITED STATES DISTRICT COURT

2         FOR THE MIDDLE DISTRICT OF ALABAMA

3                NORTHERN DIVISION

4

5    CASE NUMBER:  2:05 CV698-B

6    WEELAPAN KERN,

7              Plaintiff,

8              vs.

9    STANDARD FIRE INSURANCE COMPANY, et al.,

10             Defendants.

11

12   BEFORE:

13             Anita Thebo, Commissioner.

14

15   APPEARANCES:

16             CHRISTOPHER SANSPREE, ESQUIRE,

17   of Beasley, Allen, Crow, Methvin, Portis &

18   Miles, 272 Commerce Street, Montgomery,

19   Alabama 36104, appearing on behalf of the

20   Plaintiff.

21             JOEL S. ISENBERG, ESQUIRE, of

22   Smith & Ely, 2000-A SouthBridge Parkway,

23   Suite 405, Birmingham, Alabama 35209,

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 6

1    appearing on behalf of the Defendant

2    Standard Fire Insurance Company.

3                  * * * * * *

4

5              I, Anita Thebo, a Court Reporter

6    of Prattville, Alabama, acting as

7    Commissioner, certify that on this date,

8    as provided by the Alabama Rules of Civil

9    Procedure and the foregoing stipulation of

10   counsel, there came before me at the

11   offices of Beasley, Allen, Crow, Methvin,

12   Portis & Miles, 272 Commerce Street,

13   Montgomery, Alabama 36104, beginning at

14   10:05 a.m., Weelapan Kern, witness in the

15   above cause, for oral examination,

16   whereupon the following proceedings were

17   had:

18              WEELAPAN KERN,

19   being first duly sworn, was examined and

20   testified as follows:

21              EXAMINATION

22   BY MR. ISENBERG:

23              COURT REPORTER:  Usual

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com

1-800-888-DEPO

FOSHEE & TURNER COURT REPORTERS

1    stipulations?

2            MR. SANSPREE:  Please.

3            MR. ISENBERG:  That's fine.

4       Q.    Mr. Kern, I'm Joel Isenberg, I

5    represent Standard Fire Insurance Company,

6    which is the defendant in this case.  And

7    I'm going to ask you some questions today.

8    Have you ever given a deposition before?

9       A.    No.

10      Q.    I'm going to tell you a little

11   bit about how this works.  I will ask you

12   questions, you just give me an answer to

13   the question.  If you don't understand

14   what I've asked you, please stop me and

15   ask me to repeat the question.  Because if

16   you answer one, I will assume that you

17   understood what I asked; is that okay?

18      A.    That's fine.

19      Q.    Also, if you need to take a

20   break at any time, please feel free to do

21   so; this is not any sort of endurance test

22   at all.  And I'm hoping that we're not

23   going to be too terribly long today, but

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 8

1    if you need a break, please let me know,

2    okay?

3            A.    Okay.

4            Q.    Can you state your full name

5    for the Record, please.

6            A.    Weelapan Kern.

7            Q.    Can you spell that, please.

8            A.    W-E-E-L-A-P-A-N.  Last name is

9    Kern, K-E-R-N.

10           Q.    What is your present address?

11           A.    371 Spenseth Drive.

12           Q.    Spencer?

13           A.    Spenseth.

14           Q.    Can you spell that?

15           A.    S-P-E-N-S-E-T-H.

16           Q.    Drive?

17           A.    Drive, yes.

18           Q.    Is that in Montgomery?

19           A.    Montgomery, Alabama 36109.

20           Q.    And your social security

21    number?

22           A.    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.

23           Q.    And your date of birth?

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 9

1        A.      July -- 07-05-65.

2        Q.      July 5?

3        A.      July 5.

4        Q.      1965?

5        A.      Yes.

6        Q.      You said you've never given a

7   deposition before?

8        A.      No.

9        Q.      Have you ever testified in a

10   court hearing?

11        A.      Court hearing --

12        Q.      As a witness or a party?

13        A.      Witness, yes.

14        Q.      Can you tell me when that was?

15        A.      Twenty years ago.

16        Q.      Twenty years?

17        A.      Twenty years ago.

18        Q.      And if you can make sure you

19   can speak up so the court reporter can

20   hear you, it will it make easier for her

21   to transcribe it.

22        A.      Okay.

23        Q.      And were you a witness in the

FOSHEE & TURNER COURT REPORTERS

Page 10

1    case?

2         A.    No.   Just friend of mine, just

3    testifying as a good person.   That's about

4    it.

5         Q.    You testified on his behalf?

6         A.    Yeah.   It was a long time ago.

7    It was a high school case.

8         Q.    I understand.

9         What court was it in?

10        A.    In Indiana, Peru County; Peru,

11   Indiana.

12        Q.    What kind of case was it?

13        A.    Vandalism.

14        Q.    A vandalism case?

15        A.    Vandalism, yeah.

16        Q.    Was the friend of yours being

17   accused of vandalism?

18        A.    Yeah.

19        Q.    How did that turn out?   What

20   was the verdict, do you remember?

21        A.    I don't remember.

22        Q.    Any other times that you've

23   acted as a witness in a case?

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 11

1       A.    No.  No.

2       Q.    Now, I know you live in

3    Montgomery now.  Where were you born?

4       A.    In Thailand.

5       Q.    Where in Thailand?

6       A.    Korat.

7       Q.    Can you spell that, please.

8       A.    K-O-R-A-T.

9       Q.    When did you move to the

10   United States?

11      A.    1979.

12      Q.    And what brought you to the

13   United States?

14      A.    What brought me here?

15      Q.    Yes.

16      A.    My stepdad.  I was adopted.

17      Q.    And where did you first live

18   in the United States?

19      A.    First lived in United

20   States -- He travel, he's in the service.

21   We've been to Okinawa, Guam, and Indiana.

22      Q.    Indiana?

23      A.    Indiana.

FOSHEE & TURNER COURT REPORTERS

Page 12

1      Q.    And he was in the military

2   service?

3      A.    Right.

4      Q.    When did you first move to

5   Alabama?

6      A.    1998.

7      Q.    What brought you here?

8      A.    What brought me here?  Me and

9   my ex-wife, we move here to open a

10  business.

11     Q.    What was the business?

12     A.    A restaurant, Thai restaurant.

13     Q.    Here in Montgomery?

14     A.    Here in Montgomery.

15     Q.    What's the name of the

16  restaurant?

17     A.    Ala Thai.

18     Q.    Ala Thai?

19     A.    Yes.

20     Q.    A-L-A --

21     A.    A-L-A T-H-A-I.

22     Q.    Where is that restaurant

23  located?

FOSHEE & TURNER COURT REPORTERS

Page 13

1          A.    1361 Federal Drive.  And

2    another location, I've got a second one,

3    6663 Atlanta Highway.

4          Q.    Is that also called Ala Thai?

5          A.    It's called Ala Thai East.

6          Q.    And both of those restaurants

7    are still operating?

8          A.    Yes.

9          Q.    Do you own those restaurants?

10         A.    Yes.

11         Q.    Did you say you and your

12   ex-wife opened the first one?

13         A.    The first one.

14         Q.    What is your ex-wife's name?

15         A.    Sompong, S-O-M-P-O-N-G.

16         Q.    Is that --

17         A.    Her first name.

18         Q.    That's her first name?

19         Does she -- Her last name is still

20   Kern?

21         A.    No.  Her last is Chutakanonta.

22   It's spelled C-H-U-T-A-K-A-N-O-N-T-A.

23         Q.    Does she still live in

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 14

1    Montgomery?

2        A.    No.

3        Q.    Where does she live?

4        A.    Janesville, Wisconsin.

5        Q.    When were the two of you

6    married?

7        A.    Almost sixteen years ago.

8    We're not married, we just common-law.

9        Q.    Okay.  All right.

10       A.    We have three kids together.

11       Q.    Okay.  And did you say -- Did

12   you ever have a formal divorce proceeding

13   then?

14       A.    No.

15       Q.    You no longer live together

16   though?

17       A.    We no longer live together.

18       Q.    And when did you stop living

19   together?

20       A.    Four years ago.

21       Q.    In 2002?

22       A.    2002.

23       Q.    And what are your three

FOSHEE & TURNER COURT REPORTERS

Page 15

1    children's names?

2          A.    With her?

3          Q.    Yes, with her.

4          A.    Kids with her.

5          Q.    What are their names?

6          A.    Melissa, Vanessa, and Donny.

7          Q.    Donny?

8          A.    Donny, D-O-N-N-Y.  And the

9    last name is Kern, all three of them.

10          Q.    Are they all under the age of

11    eighteen.

12          A.    Right.

13          Q.    Do you have any other

14    children?

15          A.    No.

16          Q.    Do they live with your

17    ex-wife?

18          A.    Yes.

19          Q.    So none of them live in

20    Alabama?

21          A.    No.

22          They only come visit me in the

23    summer and holiday, Christmas.

FOSHEE & TURNER COURT REPORTERS

1          Q.     When you opened up the

2     restaurants, you opened them up with your

3     ex-wife; is that correct?

4          A.     Ex-wife.

5          Q.     Does she retain any ownership

6     interest?

7          A.     No.  Because she got her own

8     restaurant now.  I gave her the money to

9     open her own business.

10         Q.     In Wisconsin?

11         A.     In Wisconsin.  She got a

12    restaurant up there.

13         Q.     Is Ala Thai a corporation?

14         A.     Yes.

15         Q.     Who are the shareholders of

16    the corporation?

17         A.     Me.

18         Q.     Anyone else?

19         A.     Just her.  But she won't have

20    anything to do with it.

21         Q.     Who are the officers of the

22    corporation?

23         A.     Me.

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 17

1       Q.    Anyone else?

2       A.    Just me.

3       Q.    You may have said this, but

4  when did you first move to Montgomery?

5       A.    1998.

6       Q.    And that was about the same

7  time you opened up the restaurants?

8       A.    No.  We opened up 1999,

9  January 1999.  We just, you know,

10  remodeled and everything by ourself.

11       Q.    Can you tell me a little bit

12  about your educational background?  Did

13  you attend high school?

14       A.    Yes.

15       Q.    Where did you attend high

16  school?

17       A.    In Indiana, called Maconaquah

18  High School.

19       Q.    Can you spell it?

20       A.    No.  Start with M-A-C --

21       Q.    Maconoco?

22       A.    Maconaquah.  It's --

23       Q.    Is it a native American name?

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 18

1      A.      Yeah, native -- Indian.

2      Q.      And it's in Peru, Indiana?

3      A.      Peru, Indiana.

4      Q.      And when did you graduate?

5      A.      1984.

6      Q.      Did you have any education

7   after high school?

8      A.      Yes.  Yes.  I went to Kokomo

9   College, that's like twenty miles from

10  Peru.

11     Q.      Did you graduate?

12     A.      No.

13     Q.      How many years did you attend

14  Kokomo College?

15     A.      About a year.

16     Q.      Did you take just basic

17  courses, core courses?

18     A.      Yes.

19     Q.      You did not earn a degree from

20  Kokomo College?

21     A.      No.

22     Q.      Did you attend any other

23  educational institutions?

FOSHEE & TURNER COURT REPORTERS

Page 19

1        A.    No.

2        Q.    I understand now that you work

3   at your restaurant, Ala Thai; is that

4   correct?

5        A.    Yes.

6        Q.    Do you have any other present

7   employment?

8        A.    Yes.

9        Q.    Where else do you work?

10       A.    Present?  I'm sorry, back that

11   up.

12       Q.    Do you work anywhere else now?

13       A.    No.  Just two restaurants that

14   I have, that's it.

15       Q.    Prior to owning and operating

16   these restaurants, what did you do prior

17   to that?

18       A.    Everything:  Server,

19   dishwasher, cook.

20       Q.    At other restaurants?

21       A.    Both of them, I go in, you

22   know.

23       Q.    That's now?  Is that -- What

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 20

1    you're saying, that's what you do now?

2          A.    Yes.

3          Q.    Before you opened these

4    restaurants in 1999, what was your job

5    that you held before 1999?

6          A.    I was managing a restaurant up

7    in Chicago.

8          Q.    What was the name of that

9    restaurant?

10         A.    Stop Siam.

11         Q.    Stop Siam?

12         A.    Stop Siam.

13         Q.    And it was in Chicago?

14         A.    Chicago.

15         Q.    How long did you hold that

16   position?

17         A.    Five years.

18         Q.    And why did you leave there?

19         A.    I wanted to start my own --

20   establish my own business.

21         Q.    Prior to that restaurant,

22   where did you work?

23         A.    That restaurant.

FOSHEE & TURNER COURT REPORTERS

Page 21

1    Q.    Just not as a manager?

2    A.    Not as a manager.  As a

3    waiter, bartender, driver.

4    Q.    Little bit of everything?

5    A.    Everything.

6    Q.    And how long had you been at

7    the restaurant while you were doing that

8    before you became a manager?

9    A.    About twelve years.

10    Q.    Have you held any employment

11    outside of the food services industry

12    since college?

13    A.    After high school I work in

14    construction, I work as a hotel bellman.

15    And I like the restaurant better.

16    Q.    Okay.  Mr. Kern, do you have

17    any relatives who live in the Montgomery

18    area?

19    A.    Yes.

20    Q.    Who lives here?

21    A.    My mother.

22    Q.    What's her name?

23    A.    Pensri, P-E-N-S-R-I, Kern; my

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 22

1   sister, Surerat.

2         Q.    Spell that, please.

3         A.    S-U-R-E-R-A-T.

4         Q.    What is her last name?

5         A.    She remarried, I don't know

6   her last name.

7         Q.    Her maiden name was Kern?

8         A.    Maiden name was Kern.

9         Q.    Do you know her husband's

10  first name?

11        A.    No.

12        My nephew, my niece.

13        Q.    Are they over the age of

14  eighteen?

15        A.    Yeah.

16        Q.    What are their names?

17        A.    Jimmy, Roseanna, Abby.  That's

18  it.

19        Q.    And do you know their last

20  names?

21        A.    No.

22        Q.    Any other adult relatives who

23  live in Alabama?

FOSHEE & TURNER COURT REPORTERS

Page 23

1    A.    No.

2    Q.    Prior to living at the

3  Spenseth Drive address, before that, where

4  did you live?

5    A.    1262 Federal Drive.  We rented

6  that house for almost four years.

7    Q.    That's here in Montgomery?

8    A.    Montgomery.

9    Q.    Do you remember the name of

10  your landlord?

11    A.    No, I don't.  I forgot.

12    Q.    And was that the first home

13  you lived in in Montgomery?

14    A.    Yeah.

15    Q.    When did you move into the

16  Spenseth Drive house?

17    A.    Spenseth Drive house, in 2000-

18  -- early 2002 I believe.

19    Q.    And do you own that house?

20    A.    Yes.  Me and my mother.

21    Q.    You and your mother?

22    A.    Uh-huh (positive response).

23    Q.    Are you the only two people

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 24

1    who are all the time living in that home?

2         A.    Yes.

3         Q.    Mr. Kern, we are here because

4    you have filed a lawsuit against Standard

5    Fire Insurance Company with regard to

6    automobile insurance; is that correct?

7         A.    Correct.

8         Q.    When did you first obtain

9    automobile insurance with Standard Fire?

10        A.    When I bought the Montero.

11        Q.    When was that?

12        A.    In -- A year before -- I'm not

13   sure.  Two years ago.  Two or three years

14   ago, two and a half years ago.

15        Q.    You said it was when you

16   bought the Montero.  Is that the

17   Mitsubishi Montero --

18        A.    Right.

19        Q.    -- which was your car?

20        A.    Uh-huh (positive response).

21        Q.    Who was your insurance agent

22   at the time?

23        A.    At the time, Colonial.

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 25

1      Q.    Colonial Insurance Agency?

2      A.    Yes.

3      Q.    Here in Montgomery?

4      A.    Yes.

5      Q.    Did you have a particular

6  insurance agent that you dealt with at

7  Colonial?

8      A.    No.  Because they've been in

9  and out.  I can't keep track.

10     Q.    Can you think of any

11  particular person at Colonial with whom

12  you dealt?

13     A.    The guy who used to work

14  there, I used to deal with him, but he's

15  no longer there.

16     Q.    Were there any customer

17  service representatives or any assistants

18  that you remember their names?

19     A.    No.

20     Q.    How did you --

21     A.    Most of the time I called.

22     Q.    How did you come to get your

23  insurance through Colonial?

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 26

1          A.      Through Colonial.  I used to

2     have them for my restaurant, we changed

3     restaurants.

4          Q.      I didn't understand that.

5          A.      I got the insurance policy

6     from them with the restaurant, for the --

7          Q.      I see.  So you had worked with

8     Colonial before?

9          A.      Before, yes.

10         Q.      On insurance for your

11    restaurant?

12         A.      On insurance, right.

13         Q.      Did you have any other

14    policies through Colonial other than your

15    restaurant insurance?

16         A.      Restaurant and my automobile.

17         Q.      Who did you have homeowner's

18    with?

19         A.      Homeowner, I believe Travelers

20    too.

21         Q.      But that was through Colonial?

22         A.      I believe so.

23         Q.      Did you use any other

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

1    insurance agencies other than Colonial to

2    obtain insurance?

3         A.    No.  No.

4         My mother use different insurance.

5              MR. SANSPREE:  Just answer what

6    he asks you.  Don't volunteer your mom's

7    stuff.

8         Q.    Did somebody refer you to

9    Colonial Insurance?

10        A.    Yes.  Friend of mine, he own a

11   business and talked to him, and he refer

12   us to Colonial.

13        Q.    What is your friend's name?

14        A.    Tyler.

15        Q.    Tyler?

16        A.    Tyler.

17        Q.    Do you know his last name?

18        A.    No.

19        Q.    What business does he own?

20        A.    El Rey.

21        Q.    El Rey?

22        A.    El Rey in Old Cloverdale.

23        Q.    Is it a restaurant?

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 28

1    A.    Restaurant.

2    Q.    Mr. Kern, can you tell me the

3  first contact you remember having with

4  Colonial Insurance about your automobile

5  policies?

6    A.    First contact, we call from

7  the car dealer when I bought the car.

8    Q.    You called Colonial from the

9  car dealership; is that what you said?

10    A.    Yeah.  My salesman called for

11  me.

12    Q.    Okay.  When you purchased the

13  car?

14    A.    Purchased the car.  And then

15  called and talked to her; I don't know

16  what's her name.

17    Q.    Do you remember the name of

18  the salesperson?

19    A.    Donnie, Donnie Hall.

20    Q.    Hall?

21    A.    Hall.

22    Q.    And was it -- What was the

23  dealership's name?

FOSHEE & TURNER COURT REPORTERS

Page 29

1      A.    Reinhardt Toyota.

2      Q.    Was the vehicle new or used?

3      A.    Used.

4      Q.    Were you present when that

5  call was made?

6      A.    Yes.

7      Q.    What did he call Colonial for?

8      A.    To have insurance.

9      Q.    On the Montero?

10      A.    On the Montero.  I told them I

11  have insurance with the restaurant with

12  Colonial when I bought the car.

13      Q.    Had you had previous

14  automobile insurance?

15      A.    Yes.

16      Q.    With what company?

17      A.    In Indiana, State Farm,

18  Prudential, that was it.

19      Q.    Had you used an insurance

20  agency in Indiana for those policies?

21      A.    No.

22      Because I moved to Chicago, then

23  everything was in my ex-wife's name.

FOSHEE & TURNER COURT REPORTERS

Page 30

1      Q.    At the time you purchased the
2  Montero, did you own a car?
3      A.    Yes.
4      Q.    Did you have insurance on that
5  car?
6      A.    Owned the Montero, yes.
7      Q.    Before you owned the Montero.
8      A.    No.  I don't own anything.
9      Q.    Let me make sure you
10  understand my question.
11      You purchased the Montero from
12  Reinhardt Toyota; is that correct?
13      A.    Uh-huh (positive response).
14      Q.    Then the salesperson called
15  Colonial Insurance Agency to see about
16  getting insurance on the Montero for you;
17  is that correct?
18      A.    Right.
19      Q.    What car did you own before
20  the Montero?
21      A.    None.
22      Q.    You did not own a car before?
23      A.    I did not own a car.

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 31

1    Q.    Did you drive a car before the

2  Montero?

3    A.    Yeah.  My ex-wife's car.

4    Q.    Did you have insurance on that

5  car?

6    A.    She had.

7    Q.    She had insurance?

8    A.    She had insurance.

9    Q.    With what company?

10   A.    Geico.

11   Here in Montgomery.

12   Q.    And do you know if she went

13  through the Colonial Insurance Agency for

14  that policy?

15   A.    No.

16   The reason I bought a Montero,

17  because we no longer together, she took

18  all the cars.  I needed a vehicle.

19   Q.    I understand.

20   I understand from you that the

21  salesperson Donnie at Reinhardt called

22  Colonial to obtain automobile insurance

23  for you; is that correct?

FOSHEE & TURNER COURT REPORTERS

Page 32

1      A.    And talk to the lady from
2 Colonial.
3      Q.    Did you speak to her?
4      A.    Yes, I did.
5      Q.    What did you tell her?
6      Did you tell her you needed
7 insurance?
8      A.    I needed insurance on the
9 Montero because I'm purchasing the
10 Montero.
11      Q.    And did they place that
12 insurance with Standard Fire?
13      A.    I believe so.
14      Q.    Did you ever go into the
15 Colonial Insurance office when you
16 first --
17      A.    Maybe one or two times, that's
18 about it.
19      Q.    At this time when you
20 purchased the insurance for the first time
21 when you bought the Montero, did you
22 personally go into the insurance agency or
23 was it all done over the phone?

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 33

1    A.    Done by the phone.

2                (Whereupon, Defendant's

3                Exhibit No. 1 was

4                marked for

5                identification.)

6    Q.    Mr. Kern, I'm going to show

7    you what I've marked as Defendant's

8    Exhibit 1.  Can you tell me if you've ever

9    seen that before?

10    A.    Not familiar, no.

11    I've seen that before, I think.

12    Q.    You have seen this before?

13    A.    Yes.

14    Q.    Do you know what this is?

15    A.    Automobile liability insurance

16    identification card.

17    Q.    Is this the card that you

18    received from Standard Fire evidencing the

19    insurance on the Montero that we've just

20    been talking about?

21    A.    Yes.

22    Q.    Do you recall receiving a copy

23    of your policy from Standard Fire?

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 34

1      A.     Yes.

2      Q.     And if you look at this card

3  for me, it shows that the issuing company

4  is the Standard Fire Insurance Company; is

5  that correct?

6      A.     Correct.

7      Q.     And it shows a policy number,

8  correct?

9      A.     Correct.

10      Q.     It shows an effective date of

11  what?

12      A.     11/11/03.

13      Q.     And an expiration date of

14  what?

15      A.     11/11/04.

16      Q.     And it shows that you were the

17  insured; is that correct?

18      A.     Yes.

19      Q.     And is that your correct

20  address?

21      A.     Correct.

22      Q.     When you first purchased this

23  policy, did you speak to anybody directly

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

1    at Standard Fire or was all your

2    communication through the phone?

3          A.    Through the phone.

4    Communication through the phone.

5          Q.    Through the phone.  But was it

6    with Colonial?

7          A.    Right.

8          Q.    You didn't speak to anybody at

9    Standard Fire Insurance Company about this

10   policy at that time; is that correct?

11         A.    Say that again.

12         Q.    Sure.  Your communication when

13   you obtained this coverage was with the

14   Colonial Insurance Agency; is that

15   correct?

16         A.    Correct.

17         Q.    And Colonial Insurance Agency

18   was your insurance agent?

19         A.    Right.

20         Q.    It's my understanding that at

21   this time you did not speak directly to

22   anybody at the insurance company?

23         A.    I'm speaking to Colonial, and

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 36

1    I'm sure --

2         Q.    But you did not speak -- You

3    personally did not speak directly to

4    anybody at the Standard Fire Insurance

5    Company?

6         A.    Aren't you guys the same

7    company?  They represent you, they're your

8    agent?

9         I speak to Colonial --

10        Q.    You spoke only to Colonial; is

11   that correct?

12        A.    Yes.

13        Q.    When you -- You said you went

14   to Colonial's offices on one or two

15   occasions; is that correct?

16        A.    One or two, yeah, if I recall.

17        Q.    When do you recall the first

18   time you went into Colonial's offices?

19        A.    When me and my common-law wife

20   went over there to get the restaurant

21   insurance policy.  That's a long time ago,

22   five or six years ago.

23        Q.    Do you know what company that

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 37

1    policy is with?

2         A.    Hartford.  Hartford Insurance.

3         Q.    Okay.  And you obtained that

4    insurance through Colonial Insurance

5    Company as well, correct?

6         A.    Right.  And they change

7    policies over the years.  They no longer

8    Hartford.  I don't know what's going on.

9         Q.    But that was through, you

10   believe, the Hartford?

11        A.    Uh-huh (positive response).

12   Right.

13        Q.    Is that correct?

14        A.    I believe the Hartford?

15        Q.    Do you believe -- Is it your

16   understanding that that insurance policy

17   was issued by a company called Hartford on

18   the restaurant?

19        A.    Right.

20        Q.    At the time you went into

21   Colonial Insurance, however many years ago

22   it was with your ex-wife for the

23   restaurant insurance, do you recall seeing

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 38

1    any signs for -- on the door for Travelers

2    Insurance or Standard Fire Insurance?

3         A.    We didn't pay attention to it;

4    too many doors, too many offices.

5         Q.    Let me ask you this:  What

6    does the sign say on the outside of the

7    building?  Does it say Colonial Insurance

8    Agency?

9         A.    Yeah.  On the top.  But the

10   whole building represent a lot of

11   different companies.

12        Q.    All right.  Then on the door

13   of the building, was it Colonial Insurance

14   Agency?

15        A.    Right.  Say Colonial Agency,

16   something like that.  That's a long time

17   ago, I don't --

18        Q.    I understand.  I'm only asking

19   you what you can recall.

20        When was the next time that you can

21   recall visiting in person the Colonial

22   Insurance Agency?

23        A.    When me and my ex-wife was

FOSHEE & TURNER COURT REPORTERS

Page 39

1    together, that's the last time we went

2    over there; twice, that's about it.

3        Q.    How long has it been since you

4    were not together?

5        A.    Four years.

6        Q.    So prior to when you purchased

7    this insurance policy that's shown on

8    Defendant's Exhibit 1; is this correct?

9    Before you purchased the insurance on the

10   Montero; is that correct?

11       A.    Say it again.

12       Q.    Sure.  I understand you to say

13   that the last time you went personally to

14   the Colonial Insurance Agency was while

15   you and your ex-wife were still together;

16   is that correct?

17       A.    Right.

18       Q.    And the two of you have been

19   separated for four years?

20       A.    Four years.

21       Q.    Is that correct?

22       A.    Yes.

23       Q.    So that would have been before

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 40

1    you purchased the Montero?

2        A.    Correct.

3        Q.    And that was before you

4    obtained this insurance from Standard Fire

5    on the Montero; is that correct?

6        You never went to the Colonial

7    Insurance Agency in person to talk about

8    this Standard Fire policy; is that

9    correct?

10       A.    No.

11       Q.    Is that correct?

12       A.    Yes.  I never --

13       Q.    I want to make sure we're

14   communicating.  I think we are, I just

15   want to make sure the Record is clear.

16       A.    Yes.  I communicate with

17   Colonial by the phone.  I never go back

18   in.

19       Q.    That's what -- I thought we

20   were both saying that, I wanted to make

21   sure for the Record though.

22       Have you made any claims on an

23   insurance policy other than the one we're

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 41

1    here about today for an automobile?

2         A.    Automobile.  Well, I got -- My

3    house got broke into, and I believe it's

4    Travelers is my homeowners policy too.

5         Q.    Yes, sir.

6         A.    Yes.  And they stole all my

7    stuff in my house.

8         Q.    When was that?

9         A.    That's last year.

10         Q.    Did you make a claim on your

11    homeowner's policy?

12         A.    I never did.

13         Q.    You never made a claim on

14    your --

15         A.    I never did a claim.  I've

16    been working.  But they caught the person

17    who broke into my house and stole my

18    stuff.

19         Q.    Did you notify Colonial

20    Insurance Agency?

21         A.    I did.  But I never get in

22    touch with them, never get back with them.

23         Q.    Did you tell them about the

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 42

1    claim or you just called and couldn't get

2    them and never called back?

3        A.    I called them and they came

4    over to the house, actually one person and

5    give me the claim form.  And I lost it and

6    I lost the number.  I never get back

7    with --

8        Q.    You just didn't follow-up?

9        A.    I didn't follow-up.  I just

10   worried about this thing.

11       Q.    Other than that, have you made

12   any claims on an automobile insurance

13   policy?

14       A.    No.  No.

15       Q.    Now, did you make any claims

16   on your Standard Fire Insurance policy

17   prior to November 11, 2004?

18       A.    Say that again.

19       Q.    Sure.  This insurance policy

20   that we've talked about, which is

21   evidenced by Defendant's Exhibit 1 here

22   that we're talking about, shows an

23   expiration date of November 11, 2004; is

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 43

1    that correct?

2        A.    Correct.

3        Q.    Did you ever make a claim for

4    coverage under this policy before November

5    11, 2004?

6        A.    Never.

7        Q.    And you understand then that

8    this policy that we're talking about, the

9    Standard Fire policy, nonrenewed for

10   failure to pay premiums, do you understand

11   that, on November 11, 2004?

12       A.    Nonrenewed?

13       Q.    Yes, sir.  That it did not

14   renew after November 11, 2004.

15       A.    I don't recall that.  I just

16   deal with Colonial.

17       Q.    Yes, sir, I understand you

18   deal with Colonial.  But you acknowledged

19   here that the policy expired.

20       A.    Expired 11/11/2004, yeah, I

21   see that.

22                    (Whereupon, Defendant's

23                    Exhibit No. 2 was

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com

1-800-888-DEPO

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 44

1              marked for

2              identification.)

3    Q.    Mr. Kern, I'm going to show

4  you a document that your lawyers produced

5  to me that I've marked as Defendant's

6  Exhibit 2.

7    Do you recognize that document?

8    A.    Yes, I do.

9    Q.    Did you receive a copy of that

10  document in the mail?

11    A.    In the mail, yes.

12    Q.    And in the top right-hand

13  corner of it it says date of notice, can

14  you read that for me, please?

15    A.    Date of notice, yes.

16  12/22/04.

17    Q.    And it says a due date in the

18  box is what date?

19    A.    January 11, 2005.

20    Q.    And then I'm going to read

21  this and you tell me if I've read this

22  correctly, by the asterisks in all caps it

23  says:  Important notice, offer to

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 45

1    reinstate.  It says:  Your policy expired

2    on 11/11/04 at the time stated in your

3    policy because we did not receive the

4    minimum payment required to continue your

5    coverage.

6          Did I read that correctly?

7          A.    Yes.

8          Q.    And then it says:  However, we

9    will be happy to reinstate this policy

10   without interruption.

11         Did I read that correctly?

12         A.    Yes.

13         Q.    To reinstate your policy, we

14   must receive at least the, quote, minimum

15   amount due, end quote, shown above by

16   1/11/05.

17         Did I read that correctly?

18         A.    Yes.

19         Q.    Did you read this offer to

20   reinstate, this document, at the time you

21   received it?

22         A.    Yes.

23         Q.    And, Mr. Kern, you'll

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com

1-800-888-DEPO

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 46

1    acknowledge for me that it informs you

2    here in this first paragraph that your

3    policy expired on November 11, 2004?

4         A.    Yes.

5         Q.    And that it offers to

6    reinstate the policy but that the payment

7    must be received by January 11, 2005; is

8    that what it says?

9         A.    Yes.

10        I called Colonial and they said to

11   send money and I sent them the check.

12        Q.    Okay.  Tell me --

13        A.    Without interruption and my

14   policy will be reinstated.

15        Q.    When did you call Colonial?

16        A.    Right after I received this

17   notice.  And I called them, I don't know

18   who I spoke to, they just say send the

19   money in and they will be reinstated.

20        Q.    The date of the notice is

21   December 22, 2004; is that correct?

22        A.    December 22, 2004, correct.

23        Q.    And do you recall when you

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 47

1    received the notice?  Was it a couple of

2    days after that?

3           A.    I don't recall.  I was busy

4    working.  But once a week I go through the

5    mail.

6           Q.    So at least within a week

7    after December 22, 2004, is when you would

8    have received this?

9           A.    I don't recall.  I'm not sure.

10   I can't answer that.

11          Q.    Do you recall when you spoke

12   to the people at Colonial Insurance about

13   this?

14          A.    I give them a call, I don't

15   know when.  They said just send the

16   premium.  I send in eight hundred dollars.

17          Q.    Yes, sir.  Did you speak to

18   them before January 11?

19          A.    January 11.

20          Q.    Which is the due date.

21          A.    I believe so.

22          Q.    So before the due date had

23   run, you called them -- somebody at

FOSHEE & TURNER COURT REPORTERS

Page 48

1    Colonial?

2        A.    Somebody.  But I was busy at

3    the time, the restaurant busy, and I

4    just -- a lot of things.

5        Q.    Yes, sir.  And you just didn't

6    follow-up on this one?

7        A.    Didn't follow-up, no.  No.

8        Q.    But -- So you spoke to the

9    people at Colonial, the people at Colonial

10   said pursuant to this offer to reinstate

11   to send in the money; is that correct?

12       A.    Yes.

13       Q.    Did -- But a period of time

14   went by after you spoke to the people at

15   Colonial before you sent the money in; is

16   that correct?

17       A.    Say it again.

18       Q.    Yes, sir.  But you did not

19   immediately send the money when you spoke

20   to the people at Colonial, did you?

21       A.    No.

22       Q.    Do you know how long went by

23   before you sent it?  Was it a couple of

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 49

1    weeks or so?

2         A.    Probably.

3         Q.    So it's my understanding then

4    that -- let me back up and ask this:  Did

5    you have more than one conversation with

6    anybody at Colonial about the nonrenewal

7    or reinstatement of this policy?

8         A.    Just one conversation, I

9    called them.

10         Q.    After you received this

11    notice?

12         A.    I don't know who I speak to,

13    but they say send the money, the policy

14    will be reinstated; I send in the money.

15         Q.    Was it a man or a woman you

16    spoke to?

17         A.    Woman I believe.

18         Q.    Did you give her a copy of

19    this offer to reinstate?

20         A.    No.  I spoke over the phone, I

21    didn't give no copy.

22         Q.    Did you tell whoever you spoke

23    to the dates on this policy, that it had

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 50

1    expired on --

2         A.    They just told me --

3         Q.    Let me finish my question if I

4    can.

5         Did you tell them about the November

6    11, 2004, expiration date?

7         A.    Yes.

8         Q.    Did you also explain the

9    January 11, 2005, due date?

10        A.    Yes.

11        Q.    And they said -- Did the woman

12   tell you to send it in by the due date?

13        A.    Just send eight hundred

14   dollars in and my policy will be

15   reinstated.  I send my money in.

16        Q.    And this shows a minimum

17   amount --

18        A.    Minimum is four hundred

19   dollars.  I send eight hundred dollars.

20        Q.    Yes, sir.  The minimum amount

21   due of four hundred and forty-five

22   forty-nine; is that correct?

23        A.    Correct.

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com

1-800-888-DEPO

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 51

1      Q.    With a due date of January 11,
2   2005; is that correct?
3      A.    That's correct.
4      Q.    There's a notation on there,
5   handwritten notation, on Defendant's
6   Exhibit 2.  Can you read that for me,
7   please?
8      A.    Paid January 27, 2005.
9      Q.    What else does it say?
10     A.    Check number 2868.
11     Q.    Is that your handwriting?
12     A.    That's my handwriting.
13               (Whereupon, Defendant's
14               Exhibit No. 3 was
15               marked for
16               identification.)
17     Q.    I'm going to show you what
18   I've marked as Defendant's Exhibit 3 --
19     A.    That's my handwriting too.
20     Q.    Yes, sir.  Is this a copy of
21   the check that you sent?
22     A.    Yes.
23     Q.    And it's dated what date?

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 52

1        A.      January 27, 2005.

2        Q.      And it's written off an

3   account of Ala Thai, Inc., is that the

4   business we were talking about?

5        A.      Yes.  I use the vehicle for

6   the business.

7        Q.      Is the vehicle owned by the

8   business?

9        A.      Uh-huh (positive response).

10        Q.      Is the title held in the

11   business's name?

12        A.      In my name.  But I'm --

13        Q.      In your personal name?

14        A.      In my name, yes.

15        That's the only vehicle I use for

16   the business.

17        Q.      So the business does not own

18   the vehicle then?

19        A.      Yeah.  Business own vehicle

20   because I am -- own my own business.

21        Q.      Yes, sir, I understand.

22        A.      The vehicle for the business,

23   yes.

FOSHEE & TURNER COURT REPORTERS

Page 53

1        Q.    The title for the vehicle

2    though, does it show Weelapan Kern or

3    Alabama Thai, Inc.?

4        A.    It's Ala Thai, Inc.; it's not

5    Alabama Thai.

6        Q.    I'm sorry.

7        A.    It's Ala Thai.

8        Q.    Ala Thai, Inc.  I'm from out

9    of town.

10       A.    That's okay.

11       Q.    Does the title for the

12   vehicle, when you purchased the vehicle --

13       A.    Yes.

14       Q.    -- does it say Weelapan Kern

15   for owner or does it say Ala Thai, Inc.?

16       A.    It says Weelapan Kern.

17       Q.    Where did you send this check

18   that's marked as Defendant's Exhibit 3?

19       A.    At the road they sent in the

20   mail.

21       Q.    Do you know what address you

22   sent it to?

23       A.    I guess this over here

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 54

1    (indicating).

2         Q.    You're pointing to --

3         A.    Travelers, Colonial Insurance

4    Agency.  But they got --

5         Q.    Let me ask you this, this may

6    be a better question:  Did an envelope

7    come with Defendant's Exhibit 2 --

8         A.    Right.

9         Q.    -- with this offer to

10   reinstate?

11        A.    The envelope, yeah.

12        Q.    Was it a self-addressed

13   stamped envelope?

14        A.    No.  It's self-addressed, but

15   no stamp.  I put my own stamp in it.

16        Q.    Yes, sir.

17        But it had a preprinted address to

18   send to Travelers?

19        A.    Yes.  Yes.

20        Q.    Did you return this offer to

21   reinstate with your check?

22        A.    Yes.

23        Q.    So a copy of Defendant's

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

1    Exhibit 2 went along with Defendant's

2    Exhibit 3; is that correct?

3        A.    Yes.

4        Q.    So you wrote this eight

5    hundred dollar check, just so we're clear,

6    in response to this offer to reinstate; is

7    that correct?

8        A.    Correct.

9        Q.    And you wrote the check on

10   January 27, 2005?

11       A.    Yes.  And they deposit the

12   check.

13       Q.    I'm sorry?

14       A.    They deposit the check.

15       Q.    Yes, sir.

16            MR. SANSPREE:  Can we take a

17   break, Joel?

18            MR. ISENBERG:  Absolutely.

19                 (Recess was taken.)

20       Q.    Mr. Kern, you ready?

21       A.    Yes.

22       Q.    I understand that you sent

23   this check in, this eight hundred dollar

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 56

1    check in, on January 27, correct?

2        A.    Correct.

3        Q.    And when was the automobile

4    accident that forms the basis of your

5    claim in this case?

6        A.    The accident happened on

7    February 5, 2005.

8        Q.    Which is a Saturday?

9        A.    I believe, yes, a Saturday.

10       Q.    Between the time you mailed

11   this check and the time of the accident,

12   February 5, did you speak to anybody at

13   either Colonial Insurance or Standard

14   Fire?

15       A.    Yes.  I received this letter,

16   I called Colonial.

17       Q.    No, sir.  We've talked about

18   that.

19       My question is after -- You received

20   this December 22, '04.

21       A.    I've been busy, must have been

22   a couple of weeks in there, you know.  I

23   called them up, they said just send eight

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 57

1    hundred dollars, my policy will be

2    reinstated.

3         Q.    Yes, sir.  My question was

4    after January 27 when you sent the check,

5    after January 27.

6         A.    After, okay.

7         Q.    But before the automobile

8    accident on February 5, so between January

9    27 and February 5, did you speak to

10   anybody at Colonial Insurance?

11        A.    I spoke to them before January

12   27.

13        Q.    Yes, sir.

14        A.    When I send them the money.

15   They told me go ahead, send in eight

16   hundred dollars, and I sent in eight

17   hundred dollars and my policy will be

18   reinstated.

19        Q.    Yes, sir.  That's the

20   testimony we've already talked about; is

21   that correct?

22        A.    Yes.

23        Q.    Okay.  I understand that.  Did

FOSHEE & TURNER COURT REPORTERS

Page 58

1   you have any other conversation with

2   Colonial?

3        A.    No.   No.

4        Q.    Did you have any conversation

5   with anybody at Standard Fire Insurance

6   Company?

7        A.    No.

8                    (Whereupon, Defendant's

9                     Exhibit No. 4 was

10                    marked for

11                    identification.)

12       Q.    Mr. Kern, I'm showing you what

13  I've marked as Defendant's Exhibit 4,

14  which your lawyer has produced to us; it's

15  made up of documents Bates labeled Kern 27

16  to Kern 30.

17       Can you identify that document?

18       MR. SANSPREE:  He's reading

19  these, Bates numbers (indicating).

20       Q.    It's just a multiple-page

21  exhibit.  I just want to make sure we're

22  talking about the same thing.

23       A.    This accident report.

FOSHEE & TURNER COURT REPORTERS

Page 59

1        Q.    Is this the accident report

2    for the accident that we're talking about

3    on February 5?

4        A.    Yes.

5        Q.    And you were involved in the

6    accident as unit one, Weelapan T. Kern; is

7    that correct?

8        A.    Yes.

9        Q.    And then there were two other

10    people involved.  It was Lisa Ann Jackson

11    and Annette Threatt, T-H-R-E-A-T-T; is

12    that correct?

13        A.    Yes.

14        Q.    And as I said, this is

15    something that you and your lawyers have

16    produced to us.  It explains generally

17    under the -- as an accident report, what

18    happened at the accident.

19        Does it accurately reflect what

20    occurred on the date of the accident?

21        A.    Explain that to me again.

22        Q.    Yes, sir.

23        Does this accurately reflect the

FOSHEE & TURNER COURT REPORTERS

Page 60

1    people who were involved in the accident?

2         A.    Reflect, yes.

3         Q.    And then it has information on

4    it, including on page thirty, the back

5    page, a description of what happened at

6    the accident; is this correct?

7         A.    Correct.

8         Q.    Can you explain to me what

9    happened?

10        A.    Well, we were moving and all

11   of a sudden they just stopped.

12        Q.    Were you following -- Were you

13   the last car?

14        A.    Yeah.

15        Q.    Were you driving?

16        A.    Yes, I was driving.

17        Q.    You were driving your Montero?

18        A.    Yes.

19        It was stop and go, stop and go, and

20   stop.

21        Q.    Did you come in contact with

22   another car?

23        A.    Yeah.

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com

1-800-888-DEPO

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 61

1      Q.    And did that car then hit the
2  car in front of it?
3      A.    Hit the car in front of her.
4      Q.    Did you contact anybody at
5  Colonial Insurance on the day of the
6  accident?
7      A.    I called.  They didn't know
8  the accident, and I thought my policy
9  would be covered.
10     Q.    When did you call Colonial?
11     A.    On February 7.
12     Q.    Did you call Colonial?
13     A.    Monday, yes, call Colonial.
14     Q.    Do you know who you spoke
15  with?
16     A.    No.
17     Q.    What did you tell the person
18  at Colonial?
19     A.    I told them I had an accident
20  on Saturday.  And they said, well, I sent
21  in my money, it should be okay.
22     Q.    That's what you said?
23     A.    No.  That's what I thought to

FOSHEE & TURNER COURT REPORTERS

Page 62

1    myself, I (unintelligible).  They say a

2    lot of things.

3         Q.    So you told them you had an

4    accident?

5         A.    Yes, I had an accident.

6         Q.    What did the person you spoke

7    with say to you?

8         A.    Just let the other person

9    claim theirs.

10        Q.    I'm sorry, I didn't

11   understand.

12        A.    I don't know.  I don't how to

13   explain it.

14        Q.    Can you tell me the words that

15   that person used when you spoke with him

16   or her?

17        A.    Her.

18        Q.    Her.  What did she say to you

19   when you told her you had an accident on

20   Saturday?

21        A.    I told her I was involved in

22   an accident.  She say, oh, the policy will

23   be okay.  Everything take care of it.

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 63

1      Q.    She said the policy would be
2   okay?
3      A.    Uh-huh (positive response).
4      Q.    Those were her words?
5      A.    Yes.
6      Q.    And she said the policy would
7   take care of it?
8      A.    Policy -- I'm not sure.  It's
9   been a long time.
10      Q.    So you're not exactly sure
11   what she said?
12      A.    Yeah, I'm not exactly what she
13   say.
14      Q.    So you told her you had an
15   accident?
16      A.    I had an accident.
17      Q.    And that was the person at
18   Colonial?
19      A.    Yes.
20      Q.    Did you speak with anybody at
21   that time at the insurance company, at
22   Standard Fire, or did you just speak to
23   Colonial?

FOSHEE & TURNER COURT REPORTERS

Page 64

1      A.    I speak to Colonial.

2      Q.    What was the next

3  communication you had with anybody about

4  your insurance policy?

5      A.    Next communication, I believe

6  I talked to this lady, the one that we got

7  in an accident with.  That's about it.

8      Q.    You spoke with Lisa Jackson?

9      A.    Lisa Jackson, yes.

10      Q.    Did you speak to her about

11  insurance or about the facts of the

12  accident?

13      A.    About the insurance.

14      Q.    What did you tell her about

15  the insurance?

16      A.    She told me that her car is a

17  total loss and trying to contact with my

18  insurance company, there's no response.

19      Q.    I'm sorry.  She said there was

20  no response or you said there was no

21  response?

22      A.    She contact my insurance

23  company, and she said the insurance

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 65

1    company wouldn't pay for it.  And I said,
2    wow.
3         Q.   Did she say why the insurance
4    company said that?
5         A.   I talked to her and told her,
6    you know -- she got all her information
7    that we exchanged on that day, and she
8    contacted the insurance company, and her
9    insurance company say her car's totaled,
10   total loss.  And then try and contact the
11   insurance company, my own, and it's no
12   response trying to get -- it's no
13   response, nobody call, I try to call this
14   number, Traveler's number.
15        Q.   She did or you did?
16        A.   I did.  I did.
17        Q.   And which number did you call?
18        A.   And I received a -- 1-800
19   number I believe.  It's not in this one.
20        Q.   Did you speak with anybody at
21   that 800 number?
22        A.   Nobody answered it.
23        Q.   So you didn't speak with

FOSHEE & TURNER COURT REPORTERS

Page 66

1    anybody at the insurance company?

2         A.    I --

3         Q.    You spoke with somebody at

4    Colonial?

5         A.    Colonial, yeah, that's it.

6         Q.    And that's the conversation

7    we've already talked about; is that

8    correct?

9         You've already told me about that

10   conversation with Colonial, or did you

11   have another conversation with Colonial

12   about your insurance?

13        A.    That's the only conversation I

14   believe.  That's the only conversation

15   with Colonial.

16        Q.    That was the only conversation

17   with Colonial, is that correct, that we've

18   already talked about?

19        A.    You confused me.  I'm sorry.

20        Q.    I certainly don't want you to

21   be confused.

22        My understanding from you, and

23   correct me if I'm wrong, is that on Monday

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 67

1    after the accident --

2        A.    Yes.

3        Q.    -- you called Colonial

4    Insurance?

5        A.    Yes.

6        Q.    And we've already talked about

7    what you said in that conversation?

8        A.    Yes.  The policy, would be

9    coverage.

10        Q.    Well, you -- I think you

11    testified that you told them there was an

12    accident; is that correct?

13        A.    Right.

14        Q.    And then I think you testified

15    to me you couldn't remember exactly what

16    the woman said back to you?

17        A.    Right.

18        Q.    Did you have any other

19    conversations with Colonial Insurance

20    after that conversation?

21        A.    No.  I spoke to the lady here

22    (indicating), Lisa Jackson.  And she told

23    me what happened.

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 68

1      Q.    Did you speak with anybody --
2   and I think you've already told me the
3   answer --
4      A.    I didn't speak with anybody
5   else.
6      Q.    Good.  That makes it easier
7   then.
8                    (Whereupon, Defendant's
9                    Exhibit No. 5 was
10                    marked for
11                    identification.)
12      Q.    Mr. Kern, I'm going to show
13   you what I marked as Defendant's Exhibit
14   5.
15      Can you tell me if you've seen that
16   document before?
17      A.    Yes.
18      Q.    Is this a letter that you
19   received from Colonial Insurance dated
20   February 10?
21      A.    February 10, yes.
22      Q.    And it's from Chris Setzer,
23   personal account manager.  Do you know who

FOSHEE & TURNER COURT REPORTERS

Page 69

1    Chris Setzer is?

2        A.    Yes.  I heard his name, yes.

3        Q.    Who have you heard his name

4    from?

5        A.    From my attorney.

6        Q.    And I don't want to know

7    anything --

8        A.    Sorry.

9        Q.    That's okay.  And obviously

10   Mr. Sanspree will tell you this, I don't

11   want to know anything that you have spoken

12   with your attorneys about.  I don't want

13   to know the substance of that.

14       Do you have any independent

15   knowledge of who Chris Setzer is?  Did you

16   speak with Mr. Setzer or Ms. Setzer?

17       A.    No, I didn't speak to him.

18       Q.    Is Chris Setzer a man?

19       A.    A man.

20       Q.    And in this letter -- Will you

21   read for me, please, out loud if you can,

22   the second paragraph starting "I have."

23       A.    I have enclosed a quote for

FOSHEE & TURNER COURT REPORTERS

Page 70

1    replacement coverage with another company.

2    Travelers will not reinstate your policy.

3    This quote is for the same coverage amount

4    you have with Travelers, including the

5    same deductible, and it is for six months.

6         Q.    And then the next paragraph,

7    please.

8         A.    Please let me know what you

9    wish to do as soon as possible.  Please

10   understand you are without any automobile

11   coverage at this time.

12        Q.    And you received this letter,

13   didn't you, from Colonial Insurance?

14        A.    I received this letter.

15        Q.    And you --

16        A.    Go back to this one

17   (indicating).

18        Q.    Yes, sir.  I'm going to have

19   to ask you this question though --

20            MR. SANSPREE:  I think he was

21   answering your question though.

22        A.    Let me -- After I talked to

23   them, I've been busy, you know.  January

FOSHEE & TURNER COURT REPORTERS

Page 71

1    11, I've been busy, and maybe a couple of

2    weeks after that I talked to them.  And

3    they told me to send in eight hundred

4    dollars.

5        Q.    Now, I understood your

6    testimony previously that your

7    conversation you had with the people at

8    Colonial was after you received this offer

9    to reinstate, which is Defendant's Exhibit

10   2, and then it took you several weeks

11   after your conversation before you sent

12   the check in; was that not correct?

13            MR. SANSPREE:  That's not his

14   prior testimony.  He was trying to tell

15   you, but you keep cutting him off before

16   he can finish.

17            You're not doing it on purpose,

18   it's just that he's trying to explain, and

19   I don't think he's understanding what

20   you're saying.

21            MR. ISENBERG:  I think he's

22   understood perfectly, Chris, and I think

23   he's answered the question exactly in his

Page 72

1    testimony with regard to when we were

2    talking about Exhibit 2.

3            MR. SANSPREE:  Well, he's just

4    told you it's different than what you just

5    said.

6            MR. ISENBERG:  Well, it's

7    different than what his prior testimony

8    was, so if he wants to go ahead and change

9    his testimony, he can do that.  But if

10    you'll --

11        Q.    You can explain it to me

12    again, and we'll see if it's consistent

13    with your prior testimony.  Go ahead.

14            MR. SANSPREE:  Go ahead and

15    tell him again what happened.

16        A.    Okay.  I called Colonial.

17    This is past due, I call Colonial --

18            MR. SANSPREE:  When you say

19    this is past due, for the Record --

20        A.    For the Record, January 11,

21    2005.  Must have been a couple of weeks

22    after that I talked to Colonial, and they

23    told me to go ahead and send in the money

FOSHEE & TURNER COURT REPORTERS

Page 73

1    and it will be reinstated, eight hundred

2    dollars.

3         Q.    So -- Go ahead.  I'm sorry.  I

4    don't mean to interrupt you.

5         So is it now your testimony --

6         A.    And this letter is February

7    10.

8         Q.    Mr. Kern, if you'll let me

9    finish my question.

10             MR. SANSPREE:  That's what I

11   was talking about.

12        Q.    Go ahead.  But -- Go ahead and

13   answer the question then.  You can say

14   whatever you'd like to say.

15        A.    Go ahead.  Ask me, go ahead.

16             MR. ISENBERG:  And, Chris, I'm

17   not interrupting the response to the

18   question.  He's --

19             MR. SANSPREE:  He's just not

20   understanding what you're asking him.

21   He's not -- He's -- Just ask him again.

22   I'm not trying to be difficult, but I

23   don't think he's understanding your

92e9c2bd-5d5e-44f2-beac-8eda1e654417

1    questions.

2         Q.    Mr. Kern, at the beginning of

3    this deposition I expressed to you that I

4    would ask you a question, and if you did

5    not understand my question, that I would

6    ask you to tell me that.  Do you remember

7    me telling you that?

8              MR. SANSPREE:  Can I get an

9    objection?  I would object to that

10   because, first, that calls for him to

11   first realize that he doesn't understand

12   your question, so he may misunderstand the

13   question and answer it had a certain way.

14   You see what I'm saying?  And then realize

15   that he has misunderstood the question.

16             So he can't ask you to re-ask

17   the question unless he first realizes that

18   there's a misunderstanding there.

19             That's the objection.

20        Q.    Mr. Kern, you'll recall that

21   at the beginning of the deposition I

22   expressed to you that I was going to ask

23   you some questions and if you didn't

FOSHEE & TURNER COURT REPORTERS

Page 75

1    understand them, I'd asked you to let me

2    know.  But I assumed if you answered the

3    question you understood that, do you

4    recall me telling you that?

5              MR. SANSPREE:  Same objection.

6         Q.    You can answer.

7              MR. SANSPREE:  You can answer.

8         A.    I recall that, yes.

9         Q.    And you've answered my

10   questions so far.  And so I want to go now

11   and give you a full opportunity to say

12   whatever it is you want to say with regard

13   to my questions on these documents.

14        If you want to tell me again, and

15   we'll see if it's consistent with your

16   prior testimony, this offer to reinstate

17   was dated December 22, 2004, correct?

18        A.    Correct.

19        Q.    We're talking about

20   Defendant's Exhibit 2.

21        Do you recall when you spoke to

22   Colonial Insurance about this offer to

23   reinstate?

FOSHEE & TURNER COURT REPORTERS

Page 76

1    A.    About a couple of weeks after

2    that, after January 11.

3    Q.    So your testimony now is that

4    you spoke to somebody at Colonial

5    Insurance?

6    A.    Colonial Insurance, yes.  They

7    told me to send in eight hundred dollars,

8    my policy will be reinstated.

9    Q.    And your testimony now is that

10   that conversation was after January 11?

11   A.    Yes.  I was busy.

12   Q.    Yes, sir, I understand you're

13   very busy.  And you were busy -- Were you

14   too busy to call Colonial or after you

15   spoke to Colonial were you too busy to

16   send the check in or was it both?

17   MR. SANSPREE:  Object to the

18   form of the question.

19   Q.    Do you recall with whom you

20   spoke after January 11, if that's your

21   testimony now?

22   Who did you speak to at Colonial

23   Insurance after -- Who told you to send

FOSHEE & TURNER COURT REPORTERS

Page 77

1    the premium check in?

2          A.    I don't recall.

3          Q.    Was it a man or a woman?

4          A.    Lady.

5          Q.    When you called, did you call

6    the main number?

7          A.    Called the Colonial number.

8          Q.    Yes, sir.  Did you call

9    just --

10              MR. SANSPREE:  He's asking, did

11   you call Colonial's main number when you

12   called?

13         A.    Yes.

14         Q.    Did you ask to speak to

15   somebody in particular?

16         A.    No.

17         Q.    Did you give them a policy

18   number?

19         A.    I asked them I got this

20   letter, and they say just send in the

21   eight hundred dollars and my policy should

22   be reinstated.

23         Q.    Did they -- Did the person who

FOSHEE & TURNER COURT REPORTERS

Page 78

1   answered the phone answer your question or

2   did that person transfer you to somebody

3   else?

4        A.    They answered my question.

5        Q.    The person who answered the

6   phone?

7        A.    Yes.

8        Q.    To get back to my question, I

9   was asking you about, and I appreciate the

10  fact that now you've -- I'm glad you've

11  been able to answer that to your

12  satisfaction.

13       To get back to my question I was

14  asking you about, which is on Defendant's

15  Exhibit 5, the last two paragraphs there

16  from Chris Setzer of Colonial that you

17  read, it is my understanding -- I think my

18  question was whether you received a copy

19  of this letter.  And since it was produced

20  to me by you and your lawyer, I'm assuming

21  the answer is yes; is that correct?

22       A.    Yes.

23       Q.    Did you respond to Chris

FOSHEE & TURNER COURT REPORTERS

Page 79

1    Setzer's statement in the second paragraph

2    regarding a quote for other insurance?

3         A.    I didn't contact him.  I let

4    my -- I let Gary contact him.

5         Q.    Your attorney?

6         A.    My attorney.

7         Q.    You understand here in

8    paragraph two that it says that Chris

9    Setzer is enclosing a quote for

10   replacement coverage with another company,

11   do you understand that?

12        A.    You know, this is February

13   10 --

14        Q.    Mr. Kern, if you would --

15        A.    Please let me finish.  I'm

16   sorry.

17        Okay.  The accident happened

18   February 5, this is February 10 they send

19   me a letter.

20        Q.    Yes, sir.  I understand that

21   clearly.

22        And you've admitted that you

23   received the letter on February 10,

FOSHEE & TURNER COURT REPORTERS

Page 80

1    there's no dispute when the accident

2    happened.  My question to you is -- is not

3    with regard to the date of the accident at

4    all.  My question to you, if you'll listen

5    to the question closely, is whether you

6    will acknowledge that in this letter, in

7    this second paragraph, this Chris Setzer

8    is enclosing a quote for other insurance

9    coverage to you; is that correct?

10        A.    I thought I still had my old

11   policy because --

12        Q.    No, sir.  My question to you

13   was --

14            MR. SANSPREE:  Without arguing

15   with him, we'll stipulate that the letter

16   says what it says.

17        A.    Yeah.  It say what it say.

18        Q.    Did -- I understand this

19   letter says what it says.

20            But, Mr. Kern, you understood that

21   at this point Colonial Insurance in this

22   letter was saying that there was no

23   coverage under the Travelers policy, do

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 81

1    you understand that?

2        I'm not saying that was your

3    position, but I'm telling you -- I'm

4    asking you, in this letter that the

5    statement is there is no coverage.

6        A.    Dated February 10, that's well

7    after the accident.

8        Q.    You understand here that

9    Mr. Setzer was offering you other

10   insurance coverage for the same coverage

11   amounts with Travelers; isn't that

12   correct?

13       A.    Offer me after the accident?

14       Q.    Yes, sir.  On February 10.

15       A.    I don't --

16           MR. SANSPREE:   Answer the

17   question.  He's offering additional

18   insurance.

19       A.    Additional insurance, yes.

20       Q.    And as far as you know,

21   neither you nor your attorneys ever

22   responded to Mr. Setzer taking him up on

23   another insurance; is that correct?

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 82

1          A.    We already have this policy,

2    why we want to get another insurance for?

3          Q.    Is that your answer, Mr. Kern?

4               MR. SANSPREE:  He did have an

5    attorney respond.  The next logical

6    question would be why.  You would get into

7    attorney-client privilege.

8               MR. ISENBERG:  And you know I

9    certainly don't want to do that.

10          Q.    Mr. Kern, do you currently

11    have a driver's license?

12          A.    No, I don't.

13          Q.    When did you lose your

14    driver's license?

15          A.    When -- In --

16               MR. SANSPREE:  I don't know.

17    He lost it as a result of the accident,

18    for not having coverage for the accident.

19          A.    Yes.

20               MR. SANSPREE:  So obviously it

21    will be after the accident.

22          Q.    Mr. Kern, was it after

23    February 10, 2005, that you lost your

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 83

1    driver's license, after the date of this

2    letter?

3              MR. SANSPREE:  It was after --

4    Yes, Joel.  I don't know if he knows.

5    I'll let him answer, but, yeah, it was

6    after that.  See, that coverage wouldn't

7    apply.

8              MR. ISENBERG:  Chris, I

9    appreciate whatever you're saying, but

10   you're not here to testify.  I'm just

11   asking him fact questions.  Whatever

12   arguments you want to make -- I'm not

13   saying we're necessarily arguing here, but

14   legal arguments you want to make, I'm just

15   asking him questions.

16             MR. SANSPREE:  I'm just trying

17   to point out to you, I'm not trying to

18   argue with you or anything.  I'm just

19   saying the new coverage here wouldn't

20   cover the old wreck.  He still will lose

21   his license.

22        A.    Exactly.

23        Q.    Do you have automobile

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 84

1    insurance coverage now?

2         A.    No, I don't.

3         Q.    How long has your driver's

4    license -- Is your driver's license

5    suspended?

6         A.    Yes.

7         Q.    For how long?

8         A.    Until this case is done with.

9         Q.    How do you know that?

10        A.    Because they offer me -- To

11   reinstate my driver's license, I have to

12   pay the damage for Lisa Jackson, almost

13   eight thousand dollars, to reinstate my

14   driver's license.  And I don't have that

15   money.

16        Q.    Is the reinstatement of your

17   driver's license -- So that's what you

18   would have to do is pay the money, not

19   show that you had insurance at the time;

20   is that correct?

21        A.    No.  Pay the damage of her

22   car, get a letter from her that say -- she

23   say, you know --

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 85

1    Q.    And that you could get your
2    driver's license?
3    A.    Driver's license and -- you
4    know, and insurance for automobile.  Have
5    to go through all of that again.
6    Q.    I'm going to try this just one
7    more time, and it's a real simple
8    question, it's a yes or no answer I
9    believe.
10    Mr. Setzer, in paragraph two of this
11    letter, enclosed a quote for auto
12    insurance coverage.  Did you accept that
13    quote for automobile insurance coverage?
14    MR. SANSPREE:  Object to the
15    form.
16    A.    Tell you the truth, I didn't
17    even pay attention to this letter, okay.
18    Because after the fact it's February 10 on
19    the date.
20    (Whereupon, Defendant's
21    Exhibit No. 6 was
22    marked for
23    identification.)

FOSHEE & TURNER COURT REPORTERS

Page 86

1      Q.   Mr. Kern, I've marked a

2   document as Exhibit 6.  This is a copy of

3   an eight-hundred-dollar check that you

4   received from Travelers Insurance, or

5   Standard Fire Insurance.

6           MR. SANSPREE:  Are you asking

7   him --

8      Q.   Did he answer it?

9           MR. SANSPREE:  I thought it was

10  just a statement.  You just said this is a

11  copy.

12          MR. ISENBERG:  I'm sorry, I

13  thought I asked a question.

14     Q.   Is this a copy of a check you

15  received?

16     A.   Yes.

17     Q.   Refunding the eight hundred

18  dollars?

19     A.   Uh-huh (positive response).

20     Q.   Did you have any conversations

21  or personal conversations with anybody at

22  Travelers or Standard Fire with regard to

23  their policy on the refund of this money?

FOSHEE & TURNER COURT REPORTERS

Page 87

1    A.    No.

2    Q.    Did you cash that check?

3    A.    No.

4    Q.    What happened with the check?

5    A.    I gave it to my attorney.

6    Q.    Do you know what he did with

7    it?

8         MR. SANSPREE:  The original, I

9    still have it.

10        MR. ISENBERG:  You still have

11   it?

12        MR. SANSPREE:  Yeah.

13   I take that back, or either Gary has

14   it.  I don't know if I've actually got the

15   original or not.

16   A.    Actually, they sent me two of

17   them, two checks.

18   Q.    Did you return the first one

19   or do you have both of them?

20   A.    I believe I've got both of

21   them with my attorney, gave it to my

22   attorney.

23                 (Whereupon, Defendant's

FOSHEE & TURNER COURT REPORTERS

Page 88

1          Exhibit No. 7 was

2          marked for

3          identification.)

4     Q.    Mr. Kern, I'm showing you a

5  document I've marked as Defendant's

6  Exhibit 7.  It's a letter from Rick

7  Finchum at Travelers to Gary Atchison, who

8  was your attorney; is that correct?

9     A.    Yes.

10    Q.    Have you seen a copy of this

11 letter?

12    A.    No.

13          (Whereupon, Defendant's

14          Exhibit No. 8 was

15          marked for

16          identification.)

17    Q.    Mr. Kern, I'm going to show

18 what you I've marked as Defendant's

19 Exhibit 8.  Have you seen a copy of that

20 letter?

21    A.    No, I haven't seen it before.

22    Q.    You have not seen that?

23    A.    No.

FOSHEE & TURNER COURT REPORTERS

Page 89

1       Q.    And that's a letter dated --

2             MR. SANSPREE:  May 19.

3       Q.    -- May 19, 2005, to your

4   attorney Gary Atchison; is that correct?

5       A.    Uh-huh (positive response).

6                       (Whereupon, Defendant's

7                       Exhibit No. 9 was

8                       marked for

9                       identification.)

10      Q.    I'll show you what I've marked

11  as Defendant's Exhibit 9, it's a June 10,

12  2005, letter to Mr. Atchison.  Have you

13  ever seen that letter?

14      A.    No.

15      Q.    Mr. Kern, other than the --

16  other than the conversation that we've

17  spoken about, have you had any other --

18  have you had any other communications with

19  anybody at Colonial Insurance regarding

20  your automobile coverage?

21      A.    No.

22      Q.    And you've never had any

23  conversations with anybody at Standard

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 90

1    Fire or Travelers?

2         A.    I just let Gary talk with

3    them.

4         Q.    Yes, sir.  But you personally

5    have never had any conversations with

6    them?

7         A.    After the accident I never had

8    a conversation.

9         Q.    And I understood from your

10   prior conversation, you spoke to --

11        A.    Yes.  After they send the

12   check back in, talk to Gary, that's it.

13        Because I knew they send the check

14   in, policy.

15                      (Whereupon, Defendant's

16                      Exhibit No. 10 was

17                      marked for

18                      identification.)

19        Q.    Mr. Kern, I want to show you

20   what I've marked as Defendant's Exhibit

21   10.  This is a copy of -- I'll ask you, is

22   this a copy of your responses to

23   Defendant's Interrogatories in this case?

FOSHEE & TURNER COURT REPORTERS

Page 91

1      A.    Yes.

2      Q.    In number two you were asked

3  to identify and describe every

4  communication you've had with Standard

5  Fire or its agents.

6           MR. SANSPREE:  I was pointing

7  to where you were reading.

8      Q.    And your response was you

9  cannot recall each and every communication

10  you've had, but you're sure you've spoken

11  with them several times about the accident

12  and policy.

13      Are there any other communications

14  other than the ones we've talked about

15  today that are responsive to this request?

16  Or have you told me about every

17  communication you've had with Colonial?

18      A.    I don't recall.

19      Q.    You don't know of any others;

20  is that correct?

21      A.    It's been a year.

22      Q.    Same thing for number three --

23           MR. SANSPREE:  Joel, can I just

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 92

1    ask, communication implies written or

2    oral, if you want to break it down.

3              MR. ISENBERG:  Well, here,

4    Chris, number two, your office or Mr. Kern

5    answered that he's only sure he has spoken

6    with them --

7              MR. SANSPREE:  Okay, I see what

8    you're saying.  So he admitted it.

9              MR. ISENBERG:  And it's my

10   understanding that he only spoke to the

11   Colonial people not directly to Standard

12   Fire, which is what he's testified.

13             MR. SANSPREE:  I don't think

14   he's ever called Travelers.

15             MR. ISENBERG:  I just wanted to

16   make sure we're clear on that.

17        Q.    Same thing with number three,

18   this is with regard to Colonial Insurance,

19   Mr. Kern says that he's sure he's spoken

20   with them on several times during the

21   accident -- spoke to them several times

22   regarding the accident and policy.

23             I just need to know if there's any

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 93

1   other communications that we've not

2   already spoken about?

3        A.    Say again, I'm sorry.

4        Q.    Sure.  Other than what we've

5   already talked about, can you think of any

6   other conversations you have had with

7   Colonial?

8        A.    I don't recall.  I don't

9   remember.

10       Q.    Mr. Kern, what's the policy

11  period for the insurance policy you made

12  the claim under in this case?

13       A.    Policy period?

14       Q.    Yes, sir.  When did the policy

15  begin and when did the policy end?

16       A.    I have to go look at --

17  11/11/04, is that what it is?  I don't

18  recall.

19       Q.    Well, that's what I'm asking

20  you.  Because your position, I believe, is

21  that there's a policy in place, and I just

22  need to understand from you what you think

23  the policy periods were that covered this

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 94

1    accident?

2        A.    I don't understand the

3    question.

4        Q.    Well, if you -- We'll go back

5    to Defendant's Exhibit 1.  The effective

6    date of this policy was 11/11/03 and the

7    expiration date was 11/11/04.  You made --

8    You wrote a check on January 27, 2005 --

9        A.    Okay.

10        Q.    -- for eight hundred dollars.

11    What is the policy period that you were

12    making any sort of payment for?

13        A.    If you go back to look at this

14    policy, I paid them like a year.

15        Q.    Through 11/11/04.

16        A.    Right.  From this period to

17    this period, 11/11/03 to 11/11/04.

18        Q.    Yes, sir.  And the accident

19    was on what date?

20        A.    February 5, 2005.

21        What you trying to get -- I'm

22    confused on your question.

23            MR. ISENBERG:  Will you read

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 95

1   the question back, please.

2                    (Requested portion was

3                    read back.)

4        A.    I made payment for?

5        Q.    Yes, sir.

6        A.    For the automobile.

7        Q.    What was the effective date of

8   that policy that you claim you were making

9   a payment on?

10       A.    Effective date.  Say to

11  reinstate your policy, we must receive at

12  least the minimum amount due.

13       Q.    By which date?

14       A.    By 01/11/05.  Say minimum

15  amount due.

16                    (Whereupon, Defendant's

17                    Exhibit No. 11 was

18                    marked for

19                    identification.)

20       Q.    Mr. Kern, I'm going to show

21  you a document that I've marked as

22  Defendant's Exhibit 11.

23            Can you identify that for me?

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 96

1    A.    Yes.  This is how much I paid

2  to get my car fixed.

3    Q.    Is this the amount for damage

4  to your car that you're claiming in this

5  lawsuit?

6    A.    Yes.  This damage that I

7  already paid for.

8    Q.    Is there any other damage to

9  your car that you're claiming in this

10  lawsuit?

11    A.    Other than the lady that I --

12    MR. SANSPREE:  That's why he

13  said your car.  Listen to the question.

14    A.    I'm sorry.

15    Q.    To your car.

16    A.    My car, that was the damage.

17    Q.    Those are all the damages,

18  okay.

19    I'll show you what I've marked as

20  Defendant's Exhibit 12, and this is a

21  document that you and your lawyers have

22  produced to us.

23    Do you recognize this document?

FOSHEE & TURNER COURT REPORTERS

Page 97

1                    (Whereupon, Defendant's

2                    Exhibit No. 12 was

3                    marked for

4                    identification.)

5           MR. SANSPREE:  He may not have

6    ever seen this, Joel.  This is going to be

7    -- This is the damage that he's claiming

8    on it.

9           Q.    I just want to make sure we're

10   clear, that the damage that you're

11   claiming for Lisa Jackson's --

12           MR. SANSPREE:  It's Lisa

13   Jackson.

14           Q.    -- car is five thousand four

15   hundred eighty-three dollars and fifty

16   cents; is that correct?

17           A.    When I spoke to her, she says

18   it's like seven thousand, her car is

19   total; to pay off her car is seven

20   thousand and something.

21           Q.    Are you making a claim for

22   those damages in this lawsuit or is it

23   limited to five thousand four hundred and

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 98

1    eighty-three dollars and fifty cents?

2         A.    To reinstate my driver's

3    license, cost almost eight thousand

4    dollars.

5              MR. ISENBERG:  Let's go off the

6    Record for a second.

7                   (Off the Record.)

8              MR. ISENBERG:  Back on.

9         Q.    Mr. Kern, I just want to

10   direct you to interrogatory eleven on

11   Defendant's Exhibit 10.  And in there you

12   identify approximately twenty-one hundred

13   dollars as damage to your vehicle, and

14   approximately fifty-five hundred dollars

15   as the damage to Lisa Jackson's vehicle.

16         It's my understanding from your

17   attorney that this is the amount that will

18   satisfy Ms. Jackson.

19         So can we operate off the assumption

20   that this is the damage you were claiming

21   in this case?

22         A.    Yes.  Also another lady

23   that -- Lisa Threatt --

FOSHEE & TURNER COURT REPORTERS

Page 99

1          MR. SANSPREE:  That's who he's

2     talking about.

3          A.    No.  This is Jackson.  Annette

4     Threatt, the third party, also sent me a

5     letter --

6          MR. SANSPREE:  I've never seen

7     that one.

8          A.     -- that she claiming her

9     damage is eight hundred and something

10    dollars, almost a thousand dollars, to fix

11    her vehicle.

12         Q.    Can you provide that to

13    Mr. Sanspree and he can provide that to

14    me?

15         A.    Okay.

16         MR. SANSPREE:  And we can

17    assume that the interrogatory responses

18    are supplemented since it's federal court?

19         MR. ISENBERG:  Yeah.  If you

20    can get me that, that will be sufficient.

21    Just send it with a cover letter

22    explaining it.

23         MR. SANSPREE:  I can do that.

FOSHEE & TURNER COURT REPORTERS

Page 100

1      Q.    You think it's about nine

2  hundred dollars then?

3      A.    Eight hundred and something,

4  almost nine hundred dollars for that lady.

5      Q.    Mr. Kern, other than those

6  items of damage we've talked about, are

7  you claiming any other damage in this

8  lawsuit?

9      A.    Tell you the truth, I can't go

10  see my kids now because I'm afraid to

11  drive up there.  It's been a year.

12      Q.    You've not seen your children

13  in a year?

14      A.    They were here last summer,

15  that was it.  Usually I go up there to see

16  them, I drive up there to see my kids.

17      Q.    How often would you drive up

18  to see your children normally?

19      A.    Spring break, happy holiday on

20  Christmas and summer, they came stay with

21  me for the whole summer.

22      Q.    So your children were here

23  during the summer?

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 101

1    A.    Yes.

2    Q.    And we've not had spring break

3  yet, so it just would have just been at

4  the holidays?

5    A.    Yeah.  Holidays, I didn't go

6  see them.

7    Q.    Did you offer to bring them

8  here?

9    A.    Yes.  But their mother got a

10  restaurant too.  And restaurant business

11  is twenty-four to seven, you know.

12    Q.    Very busy?

13    A.    Very busy.

14    Q.    Anything else?

15    A.    Anything else?  I thought I'd

16  be covered.  I paid my money, I thought

17  there would be coverage.

18    Q.    And that's your claim here, is

19  that correct, against Standard Fire is

20  that you claim that there was a policy and

21  they didn't pay under the policy?

22    A.    They didn't -- Yeah.  After

23  the accident, I pay my money, I write my

FOSHEE & TURNER COURT REPORTERS

Page 102

1    check, they cashed my check, I thought my

2    policy is good, reinstate, whatever you

3    want to call it.  And after the accident,

4    they returned my check.

5            Q.    Any other damages you're

6    claiming?

7            A.    I'm losing sleep over it.

8            Q.    Have you seen a doctor about

9    that?

10           A.    No.

11           Q.    Taking any medication for it?

12           A.    No.

13           Q.    Have you seen a counselor or

14    therapist?

15           A.    No.  I should have.

16           Q.    But you haven't?

17           A.    No.  Too busy working.

18           Q.    Have you been involved in any

19    other lawsuits?

20           A.    No.

21           Q.    You've never sued anybody?

22           A.    No.

23           Q.    Have you ever been sued by

FOSHEE & TURNER COURT REPORTERS

Page 103

1    anybody?

2           A.    I don't recall, no.

3           Q.    Have you ever been arrested?

4           A.    Yes, I've been arrested

5    before.

6           Q.    When was that?

7           A.    Couple of years ago I believe.

8    Yeah, couple of years ago.  Between me and

9    my ex-wife.

10          Q.    Was that here in Montgomery?

11          A.    Here in Montgomery.  An

12   altercation.  We end up living separate

13   ways, we go our own life.  She open her

14   business and I operate mine and that's it.

15          Q.    Were any charges filed against

16   you?

17          A.    All dropped.

18          Q.    Were there any charges filed

19   against you?

20          A.    They all dropped.

21          MR. SANSPREE:  Listen to his

22   question.  He just wants to know if they

23   were filed.  We understand they may have

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 104

1    been dropped.  He wants to know were any

2    filed.

3         A.    Filed, like --

4              MR. SANSPREE:  What were you

5    charged with when you were arrested?

6         A.    Domestic violence.

7         Q.    Was that Montgomery police or

8    sheriff?

9         A.    Montgomery police.

10        Q.    The charges were ultimately

11   dropped?

12        A.    Yes.

13        Q.    Any other arrests?

14        A.    Like when I was eighteen.

15   That's eighteen, nineteen, that's a long

16   time ago.  DUI.

17        Q.    Where was that?

18        A.    Indiana.

19        Q.    Were you convicted?

20        A.    Yeah.  I pay my fine, went to

21   class for it, yes.

22        Q.    Any other arrests?

23        A.    That's about it.

FOSHEE & TURNER COURT REPORTERS

Page 105

1       Q.    And have you ever filed for

2    bankruptcy?

3       A.    No.

4       Q.    Either personally or as a

5    business?

6       A.    Never.

7             MR. ISENBERG:  Give me about

8    five minutes, I think I'm done.

9                      (Recess was taken.)

10            MR. ISENBERG:  That's all I've

11   got.  Unless, Chris, you've got something.

12            MR. SANSPREE:  Hang on one

13   second.

14                 EXAMINATION

15   BY MR. SANSPREE:

16      Q.    Mr. Kern, on Exhibit 1 you've

17   testified that there's an effective date

18   of 11/11/03, 11/11/04 is the expiration

19   date?

20      A.    Yes.

21      Q.    And you see on -- You've

22   already testified previously that

23   Defendant's 2 informed you that if you

FOSHEE & TURNER COURT REPORTERS

Page 106

1    paid the minimum amount of premium by

2    January 11, 2005, your policy would be

3    reinstated?

4         A.    Yes.

5         Q.    The January 11, 2005, date is

6    after the 11/11/04?

7         A.    Right.

8         Q.    What was your understanding if

9    you paid the premium after the 11/11/04?

10   What was your policy period if you paid

11   the premium after that date?

12            MR. ISENBERG:  I'm going to

13   object.

14        Q.    Go ahead.

15        A.    Be renewed.

16        Q.    What does that mean to you?

17        A.    Mean be 11/11/05.

18        Q.    And did you -- And you've

19   testified previously that you contacted

20   Colonial?

21        A.    Yes.

22        Q.    After the January 11, 2005,

23   date?

FOSHEE & TURNER COURT REPORTERS

Page 107

1       A.      Yes.

2       Q.      And Colonial instructed you to

3   send in --

4       A.      -- eight hundred dollars.

5       Q.      And did you do that?

6       A.      Yes, I did.

7       Q.      And once you sent in that

8   eight hundred dollars, what was your

9   understanding of your coverage?

10      A.      It would be reinstated without

11  interruption.

12      Q.      And just for the Record,

13  everybody you've dealt with regarding this

14  insurance would be at Colonial Insurance

15  Company or Colonial Insurance Agency,

16  correct?

17      A.      Right.

18          MR. SANSPREE:   That's all I've

19  got.

20          MR. ISENBERG:   I have just a

21  few more questions.

22          EXAMINATION CONTINUED

23  BY MR. ISENBERG:

FOSHEE & TURNER COURT REPORTERS

Page 108

1      Q.    Mr. Kern, this conversation

2   you said you had with somebody at Colonial

3   after January 11, 2005, do you have any

4   notes of that conversation?

5      A.    Just the phone conversation,

6   no notes.

7      Q.    You didn't make any notes at

8   the time you spoke with somebody there?

9      A.    No.

10     Q.    How do you know that it was

11  after January 11, 2005?

12     A.    How do I know?

13     Q.    Yes, sir.  If you received the

14  notice December 22, 2004, how do you know

15  it was after January 11, 2005?

16     A.    Repeat the question again.

17     Q.    Sure.  Earlier in the day you

18  said you couldn't remember when you talked

19  to them, then your testimony became that

20  you were certain that it was after January

21  11, 2005.

22     My question to you is how can you be

23  so certain that it was after January 11,

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 109

1    2005, that you spoke to Colonial?

2         A.    I don't understand what you --

3              MR. ISENBERG:  Would you read

4    my question back, please.

5                   (Requested portion was

6                    read back.)

7         A.    I got this letter and a couple

8    of weeks after that I called them, and

9    they said to send in money, and it will be

10   reinstated, don't worry about it.

11        Q.    And the letter you're talking

12   about is the one that's dated December 22,

13   2005, is that correct?

14        A.    December 22 --

15        Q.    2004, excuse me.

16        A.    2004, yes.

17        Q.    Do you know what day it was

18   that you spoke to the people at Colonial

19   about this?

20        A.    No, I don't.

21        I spoke to a lot of people every

22   day.  I'm sorry.

23        Q.    You can't remember exactly

92e9c2bd-5d5e-44f2-beac-8eda1e654417

FOSHEE & TURNER COURT REPORTERS

Page 110

1    when it was; is that correct?

2           A.     (Witness nods head

3    affirmatively.)

4           Q.     Is that correct?

5           A.     That's correct.  I can't

6    remember.

7                  MR. ISENBERG:  That's all I

8    have.

9    (The deposition of Weelapan Kern was

10    concluded at 12:15 p.m. on March 1,

11    2006.)

12

13

14

15

16

17

18

19

20

21

22

23

FOSHEE & TURNER COURT REPORTERS

Page 111

C E R T I F I C A T E

STATE OF ALABAMA          )

AUTAUGA COUNTY            )


     I do hereby certify that the above
and foregoing transcript was taken down by
me in stenotype, and the questions and
answers thereto were transcribed by means
of computer-aided transcription, and that
the foregoing represents a true and
correct transcript of the testimony given
by said witness.

     I further certify that I am neither
of counsel, nor of any relation to the
parties to the action, nor am I anywise
interested in the result of said cause.




                         Anita Thebo, Certified
                         Shorthand Reporter and
                         Commissioner for the
                         State of Alabama at
                         Large.